**ORAL ARGUMENT NOT YET SCHEDULED**

No. 14-5326

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE CONFEDERATED TRIBES OF THE GRAND RONDE
COMMUNITY OF OREGON,

*Appellant,*

CLARK COUNTY, WASHINGTON, IN CASE NO.:
13-CV-850, ET AL.,

*Appellees,*

v.

SALLY JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF
THE UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,

*Appellees,*

Appeal from the United States District Court
for the District of Columbia
No. 13-cv-849-NJR

## BRIEF OF APPELLANT THE CONFEDERATED TRIBES
## OF THE GRAND RONDE COMMUNITY OF OREGON

Lawrence S. Robbins
Gary A. Orseck
Daniel N. Lerman
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
lrobbins@robbinsrussell.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a), the following is a statement of the parties, *amici*, rulings under review, and related cases.

**A.    Parties and Amici:**  Appellant is the Confederated Tribes of the Grand Ronde Community of Oregon.  The Confederates Tribes of the Grand Ronde Community of Oregon is not a corporation and no parent company or publicly held company has a 10% or greater ownership interest in Appellant.

Clark County, Washington; the City of Vancouver, Washington; Citizens Against Reservation Shopping; Al Alexanderson; Greg Gilbert; Susan Gilbert; Dragonslayer, Inc.; and Michels Development, LLC, are Appellants in No. 15-5033, which has been consolidated with this case.

Appellees are Sally Jewell, in her official capacity as Secretary of the U.S. Department of the Interior; Kevin Washburn, in his official capacity as Assistant Secretary – Indian Affairs, U.S. Department of the Interior; and Stanley M. Speaks, in his official capacity as Regional Director, Northwest Region, Bureau of Indian Affairs.

The Intervenor for Appellees is the Cowlitz Indian Tribe.

The following appeared as *amici* in the district court proceedings: City of La Center, Washington; Confederated Tribes of the Warm Springs Reservation of

Oregon; Samish Indian Nation; United South and Eastern Tribes, Inc.; Jamestown S'Klallam Tribe; and Chinook Nation.

     **B.**    **Rulings Under Review:** The rulings under review are the Order, JA0103, and Memorandum Opinion, JA0104-60, issued by Judge Barbara J. Rothstein on December 12, 2014, in *Confederated Tribes of the Grand Ronde Community of Oregon* v. *Jewell*, 75 F. Supp. 3d 387 (D.D.C. 2014) (Doc. Nos. 84, 85).

     **C.**    **Related Cases:**    This case was consolidated with No. 15-5033 on the Court's own motion.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,  AND RELATED CASES ............ i

TABLE OF AUTHORIES ................................................................ vi

GLOSSARY ................................................................................ xi

STATEMENT OF JURISDICTION...................................................1

STATEMENT OF THE ISSUES.......................................................1

STATUTES AND REGULATIONS ..................................................1

PRELIMINARY STATEMENT ......................................................1

STATEMENT OF THE CASE.........................................................3

I.     STATUTORY FRAMEWORK ................................................3

II.    FACTS AND PROCEDURAL HISTORY .................................4

       A.   Background...............................................................4

       B.   The Record Of Decision.............................................6

       C.   The District Court's Opinion.......................................7

SUMMARY OF ARGUMENT .......................................................8

ARGUMENT .............................................................................9

I.     STANDARD OF REVIEW ....................................................9

II.    THE  SECRETARY  LACKED  AUTHORITY  TO  TAKE  TRUST
       TITLE TO THE PARCEL....................................................10

       A.   The Cowlitz Were Not A "Recognized Indian Tribe" Within The
            Meaning Of The IRA ...............................................10

            1.   The IRA Authorizes The Secretary To Take Land In Trust
                 Only For Indian Tribes That Were "Recognized" In 1934...............11

iii

# TABLE OF CONTENTS—Cont'd

**Page**

(a) The IRA's Text. ...........................................................................11

(b) Legislative History. ...................................................................15

(c) Judicial Decisions. .....................................................................16

(d) Prior Agency Interpretations. ....................................................18

2. The Cowlitz Were Not A "Recognized Indian Tribe" In 1934 .........19

(a) The Term "Recognized Indian Tribe" Refers To Political—Not "Cognitive"—Recognition. ...............................19

(b) The Cowlitz Were Not Politically Recognized In 1934. ...........20

B. The Cowlitz Were Not "Under Federal Jurisdiction" In 1934...............21

1. The Meaning Of "Under Federal Jurisdiction" ..................................22

2. The Cowlitz Were Not "Under Federal Jurisdiction" In 1934 Because They Were Terminated As A Tribe As Of That Date .........24

3. The Cowlitz Were Not "Under Federal Jurisdiction" In 1934 Because They Had No Government-To-Government Relationship With The United States As Of That Date ....................28

4. Until This Case, The Department Had Consistently Determined That The Cowlitz Were Not Under Federal Jurisdiction In 1934 .........................................................................................30

5. The Secretary's Own "Two-Part Inquiry" Demonstrates That The Cowlitz Were Not "Under Federal Jurisdiction" In 1934 .........32

III. THE COWLITZ DO NOT HAVE "SIGNIFICANT HISTORICAL CONNECTIONS" TO THE PARCEL ITSELF, AND THUS ARE NOT ENTITLED TO ENGAGE IN GAMING UNDER IGRA .................35

A. The "Initial Reservation" Exception Requires "Significant Historical Connections" To The Parcel *Itself* .........................................36

iv

## TABLE OF CONTENTS—Cont'd

**Page**

B.   Under These Standards, The Cowlitz Are Not Entitled To Have Gaming On The Parcel ........................................................... 42

CONCLUSION ......................................................................................... 49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORIES

**Page(s)**

## Cases

*California Valley Miwok Tribe* v. *United States*,
515 F.3d 1262 (D.C. Cir. 2008) .........................................................19

* *Carcieri* v. *Salazar*,
555 U.S. 379 (2009) .............................. 2, 4, 10, 11, 14, 17, 20, 21, 24, 28, 30, 33

*Cherokee Nation* v. *State of Georgia*,
30 U.S. 1 (1831) ................................................... 22, 23, 24

*Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ........................................ 10, 18, 31, 32

*Citizens Exposing Truth About Casinos* v. *Norton*,
No. 02-1754, 2004 WL 5238116 (D.D.C. Apr. 23, 2004),
aff'd, 492 F.3d 460 (D.C. Cir. 2007).................................................41

*City of Sault Ste. Marie* v. *Andrus*,
532 F. Supp. 157 (D.D.C. 1980) .......................................17

*Comau, Inc.* v. *Nat'l Labor Relations Bd.*,
671 F.3d 1232 (D.C. Cir. 2012) .........................................48

*Comm'r* v. *Clark*,
489 U.S. 726 (1989) ...........................................................40

*Dickman* v. *Comm'r*,
465 U.S. 330 (1984) ...........................................................17

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ...........................................................21

*FDA* v. *Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ...........................................................14

*Heckman* v. *United States*,
224 U.S. 413 (1912) ...........................................................23

* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES—Cont'd

**Page(s)**

*King Broad. Co.* v. *FCC*,
860 F.2d 465 (D.C. Cir. 1988) ................................................................ 18, 29, 32

*Maynor* v. *Morton*,
510 F.2d 1254 (D.C. Cir. 1975) ........................................................................16

*Morton* v. *Mancari*,
417 U.S. 535 (1974) ..........................................................................................20

*New Hampshire* v. *Maine*,
532 U.S. 742 (2001) .................................................................................... 21, 25

*Ramaprakash* v. *F.A.A.*,
346 F.3d 1121 (D.C. Cir. 2003) .......................................................................48

*Rodriguez de Quijas* v. *Shearson/American Express, Inc.*,
490 U.S. 477 (1989) ..........................................................................................18

*SEC* v. *Chenery Corp.*,
318 U.S. 80 (1943) ............................................................................................18

*Stand Up For California!* v. *Dep't of the Interior*,
919 F. Supp. 2d 51 (D.D.C. 2013) ...................................................................28

*TOMAC* v. *Norton*,
433 F.3d 852 (D.C. Cir. 2006) ................................................................. 9, 25, 27

*Truscott* v. *Hurlbut Land & Cattle Co.*,
73 F. 60 (9th Cir. 1896) ....................................................................................23

* *United States* v. *John*,
437 U.S. 634 (1978) ......................................................................... 10, 13, 16, 27

*United States* v. *State Tax Comm'n of Miss.*,
535 F.2d 300 (5th Cir. 1976) ............................................................................15

*United States* v. *State Tax Comm'n of Miss.*,
505 F.2d 633 (5th Cir. 1974) ..................................................................... 16, 17

# TABLE OF AUTHORITIES—Cont'd

**Page(s)**

*United States* v. *Washington*,
476 F. Supp. 1101 (W.D. Wash. 1979) ...............................................23

*Village of Barrington* v. *Surface Transportation Bd.*,
636 F.3d 650 (D.C. Cir. 2011) ...............................................32

*Worcester* v. *State of Georgia*,
31 U.S. 515 (1832) ............................................... 22, 23

**Statutes and Regulations**

5 U.S.C. § 706(2) ...............................................9

25 U.S.C. § 465 ...............................................3

25 U.S.C. § 479 ............................................... 2, 3, 10, 11, 13

25 U.S.C. § 2701 ...............................................4

25 U.S.C. § 2704 ...............................................4

25 U.S.C. § 2719 ...............................................2, 4

25 U.S.C. § 2719(a) ...............................................40

Appropriations Act of July 4, 1884, 23 Stat. 76 ...............................................30

Pub. L. No. 100-581, § 214, 102 Stat. 2938 (1988)...............................................17

Pub. L. No. 103-263, 108 Stat. 707 (1994)...............................................41

25 C.F.R. § 292.2 ...............................................36

25 C.F.R. § 292.6 ............................................... 9, 36, 37, 42

25 C.F.R. § 292.6(d) ............................................... 3, 4, 36

25 C.F.R. § 292.12 ...............................................37

## TABLE OF AUTHORITIES—Cont'd

**Page(s)**

**Agency Decisions**

*Bear River Band of Rohnerville Rancheria* (Aug. 5, 2002) ............................ 39, 40

*Brown* v. *Commissioner of Indian Affairs*, 8 IBIA 183 (1980) ............ 13, 18, 21, 32

*Confederated Tribe of Coos* ........................................................................ 39, 40, 41

*Decision for the Tunica-Biloxi Tribe (Aug. 11, 2011)* .............................................. 27

*Estate of Elmer Wilson, Jr.*, 47 IBIA 1 (2008) ........................................................ 29

*Ft. Sill Apache Tribe Luna Co., NM Property* (May 19, 2008) ........................ 39, 40

*Guidiville Band of Pomo Indians* (Sept. 1, 2011) ...................................... 44, 45, 47

*Karuk Tribe of Cal.* (Apr. 9, 2012) .................................................................. 39, 40

*Karuk Tribe of Cal.* (Oct. 12, 2004) ...................................................................... 45

*Mechoopda Indian Tribe of the Chico Rancheria* (March 14, 2003) ............... 39, 40

*Poarch Band of Creek Indians* (May 19, 2008) .............................................. 39, 40

*Pomo of Upper Lake Indian Lands Determination* (Nov. 21, 2007) ................ 39, 40

*Record of Decision for the Mashpee Wampanoag Tribe (Sept. 18, 2005)* .............. 14

*Sault Ste. Marie Tribe* (July 31, 2006) ................................................................... 39

\* *Scotts Valley Band of Pomo Indians*
   (May 25, 2012) .................................................. 37, 38, 39, 44, 45, 46, 47, 48, 49

*Turtle Creek Casino Site, Grand Traverse Band* (Aug. 31, 2001) ......................... 39

*Wyandotte Nation Amended Gaming Ordinance* (Sept. 10, 2004) ......................... 47

**Other Authorities**

65 Fed. Reg. 8436 (Feb. 18, 2000) ........................................................................... 5

67 Fed. Reg. 607 (Jan. 4, 2002) ............................................................................... 5

## TABLE OF AUTHORITIES—Cont'd

**Page(s)**

Cohen's Handbook of Federal Indian Law (2005 ed.) ...........................................25

*Definition of Tribe as Political Entity* (Nov. 7, 1934),
 http://thorpe.ou.edu/sol_opinions/p476-500.html ................................................20

Letter from Wyman D. Babby to George Miller (Jan. 14, 1994)
 (alteration in original), http://sct.narf.org/documents/carcieri/merits/
 lodging/letter_to_rep_miller_1-14-94.pdf............................................................18

Quinn, *Federal Acknowledgment of American Indian Tribes: The Historical
 Development of a Legal Concept*,
 34 AM. J. LEGAL HIST. 331 (1990) ....................................................... 19, 20, 30

The Meaning of 'Under Federal Jurisdiction' for Purposes of the Indian
 Reorganization Act (March 12, 2014),
 http://www.bia.gov/cs/groups/webteam/documents/text/idc1-028386.pdf .........29

Webster's Third New Int'l Dictionary (1986) ................................................. 36, 37

# GLOSSARY

| | |
|---|---|
| BIA: | Bureau of Indian Affairs |
| The Department: | The Department of the Interior |
| Grand Ronde: | The Confederated Tribes of the Grand Ronde Community of Oregon |
| IBIA: | Interior Board of Indian Appeals |
| ICC: | Indian Claims Commission |
| IGRA: | Indian Gaming Regulatory Act |
| IRA: | Indian Reorganization Act |
| NIGC: | National Indian Gaming Commission |
| ROD: | Record of Decision |
| The Secretary: | The Secretary of the Interior |
| The Solicitor: | The Solicitor of the Department of the Interior |

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331, and issued a final order disposing of all claims on December 12, 2014.  JA0103.  Grand Ronde filed a timely notice of appeal on December 18, 2014.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The Secretary of the Interior approved the acquisition of land to be held in trust for the Cowlitz Indians, and declared it to be eligible for gaming.  This appeal raises two issues:

1.      Whether the Secretary was authorized under the Indian Reorganization Act to take the land in trust.

2.      Whether the Secretary properly authorized gaming on the land under the Indian Gaming Regulatory Act.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are included in the Addendum.

## PRELIMINARY STATEMENT

This case implicates the long, fraught history of relations between the federal Government and Indian tribes, contains a record spanning a century, and involves principles of American Indian law that trace back to the Nation's founding.  But, at bottom, this case is about statutory interpretation—and the agency's unexplained departure from longstanding precedent.  The district court

held that the Secretary had authority to take a parcel of land in Clark County, Washington ("the Parcel"), in trust for the Cowlitz Indians and declare the land eligible for gaming.  That decision should be reversed.

First, for two independent reasons, the Secretary lacked statutory authority to take trust title to the Parcel.  The Indian Reorganization Act, 25 U.S.C. § 479, authorizes the Secretary to acquire land in trust (as relevant here) only for "members of any recognized Indian tribe now under Federal jurisdiction."   As the Supreme Court made clear in *Carcieri* v. *Salazar*, 555 U.S. 379, 395 (2009), the term "now under Federal jurisdiction" refers to tribes that were "under Federal jurisdiction" when the statute was enacted in 1934.  It is undisputed, however, that the Cowlitz were "terminated" as a tribe as of 1934; the Cowlitz were *neither* "recognized" nor "under Federal jurisdiction" in 1934—and a loss for the government on *either* of those IRA requirements requires reversal of the decision to take the land into trust.  The Secretary's contrary ruling misapprehends the statutory text, ignores Supreme Court authority stating that the IRA requires recognition *in 1934*, and is a transparent end-run around *Carcieri*.

Second, the Parcel is not eligible for gaming.   The Indian Gaming Regulatory Act, 25 U.S.C. § 2719, prohibits gaming on land acquired after 1988 unless a statutory exception applies.   Here, the Secretary invoked the "initial reservation exception," which required the Cowlitz to show that they have

2

"significant historical connections" to the Parcel.  25 C.F.R. § 292.6(d).  But they

don't.  Indeed, the agency itself has repeatedly found that the Cowlitz have *no*

historical connections to the Parcel, which is located 50 miles away from the heart

of the Cowlitz's historical territory; a long line of agency decisions, from which

the Secretary inexplicably departed, prohibits gaming on lands so far removed

from a tribe's historical territory.  The fact is, the Cowlitz cherry-picked the Parcel

because it is a prime location for a casino-resort complex.  The tribe's motivations

are easy to understand, but they do not constitute "significant historical

connections."

## STATEMENT OF THE CASE

### I.     STATUTORY FRAMEWORK

The Indian Reorganization Act (IRA) authorizes the Secretary to acquire

land and hold it in trust "for the purpose of providing land for Indians."  25 U.S.C.

§ 465.  Section 19 of the Act defines "Indians" as

> **[1]** all persons of Indian descent who are members of any recognized
> Indian tribe now under Federal jurisdiction, and **[2]** all persons who
> are descendants of such members who were, on June 1, 1934, residing
> within the present boundaries of any Indian reservation, and **[3]** shall
> further include all other persons of one-half or more Indian blood.

*Id.* § 479.

This case involves the first definition of "Indians."  The Supreme Court

addressed that definition in *Carcieri*, explaining that "the term 'now under Federal

jurisdiction' in §479 unambiguously refers to those tribes that were under the

3

federal jurisdiction of the United States when the IRA was enacted in 1934." 555 U.S. at 395. The Court therefore held that the Secretary lacked authority to take land in trust for an Indian tribe that, while recognized in 1983, was "neither federally recognized nor under the jurisdiction of the federal government" in 1934. *Id.* at 395-96.

Congress passed the Indian Gaming Regulatory Act (IGRA) in 1988 to regulate gaming on Indian lands by Indian tribes. 25 U.S.C. § 2701. IGRA created the National Indian Gaming Commission (NIGC), an agency within the Department of the Interior, to implement the Act. *Id.* § 2704. Section 20 of IGRA prohibits gaming on land acquired after October 17, 1988, with two relevant exceptions: for "restored" lands and for "initial reservation[s]." *Id.* § 2719. To satisfy either exception, a tribe must show "significant historical connections" to the land. 25 C.F.R. § 292.6(d).

## II.   FACTS AND PROCEDURAL HISTORY

### A.   Background

The Confederated Tribes of the Grand Ronde Community of Oregon ("Grand Ronde") comprises more than 25 tribes and bands that have lived in their ancestral homelands in western Oregon, northern California, and southern Washington for thousands of years. JA2168. Grand Ronde owns and operates Spirit Mountain Casino on its reservation, approximately 65 miles southwest of

Portland. *Ibid*. Spirit Mountain's revenues are vital for funding such tribal services as health care, education, housing, elder care, and pension and disability payments. JA3407.

The Cowlitz live in western Washington. They maintain governmental offices and services in Cowlitz and Lewis Counties, within their aboriginal lands. JA3438. In January 2002, the Secretary recognized the Cowlitz as a tribe, pursuant to the Federal Acknowledgment Process (65 Fed. Reg. 8436 (Feb. 18, 2000); 67 Fed. Reg. 607 (Jan. 4, 2002)).

The Parcel is a 151.87-acre plot in Clark County, Washington. JA0167-68; JA0172-73. It is located just off Interstate 5 in the Portland-Vancouver metropolitan area. JA0168; JA0172. The Parcel is approximately 25 miles from the Cowlitz administrative offices, located near Kelso, Washington, and 50 miles away from tribal housing and the Cowlitz Elders Program and Senior Nutrition Center, located in Toledo, Washington. JA3438. Grand Ronde has significant historical connections to Clark County, which it considers part of its Non-Treaty Homelands.

In 2002, the Cowlitz applied to have the Parcel taken into trust. JA0167. The Cowlitz also requested that the NIGC declare the Parcel eligible for gaming under IGRA's "restored lands" exception. See JA1245-83. To meet that exception—which requires a tribe to demonstrate that they were not recognized for

5

a period of time—the Cowlitz asserted in substance (because it was then in their interest to do so) that they were *unrecognized* and *not under federal jurisdiction* from the early 1900s through 2002. In 2005, the NIGC granted the request, finding that the Cowlitz were a restored tribe precisely because they were *unrecognized* throughout the twentieth century. JA1357-80.

### B. The Record Of Decision

On April 22, 2013, the Secretary issued the Record of Decision (ROD) on the Cowlitz's application. JA0161-304. The Secretary first found that she was authorized to take trust title to the Parcel under the IRA. The Secretary acknowledged (as she had to, under *Carcieri*) that the phrase "now under Federal jurisdiction" refers to tribes that were "under Federal jurisdiction" *in 1934*. In the Secretary's view, however, the IRA does not likewise require "recognition" in 1934. JA0255. Accordingly, the Secretary concluded, federal acknowledgment of the Cowlitz in *2002* sufficed to constitute "recognition" of the Cowlitz under the IRA. *Ibid.*

With respect to the "under Federal jurisdiction" requirement, the Secretary applied a "two-part inquiry"—asking first, whether the United States had taken actions before 1934 that reflect federal obligations to the tribe, and second, whether the tribe's jurisdictional status remained intact in 1934. JA0260-61. The Secretary found that failed treaty negotiations between the United States and the

6

Lower Cowlitz in 1855 constituted "sufficient evidence of federal jurisdiction as of at least 1855." JA0263. Turning to the second prong, the Secretary found "no clear evidence" that the Cowlitz's jurisdictional status had thereafter been "terminated." JA0264. The Secretary therefore found that she could take trust title to the Parcel.

The Secretary next determined that the Parcel was eligible for gaming under IGRA's "initial reservation" exception, concluding that the tribe had "significant historical connections" to the land. JA303. The Secretary stated that Cowlitz historically had passed within miles of the Parcel on their way to other places; that Cowlitz had been sighted in three instances within several miles of the Parcel; and that individual Cowlitz members lived in the same county as the Parcel in the late 1800s and early 1900s. JA0293-301.

### C. The District Court's Opinion

The district court granted Defendants' cross-motions for summary judgment. With respect to the Secretary's authority under the IRA, the court held that "the term 'recognized' does not unambiguously refer to recognition as of 1934," and that recognition in 2002 was sufficient. JA0120. The district court next held that the Cowlitz were "under Federal jurisdiction"—notwithstanding that, as the Cowlitz had conceded, "the federal government effectively *terminated* its federal supervision of the Cowlitz tribe" as of 1934. JA4237-38 (emphasis added).

7

Finally, the court sustained the Secretary's determination that the Parcel was eligible for gaming under IGRA's "initial reservation" exception, even though the Parcel is 50 miles from the heart of the Cowlitz's historic territory.  JA0137.

Grand Ronde appealed.  On March 9, 2015, the Department took trust title to the Parcel.

## SUMMARY OF ARGUMENT

I.     The Secretary lacked authority to take trust title to the Parcel, for two independent reasons.  First, this Court and the Supreme Court have made clear that the IRA requires a tribe to have been recognized *in 1934*—just as it requires a tribe to have been "under Federal jurisdiction" in 1934.  The statutory text, legislative history, and agency precedent all confirm the point.  The Secretary and the district court therefore erred in holding that the Cowlitz's federal acknowledgment *in 2002* satisfies the IRA's "recognized Indian tribe" requirement.

Second, the Cowlitz were not "under Federal jurisdiction" in 1934, an independent requirement under the IRA.  Indeed, during the Cowlitz's formal acknowledgment proceedings in 2000, the agency conceded that, "from 1880-1940, the Cowlitz Indians" were neither "a reservation tribe under Federal jurisdiction" nor "under direct Federal supervision."  JA1076.  Moreover, the Cowlitz were indisputably "terminated" as a tribe in 1934 and lacked a government-to-government relationship with the United States at that time.  As a

8

matter of law, the Cowlitz were not "under Federal jurisdiction" within the meaning of the IRA.

II.      The Secretary also erred in declaring the Parcel eligible for gaming under IGRA.  To meet the "initial reservation" exception, a tribe must show that the Parcel is "within an area where the tribe has significant historical connections." 25 C.F.R. § 292.6.  As the agency has repeatedly made clear, a tribe can satisfy that requirement only if it shows occupancy or subsistence use in the vicinity of the land sufficient to create "a natural inference" that the tribe had "significant historical connections" to *the parcel itself.*  Here, the Secretary did not even purport to apply that standard, and the evidence on which she relied showed that the Cowlitz did *not* have significant connections to the Parcel.

## ARGUMENT

## I.      STANDARD OF REVIEW

This Court's "review of the District Court's grant[] of summary judgment is *de novo*."  *TOMAC* v. *Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006).  This Court will set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

## II.    THE SECRETARY LACKED AUTHORITY TO TAKE TRUST TITLE TO THE PARCEL

Under the IRA's first definition of "Indian," the Secretary may take land in trust only for a tribe that is *both* "recognized" *and* "under Federal jurisdiction." 25 U.S.C. § 479. The Secretary held that the Cowlitz met both requirements. As we show below, that conclusion is flawed—at every turn, and as a matter of law: The Cowlitz were *neither* "recognized" *nor* "under Federal jurisdiction" within the meaning of the IRA. Because that conclusion is compelled by the statute's plain text, the Secretary's contrary conclusion is entitled to no deference. See *Carcieri*, 555 U.S. at 391-92 (declining to apply deference under *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).

### A.    The Cowlitz Were Not A "Recognized Indian Tribe" Within The Meaning Of The IRA

The Secretary concluded that the "Cowlitz Tribe's federal acknowledgment in 2002"—70 years after the IRA was enacted—"satisfies the IRA's requirement that the tribe be 'recognized.'" JA0255. That conclusion conflicts with the statutory text, with agency precedent, and with the Supreme Court's decision in *United States* v. *John*, 437 U.S. 634, 650 (1978), which stated that the IRA requires recognition "in 1934."

10

**1.  *The IRA Authorizes The Secretary To Take Land In Trust Only For Indian Tribes That Were "Recognized" In 1934***

**(a)  The IRA's Text.**  The IRA authorizes the Secretary to take land in trust for "members of any recognized Indian tribe now under Federal jurisdiction."  25 U.S.C. § 479.  It is undisputed (because the Supreme Court has said so) that the phrase "now under Federal jurisdiction" refers to tribes that were under federal jurisdiction in 1934.  *Carcieri*, 555 U.S. at 395.  It is also undisputed that the phrase "now under Federal jurisdiction" modifies the term "recognized Indian tribe."  See JA0260.  It follows that the Act requires the tribe to be "recognized" at the same time at which it was "under Federal jurisdiction"—in 1934.  That is because the temporal limitation of the modifying term ("now under Federal jurisdiction") necessarily applies to the modified term ("recognized Indian tribe").  A tribe cannot be a "recognized Indian tribe now under Federal jurisdiction" in 1934 if it was not a "recognized Indian tribe" in 1934.

Imagine, for example, a statute that provides benefits to "any state resident now practicing medicine."  If the statute covers only persons who were "practicing medicine" in 1934, would it apply to someone who practiced medicine in a foreign country in 1934 but did not become a "state resident" until 2002?  No, because you cannot be "a state resident now practicing medicine" in 1934 if you were not a "state resident" in 1934.  Or imagine a statute that provides benefits to "any active-duty soldier now being treated in a military hospital."  If the statute covers only

11

those who were being treated in a military hospital in 1934, would it apply to a *child* treated in a military hospital in 1934, but who did not herself become an active-duty solider until several decades later?  No:  The statute covers only those who were active-duty soldiers *and* were being treated in a military hospital in 1934.

The district court agreed that these analogies were compelling "at first blush," but believed that the IRA was more like a statute that provided benefits "to any certified veteran wounded in 1934."  JA0116.  "Arguably," the district court surmised, such a statute could apply to someone who was "wounded as of 1934" but not certified as a veteran until 2002.  *Ibid.*

But the IRA does not define "Indian" to include members of any "recognized Indian tribe under Federal jurisdiction *in 1934*" (the district court's formulation).  Rather, it defines "Indian" to include members of any "recognized Indian tribe *now* under Federal jurisdiction."  A parallel statute would therefore read "any certified veteran *now* wounded."  And if *that* statute unambiguously required the person to have been wounded in 1934, it would also require the person to have been a certified veteran in 1934—just as the IRA requires recognition in 1934.  The district court created ambiguity in the IRA's plain text only by re-writing that text.

12

The Secretary's conclusion that a tribe can be "recognized" some 70 years after 1934 is also at odds with section 19's second definition of "Indian." Section 19's first definition includes "members of any recognized Indian tribe now under Federal jurisdiction," and its second definition includes "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." 25 U.S.C. § 479; see *John*, 437 U.S. at 650 (the IRA's second definition includes members' "descendants who then were residing on any Indian reservation"). But members of tribes first "recognized" in *2002* do not have "descendants" living on reservations in *1934*. Section 19's second definition therefore confirms that the IRA requires recognition of "such members" in 1934.

And that is exactly what the agency itself has held—in the past. In *Brown* v. *Commissioner of Indian Affairs*, 8 IBIA 183 (1980), the Interior Board of Indian Appeals (IBIA) explained that a Cowlitz member failed to meet section 19's first definition of "Indian" because, as a Cowlitz member, he was *not* "a member of a federally recognized tribe on June 18, 1934 (the date of enactment of section 19)." *Id.* at 188. But, the IBIA continued, he satisfied section 19's second definition, because, as a descendant of a member of another Indian tribe, he was "a descendant of an Indian who, on June 1, 1934, was a member of a recognized Indian tribe under Federal jurisdiction." *Id.* at 187. Indeed, just last month the

13

Secretary stated that "both the first and second definitions [are] limited to those for whom a Federal relationship existed *in 1934*, either through membership in a 'recognized Indian tribe' or by residence on a reservation." *Record of Decision for the Mashpee Wampanoag Tribe* (Sept. 18, 2015) ("Mashpee ROD") at 94 (emphasis added) (JA4554); see *id.* at 101 (JA4561) (to take land in trust "pursuant to the second definition, we must find that the Tribe is composed of descendants of members of a recognized Indian tribe who maintained residence within the boundaries of an Indian reservation as of June 1, 1934").

"A court must … interpret [a] statute as a symmetrical and coherent regulatory scheme." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Congress attached a temporal limitation to the "jurisdiction" requirement, and it limited section 19's second definition of "Indian" to persons who were living on a reservation in 1934 and were descendants of members of tribes that were recognized in 1934. It would be surpassingly odd for Congress to nevertheless allow the "recognized" requirement in section 19's first definition to float in time to encompass tribes that were recognized 70 years *after* the IRA was enacted. Reading "recognized Indian tribe" in "the context of the IRA" as a whole therefore "provides further textual support for the conclusion that the term refers solely to events contemporaneous with the Act's enactment." *Carcieri*, 555 U.S. at 389.

14

**(b) Legislative History.** The IRA's legislative history confirms the point. Section 19's first definition of "Indian" originally included only the "recognized Indian tribe" requirement (and not the "now under Federal jurisdiction" proviso). JA0251. Senator Wheeler (the IRA's Senate sponsor) stated at a May 17, 1934, hearing on the Act that Indians would not qualify as members of a "recognized" Indian tribe "unless they are enrolled *at the present time*." JA0377 (emphasis added). The IRA's House sponsor similarly explained that the Act "recognizes the status quo of the *present* reservation Indians" and precludes persons "who are not *already* enrolled members of a tribe" from claiming benefits under the Act. *United States* v. *State Tax Comm'n of Miss.*, 535 F.2d 300, 309 (5th Cir. 1976) (emphasis added) (quoting House debate).

In the district court's view, however, the following colloquy with Indian Affairs Commissioner John Collier somehow pointed in a different direction:

> COMMISSIONER: This bill provides that any Indian who is a member of a recognized tribe or band shall be eligible to Government aid.
>
> SENATOR THOMAS OF OKLAHOMA: Without regard to whether or not he is now under your supervision?
>
> COMMISSIONER: Without regard; yes.

JA0343 (quoted at JA0117-18). But this colloquy had nothing to do with the meaning of "recognized"; it was addressed, instead, to the entirely separate question whether the tribe was "under Federal jurisdiction." Congress did not add the "under Federal jurisdiction" requirement until Commissioner Collier proposed

15

doing so after this colloquy—precisely to exclude tribes that *were* "recognized" in 1934 but *not* under the "supervision" of the federal government at that time. JA0377-79.    Thus, far from "contradict[ing]" Congress's other statements (JA0118-19), the colloquy cited by the district court underscores that Congress limited the IRA to tribes that were recognized "at the present time."

(c)  **Judicial Decisions.**   Consistent with the statutory text, the Supreme Court stated in *United States* v. *John* that the IRA's first definition of "Indian" was limited to tribes recognized in 1934 (but that its third definition was not).   The Court quoted section 19's definition of "Indian," adding the crucial bracketed language as follows:

> The 1934 Act defined "Indians" not only as "all persons of Indian descent who are members of any recognized [in 1934] tribe now under Federal jurisdiction," and their descendants who then were residing on any Indian reservation, but also as "all other persons of one-half or more Indian blood."

437 U.S. at 650.   The lesson from *John* is clear:   The term "recognized" unambiguously refers to tribes that were recognized "in 1934."   *Ibid.*

Until the decision below, every other court to address the issue had reached the same conclusion.  In *Maynor* v. *Morton*, 510 F.2d 1254, 1256 (D.C. Cir. 1975), this Court stated that "the IRA was primarily designed for tribal Indians, and neither [the plaintiff] nor his relatives had any tribal designation, organization, or reservation at that time"—*i.e.*, when the IRA was enacted in 1934.  In *United*

16

*States* v. *State Tax Commission of Mississippi*, 505 F.2d 633, 642 (5th Cir. 1974), the Fifth Circuit held that "[t]he language of Section 19 positively dictates that tribal status is to be determined as of June, 1934." *Id.* at 642. And in *City of Sault Ste. Marie* v. *Andrus*, 532 F. Supp. 157, 160 n.6 (D.D.C. 1980), the court stated that "the IRA was intended to benefit only those Indians federally recognized at the time of passage."[1]

The district court did not even address the Supreme Court's decision in *John*. Instead, it relied on Justice Breyer's concurring opinion in *Carcieri*, which stated that the "'IRA imposes no time limit upon recognition.'" JA0115-16 (quoting *Carcieri*, 555 U.S. at 398 (Breyer, J., concurring)). But the opinion *for the Court* in *Carcieri* provides no support for that interpretation.[2] And, as noted, the Supreme Court spoke directly to the issue in *John*, stating that the IRA applies only to tribes recognized "in 1934." Because that determination was not disturbed

---

[1] Congress has amended the IRA (including the section authorizing the Secretary to take land in trust for "Indians") since the Supreme Court stated in *John* that it requires recognition "in 1934." See, *e.g.*, Pub. L. No. 100-581, § 214, 102 Stat. 2938 (1988). "Although Congress is presumed to be aware of judicial interpretations of a statute," *Dickman* v. *Comm'r*, 465 U.S. 330, 347 n.5 (1984), no amendment altered the interpretation of the IRA set forth in *John* and the other cases cited above.

[2] To the contrary, the Court stated that, "*[i]n 1934*, the Narragansett Indian Tribe … was *neither* federally recognized nor under the jurisdiction of the federal government." *Carcieri*, 555 U.S. at 395-96 (emphasis added).

by *Carcieri*, *John* remains binding precedent.   See *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

    **(d)  Prior Agency Interpretations.**  As noted, the agency previously held that the IRA does not apply to tribes that were not "federally recognized … on June 18, 1934 (the date of enactment of section 19)." *Brown*, 8 IBIA at 188.  In 1994 the agency again stated that section 19 defines "Indians" as "all persons of Indian descent who are members of any recognized [in 1934] tribe under Federal jurisdiction."  Letter from Wyman D. Babby to George Miller, at 3 (Jan. 14, 1994) (alteration in original), http://sct.narf.org/documents/carcieri/merits/lodging/ letter_to_rep_miller_1-14-94.pdf.   The Secretary's current interpretation therefore also flunks *Chevron*'s second step (though we do not think this Court need go that far) because her interpretation "is inconsistent with [the agency's] prior analysis in similar situations without any acknowledgement of the fact, or cogent explanation as to why." *King Broad. Co.* v. *FCC*, 860 F.2d 465, 470 (D.C. Cir. 1988).

* * *

    Because the Secretary's determination that "the date of federal recognition does not affect the Secretary's authority under the IRA" (JA0255) is foreclosed by the plain text of the statute, this Court should vacate the ROD.  See *SEC* v. *Chenery Corp.*, 318 U.S. 80, 87-88 (1943).  But there is no reason to remand for a determination whether the Cowlitz were in fact "recognized" in 1934.  Although

18

the Secretary did not decide that question (see AR140469), it is perfectly plain, as we next show, that the Cowlitz were not "recognized"—in the required sense of that term—in 1934.

### 2. *The Cowlitz Were Not A "Recognized Indian Tribe" In 1934*

### (a)    The Term "Recognized Indian Tribe" Refers To Political— Not "Cognitive"—Recognition.

Without actually resolving the issue, the Secretary suggested that the term "recognized Indian tribe" uses the word "recognized" only in a "cognitive" sense. JA0253 (citing Quinn, *Federal Acknowledgment of American Indian Tribes: The Historical Development of a Legal Concept*, 34 AM. J. LEGAL HIST. 331, 333 (1990)).   According to the Secretary, because the Cowlitz were *perceived as Cowlitz* in 1934—even if they were not then "politically" recognized (in the sense of having a government-to-government relationship with the United States)—the tribe was in fact "recognized" in 1934 after all.  JA0253.

Wrong.  This Court and the Supreme Court have both held that the IRA uses the term "recognized" in the political sense—not this vague "cognitive" sense.  In *California Valley Miwok Tribe* v. *United States*, for example, this Court defined "recognition" as "a formal political act confirming the tribe's existence as a distinct political society."  515 F.3d 1262, 1263 (D.C. Cir. 2008).  In *Morton* v. *Mancari*, the Supreme Court likewise held that the IRA's hiring preference for "Indians" is "not directed towards a 'racial' group consisting of 'Indians'; instead,

19

it applies only to members of 'federally recognized' tribes," a category that "is political rather than racial in nature."  417 U.S. 535, 553 n.24 (1974).

"[T]he Secretary's current interpretation" is also "at odds with the Executive Branch's construction of this provision at the time of enactment."  *Carcieri*, 555 U.S. at 390.  For example, a 1934 Solicitor's opinion unequivocally stated that a "tribe" within the meaning of the IRA is a "political entity."  *Definition of Tribe as Political Entity* at 478 (Nov. 7, 1934), http://thorpe.ou.edu/sol_opinions/p476-500.html.  In a complete about-face, the Secretary now suggests that the IRA uses the term "recognized" in the "cognitive" sense because "political" recognition is a "modern" concept.  Not only is that departure from precedent unreasoned; it rests on a bizarre misreading by the Secretary of the only cited authority.[3]

### (b)    The Cowlitz Were Not Politically Recognized In 1934

In their request for a restored-lands opinion, the Cowlitz acknowledged (when the point helped them) that the tribe "no longer enjoyed federal recognition as a tribal entity" at the time of the IRA's enactment in 1934.  JA1258.  The Secretary agreed that the Cowlitz "'have never had any recognition at the hands of

---

[3] The cited Quinn article states that, while "recognized" was sometimes used "in the cognitive sense" in "the early documentary record" (34 AM. J. LEGAL HIST. at 333), the very *same paragraph* goes on to explain that "at least since the Indian Reorganization Act of 1934 (hereafter IRA) the term 'recognized' has been used almost exclusively in the jurisdictional sense by all branches of the government" to mean that "the federal government formally acknowledges a tribe's existence as a 'domestic dependent nation' with tribal sovereignty."  *Id.* at 333-34.

the Government'" as of 1910. JA0266 (quoting agency report). Those concessions are now fatal: The Cowlitz cannot have been a "recognized Indian tribe" in 1934 within the meaning of the IRA if, as the NIGC held, "the United States did not recognize the Cowlitz Tribe as a governmental entity from at least the early 1900s until 2002." JA1363.[4]

What is more, until the ROD in this case, the Department had consistently found that the Cowlitz *failed* to satisfy the IRA's "recognized Indian tribe" requirement. As noted, in *Brown* the IBIA held that the Cowlitz were *not* a recognized tribe in 1934. 8 IBIA at 188. Agency positions have consequences— agencies "may not … depart from a prior policy *sub silentio*." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Yet that is precisely what the Secretary has done here.

## B.    The Cowlitz Were Not "Under Federal Jurisdiction" In 1934

The Secretary also lacked authority to take trust title to the Parcel for a second—and independently fatal—reason: The Cowlitz were not "under Federal jurisdiction" in 1934. See *Carcieri*, 555 U.S. at 395. Indeed, that is exactly what

---

[4] Having successfully taken an opposite position, the Cowlitz are estopped from arguing that they were "recognized" in 1934. Judicial estoppel applies "where a party assumes a certain position in a legal proceeding, . . . succeeds in maintaining that position, . . .  [and then,] simply because his interests have changed, assume[s] a contrary position." *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001). That is precisely what happened here.

the agency held during the Cowlitz's acknowledgment proceedings in 2000: "[F]rom 1880-1940, the Cowlitz Indians were *not* a reservation tribe *under Federal jurisdiction* or *under direct Federal supervision*."  JA1076 (emphasis added).  That determination—which, inexplicably, neither the Secretary nor the district court even mentioned—should be the end of the matter.[5]

As we show below, the Secretary's determination—dispositive in its own right—was plainly correct:  The Cowlitz had no government-to-government relationship with the United States as of 1934, and thus were not "under Federal jurisdiction" at that time.

### 1.  *The Meaning Of "Under Federal Jurisdiction"*

The term "under Federal jurisdiction" encompasses four requirements.  First, a tribe "under Federal jurisdiction" must be under the supervision and control of the federal government, typically asserted through treaties and other formal acts that place tribes "under the protection of the United States."  *Cherokee Nation* v. *State of Georgia*, 30 U.S. 1, 12 (1831); *Worcester* v. *State of Georgia*, 31 U.S. 515, 542 (1832) ("[T]he very passage of this act is an assertion of jurisdiction over the Cherokee nation.").  Thus, as the Secretary stated, "under Federal jurisdiction"

---

[5] The agency made that concession before *Carcieri* was decided—and therefore before the agency realized that, by doing so, it was conceding that it lacked authority to take land in trust for the Cowlitz.  But an agency is not relieved from its findings simply because it does not appreciate the implications of what it has found.

requires actions that "reflect[] federal supervision of the Tribe." JA0272.[6]

Second, as the district court recognized (JA0123), the United States must exercise that supervision and control over the tribe as a *group*—not just over individual Indians. Again, the Secretary agreed. See JA0258; JA0260-61.

Third, the federal government must actually *exercise* jurisdiction over the Indian tribe; the mere *authority* to do so is not enough. Indeed, the Secretary rejected the Cowlitz's argument that the term "under Federal jurisdiction" requires only the *authority* to assert jurisdiction over a tribe—Congress's so-called "plenary authority" over Indians—explaining that a "tribe must make a further showing that the United States has exercised its jurisdiction" over the tribe. JA0263.

Finally, a tribe "under Federal jurisdiction" must have a *government-to-government relationship* with the United States. See *Worcester*, 31 U.S. at 555 (explaining that a tribe's "relation with the United States" was "that of a nation claiming and receiving the protection of one more powerful"); *Cherokee Nation*, 30 U.S. at 13 (describing Indian tribes as "domestic dependent nations" whose

---

[6] See also *Heckman* v. *United States*, 224 U.S. 413, 429 (1912) ("By this treaty, the Cherokees acknowledged that they were under the protection of the United States."); *Truscott* v. *Hurlbut Land & Cattle Co.*, 73 F. 60, 64 (9th Cir. 1896) (through treaty and agreements "between that tribe and the United States, the reservation in question is within the sole and exclusive jurisdiction of the United States); *United States* v. *Washington*, 476 F. Supp. 1101, 1110 (W.D. Wash. 1979) (through "treaties and by other actions of the United States, the Indian tribes which were parties to said treaties … came under the jurisdiction of the United States").

"relation to the United States resembles that of a ward to his guardian"). Ratified treaties, for example, manifest a government-to-government relationship between two sovereigns. *Cherokee Nation*, 30 U.S. at 12.[7]

## 2. The Cowlitz Were Not "Under Federal Jurisdiction" In 1934 Because They Were Terminated As A Tribe As Of That Date

In their request for a restored lands opinion from the NIGC, the Cowlitz acknowledged that they were "administratively terminated in the early twentieth century, as evidenced by numerous and unambiguous statements from federal officials," JA1260, and by "the Department of the Interior's refusal to allow the Tribe to organize its government under the [IRA]," JA1254. See JA1260 (citing "unequivocal evidence of *de facto* termination" of the Cowlitz).[8] The NIGC agreed, citing Commissioner Collier's 1933 statement that the Cowlitz were "no

---

[7] This interpretation of "under Federal jurisdiction" is the very approach suggested by Justice Breyer in his *Carcieri* concurrence. The term "under Federal jurisdiction," he stated, requires "a 1934 relationship between the tribe and Federal Government that could be described as jurisdictional." *Carcieri*, 555 U.S. at 399 (Breyer, J., concurring). He then explained that such a government-to-government relationship could be established by "a treaty with the United States (in effect in 1934), a (pre-1934) congressional appropriation, or enrollment (as of 1934) with the Indian Office"—formal actions that demonstrate the exercise of federal supervision and control over a tribe "as a group." *Id.* at 399-400.

[8] The Cowlitz (like the agency) made that concession before *Carcieri* was decided. They, too, are not relieved of their admissions simply because they may not have anticipated *Carcieri*.

longer in existence as a communal entity" and were not "wards" of the government as of 1934. JA1364.[9]

Those concessions are dispositive. "Termination" is the very *antithesis* of "under Federal jurisdiction." It denotes the cessation of "federal supervision and control" over an Indian tribe and the abrogation of "the special relationship between those tribes and the federal government." Cohen's Handbook of Federal Indian Law 91 (2005 ed.). Indeed, in *TOMAC*, this Court equated termination with the inability to organize under the IRA: "After years of dealing with the United States in government-to-government relations, the Tribe was administratively terminated in 1935, when its application for recognition was denied under the Indian Reorganization Act of 1934." 433 F.3d at 854. The Secretary, too, acknowledged that termination vitiates "federal supervision over" Indian tribes. JA0259.

The Cowlitz agree (or at least they did until now). They stated in their briefing to the Secretary that by "terminating" Indian tribes "Congress terminated the United States' supervisory activities (*i.e.*, *the exercise of jurisdiction*)" over those tribes. JA4233-34 (emphasis added). They therefore confessed that "the

---

[9] Once again, because the Cowlitz prevailed on their argument that they were terminated in 1934, they are estopped from arguing otherwise. See *New Hampshire*, 532 U.S. at 749.

25

federal government effectively terminated its federal supervision of the Cowlitz tribe." JA4237-38.

Despite that concession, the Secretary did not even *address* the Cowlitz's termination as of 1934. The district court fared little better, opining that administrative termination is inconsequential because only *congressional* termination can "terminate federal jurisdiction over a tribe." JA0130. But that's wrong—and the ROD said so.

As noted, the first step of the Secretary's jurisdictional test looks to whether "Federal Government officials"—not Congress—"undertook guardian-like action on behalf of the tribe." JA0261. The second step of her test likewise asks whether "the *United States* terminated the Tribe's jurisdictional status"—not whether Congress terminated the tribe. JA0264 (emphasis added). To determine whether the Cowlitz's jurisdictional status had been terminated as of 1934, the Secretary therefore relied exclusively on a series of *administrative* actions; she did not rely (as the district court did) on the mere fact that Congress did not enact legislation terminating the tribe. And for good reason: If the exercise of jurisdiction can be *created* by agency action, it follows that it can be *terminated* by administrative action. Indeed, in its initial briefing below the government admitted that a tribe's

"jurisdictional status" can be "administratively *or* congressionally terminated." Case No. 11-cv-284, Dkt. 61 at 31 (emphasis added).[10]

The district court ignored all this. Instead, it said only that "Congress's constitutional *plenary authority* over [an] Indian tribe[] cannot be divested." JA0131 (emphasis added). But the Secretary *rejected* that argument, holding that the "under Federal jurisdiction" term requires a showing that "the United States has *exercised* its jurisdiction" over a tribe—not just a showing that the tribe was subject to Congress's plenary authority. JA0263. The Cowlitz's concession that "the federal government effectively terminated its federal supervision of the Cowlitz tribe" (JA4237-38) is therefore a concession that the tribe was not under Federal jurisdiction *under the Secretary's own test.[11]*

---

[10] In a decision issued after the ROD in this case, the agency likewise asked whether "*the President* or Congress terminate[d] the under federal jurisdiction status of the Tribe"—once again showing that Congressional termination is not the only type of termination that is relevant under the IRA. *Decision for the Tunica-Biloxi Tribe* at 12 (Aug. 11, 2011) (emphasis added), https://turtletalk. files.wordpress.com/2012/08/tunica-biloxi-carcieri-ruling-from-interior.pdf.

[11] The two cases cited by the district court (at JA0131) do not say otherwise. *TOMAC* only undermines the district court's position: There, this Court equated a tribe that was "administratively terminated" with an *inability* to organize under the IRA. 433 F.3d at 854. And in *John*, the Supreme Court simply stated that "the fact that federal supervision over [a tribe] has not been continuous" does not "destroy[] the federal power to deal with them." 437 U.S. at 653 (cited at JA0131). But we do not contend that a tribe must have been "continuous[ly]" under Federal jurisdiction to qualify as "Indian" under the IRA. Rather, our argument is that, as *Carcieri* held, a tribe must have been under Federal jurisdiction *in 1934*. And here,

### 3. The Cowlitz Were Not "Under Federal Jurisdiction" In 1934 Because They Had No Government-To-Government Relationship With The United States As Of That Date

As the Secretary herself held, the Cowlitz lacked a "government-to-government relationship with the United States" in 1934.  JA0272.  The NIGC, too, concluded that "the United States "no longer had a government-to-government relationship with" the Cowlitz in 1934.  JA1363-64.  The Secretary, affirmed by the district court (JA0131), nevertheless found that the absence of such a relationship was "not fatal to the determination that the Tribe was under federal jurisdiction in 1934."  JA0270.

But the existence of a government-to-government relationship is the *sine qua non* of federal jurisdiction.  Thus, as Justice Breyer explained in his *Carcieri* concurrence, the term "under Federal jurisdiction" entails the existence of some "relationship between the tribe and Federal Government that could be described as jurisdictional."  555 U.S. at 399 (Breyer, J., concurring); see *Stand Up For California!* v. *Dep't of the Interior*, 919 F. Supp. 2d 51, 66-67 (D.D.C. 2013) (stating that, to be "under Federal jurisdiction" a tribe must have had a "government-to-government relationship" with the United States in 1934).  And for good reason:  It stretches credulity to say that a tribe that had no relationship

_____

both the agency and the Cowlitz conceded that the Cowlitz were *not* "under Federal jurisdiction" at that time.

with the federal government could nevertheless be under the active supervision and control of that government.

And the agency itself has repeatedly recognized that a government-to-government relationship is necessary for a tribe to be "under Federal jurisdiction." As the IBIA has explained, "if the Department has determined that a group is not a political entity with whom the Federal Government has a government-to-government relationship, that group *cannot be considered a 'tribe' within the meaning of the IRA*." *Estate of Elmer Wilson, Jr.*, 47 IBIA 1, 11 (2008) (emphasis added). Last year, the Department's Solicitor reaffirmed that the "unique legal relationship between the United States and Indian tribes … forms the underlying basis of any 'jurisdictional' analysis" under the IRA. The Meaning of 'Under Federal Jurisdiction' for Purposes of the Indian Reorganization Act, at 14 (March 12, 2014), http://www.bia.gov/cs/groups/webteam/documents/text/idc1-028386.pdf. And just last month, the Secretary again stated that "both the first and second definitions [are] limited to those for whom a Federal relationship existed in 1934." Mashpee ROD at 94 (JA4554). The Secretary provides no explanation for her departure from those interpretations. See *King*, 860 F.2d at 470.[12]

---

[12] As noted, the Cowlitz conceded that the tribe "no longer enjoyed federal recognition as a tribal entity" in 1934, JA1258, and the Secretary likewise acknowledged that the Cowlitz "'never had any recognition at the hands of the

### 4.  *Until This Case, The Department Had Consistently Determined That The Cowlitz Were Not Under Federal Jurisdiction In 1934*

At the time of the IRA's enactment, Commissioner Collier created a list of 258 tribes that were eligible to vote to organize under the Act.  Quinn, 34 AM. J. LEGAL HIST. at 356.  The Cowlitz were excluded from that list and denied the right to vote on the IRA.  JA0428-35.  Disavowing that history, the Secretary protested that "many tribes that were clearly under the jurisdiction of the Federal Government chose not to organize under the IRA."  JA0269.  But that misses the point.  The Cowlitz didn't *choose* not to organize under the IRA.  Rather, Cowlitz Indians sought to vote on the IRA, and the Department expressly *rejected* their right to do so.  JA1268; JA0754.

Nor were Cowlitz Indians enrolled with the Indian office in 1934 or enumerated on the annual Indian censuses at the time.  The Appropriations Act of July 4, 1884, required each Indian agent to submit in his annual report "a census of the Indians at his agency."  23 Stat. 76, 98.   Thus, as Justice Breyer explained, "enrollment (as of 1934) with the Indian Office" could suggest that a tribe was "under Federal jurisdiction."   *Carcieri*, 555 U.S. at 399 (Breyer, J., concurring).  The Cowlitz conceded below, however, that the "BIA *never* kept an 'official' census or roll for the Cowlitz."   JA4239 (emphasis added).   Indeed, in their

Government.'"  JA1146.  How could a tribe that was not even *recognized* in 1934 nevertheless have been "under Federal jurisdiction"?

briefing to the NIGC, the Cowlitz relied on the Bureau of Indian Affair's (BIA's) refusal to enroll the tribe as affirmative evidence that the tribe was not even recognized in 1934.  JA1258.

The Secretary, too, acknowledged that the Cowlitz "were not enumerated in the annual censuses required by the Appropriations Act."  JA0266.  And, in 1933, Commissioner Collier rejected an individual Indian's request to enroll with the Cowlitz on the ground that "'[n]o enrolments [sic] are now being made with the remnants of the Cowlitz tribe which in fact, is no longer in existence as a communal entity.'"  JA0746.

The district court dismissed Secretary Collier's statement as inconsistent with the Cowlitz's 2002 federal acknowledgment decision.  JA0132.  But, as noted, it was during those very acknowledgment proceedings that the agency stated that, "from 1880-1940, the Cowlitz Indians" were neither "a reservation tribe under Federal jurisdiction" nor "under direct Federal supervision."  JA1076.  The agency has therefore consistently held, from 1934 until 2000, that the Cowlitz were not "under Federal jurisdiction" in 1934—*however that phrase is interpreted*.

The district court deferred to the Secretary's decision on the ground that "under Federal jurisdiction" is "ambiguous."  JA0125.   But the question under *Chevron*'s first step is not whether a phrase is ambiguous in *some* respect.  Rather, an agency's interpretation will fail at step one if Congress granted "the agency a

31

range of interpretive discretion that the agency has clearly exceeded"—a determination that courts make "without showing the agency any special deference."  *Village of Barrington* v. *Surface Transportation Bd.*, 636 F.3d 650, 659-60 (D.C. Cir. 2011).

That is the case here:  Regardless of the precise metes and bounds of the phrase "under Federal jurisdiction," it unambiguously *excludes* a tribe that was terminated in 1934 and that lacked a government-to-government relationship with the United States at that time.  The agency recognized as much when it stated that, "from 1880-1940," the Cowlitz were *not* "under Federal jurisdiction."  JA1076.[13]

### 5. *The Secretary's Own "Two-Part Inquiry" Demonstrates That The Cowlitz Were Not "Under Federal Jurisdiction" In 1934*

The Secretary established a "two-part inquiry" for determining whether a tribe was "under Federal jurisdiction" within the meaning of the IRA.  JA0260.  The Cowlitz flunk the Secretary's test.  First, the Secretary did not establish (under part one of her test) that the Cowlitz were *ever* under Federal jurisdiction "at or before 1934."  JA0260.  The Secretary relied on a single non-event: "the United States' treaty negotiations with the Lower Band of Cowlitz Indians" in 1855.

---

[13] The Secretary's interpretation would also fail *Chevron*'s second step because she failed to provide any "cogent explanation," *King*, 860 F.2d at 470, for her tacit rejection of the agency's prior determination that the Cowlitz were *not* "under Federal jurisdiction" in 1934, JA1076, and were *not* "a federally recognized tribe" in 1934 (much less a tribe then under Federal jurisdiction), *Brown*, 8 IBIA at 188.

JA0263.  But *those negotiations failed*.  *Ibid.*  Because a treaty was never ratified, the government never actually *exercised* jurisdiction over the Cowlitz.  Indeed, by rejecting the proposed treaty, the Cowlitz manifestly refused to submit to federal jurisdiction.  See *Carcieri*, 555 U.S. at 399 (Breyer, J., concurring) (requiring a treaty "in effect" in 1934).

The district court *agreed* that the Secretary's "part one" analysis was flawed, explaining that "failed treaty negotiations do not, in and of themselves," establish federal jurisdiction over a tribe.  JA0129.  The district court should have stopped there:  Because the Secretary never established that the Cowlitz passed the first step of her test—*i.e.*, that the Cowlitz were under Federal jurisdiction prior to 1934—she never should have even gotten to the second step.

And the Secretary's "part two" analysis—which asks whether the tribe's jurisdictional status remained intact in 1934, JA0261—fares no better (even assuming that, contrary to the district court's conclusion, failed treaty negotiations are sufficient to create federal jurisdiction).  As noted, it is undisputed that the government's exercise of jurisdiction over the Cowlitz was "terminated" as of 1934; yet the Secretary did not even attempt to reconcile that fact with her assertion that there was no evidence that the Cowlitz lost its jurisdictional status. Under "part two" of the Secretary's test, then, the Cowlitz cannot be said to have "remained" under federal jurisdiction in 1934.  JA0261.

Nor is the Secretary's "part two" analysis strengthened by her citation to sporadic contacts with individual Cowlitz Indians.  To begin with, the term "under Federal jurisdiction" requires the exercise of supervision and control over a tribe.  Mere "dealings" with a tribe (much less with individual Indians), JA0261, are insufficient.  See JA0260.  And a closer look at the "dealings" relied on by the Secretary affords cold comfort to her conclusion:

- The Secretary noted that, in 1904, "the Cowlitz 'began a prolonged effort to obtain legislation to bring a claim against the United States for the taking of their land." JA0266.  But none of that proposed legislation became law, because the Department repeatedly "opposed the proposed legislation" (JA0749) on the ground that "the Secretary is *not* empowered to take … land in trust" for the Cowlitz under the IRA (JA0518).  The failed legislation shows the Cowlitz were *not* under Federal jurisdiction in 1934.

- The Secretary noted that the local Superintendent "enumerated the members" of Cowlitz bands.  JA0264.  But it is undisputed that the "BIA never kept an 'official' census or roll for the Cowlitz" (JA4239) and that the Cowlitz were not listed as a tribe on the annual Indian censuses (JA0266).  That is proof that the Cowlitz were *not* under Federal jurisdiction in 1934.

- The Secretary relied on an 1868 attempt by the local BIA superintendent to distribute goods to individual Cowlitz.  JA0264.  But the Indians *refused* those goods.  And they did so because they believed that accepting them would surrender title to their lands (JA0698-99).

- The Secretary cited statements by local BIA officials that the Cowlitz were within the "jurisdiction" of one local agency rather than another.  JA0265.  But the Department itself made clear that those statements were "not backed by policy statements from the office of the Commissioner of Indian Affairs" (JA0746), who stated in 1933 that "the Cowlitz were "no longer in existence as a communal entity" and were not "Federal wards" (JA0746-47).[14]

---

[14]  In light of agency policy, these isolated comments refer to a local agency's "jurisdiction" in the geographic sense—*i.e.*, that some individual Cowlitz Indians

34

- The Secretary cited evidence of allotments to individual Cowlitz Indians. JA0267-68. As the Department explained, however, most of those allotments were given to Indians "who have abandoned … tribal relations" (JA0713) and thus do "not provide good evidence [of] an acknowledged government to government relationship with a tribe" (JA0714). Indeed, the Department has held that Cowlitz allotments did not alter the fact that "the Cowlitz Indians were not then Federally recognized as a tribe." JA1073.

- The Secretary noted the agency's approval of attorney contracts with the Cowlitz. JA0269. But the Department approved attorney contracts pursuant to Revised Statutes § 2103 (1872), which required approval of contracts with any "tribe of Indians, or individual Indian or Indians" (17 Stat. 136, 136)—not just with Indian *tribes* (much less those that were "under Federal jurisdiction).

The attenuated "dealings" cited by the Secretary are just a distraction. It is undisputed that the Cowlitz refused to enter into any treaty with the United States and that they were "terminated" by the United States as of 1934. There is therefore no way that the Cowlitz were "under Federal jurisdiction" at that time under the Secretary's own test—as the agency itself plainly recognized when it held that the Cowlitz were *not* "under Federal jurisdiction" in 1934. JA1076.

## III. THE COWLITZ DO NOT HAVE "SIGNIFICANT HISTORICAL CONNECTIONS" TO THE PARCEL ITSELF, AND THUS ARE NOT ENTITLED TO ENGAGE IN GAMING UNDER IGRA

IGRA prohibits gaming on land acquired after October 17, 1988, with two pertinent exceptions: for "restored" lands and for "initial reservations." The Secretary held that the Parcel (acquired well after 1988) was eligible for gaming under the "initial reservation" exception, which requires that the Parcel be "within

_____

were within the geographical area covered by one local agency or another.

35

an area where the tribe has significant historical connections." 25 C.F.R. § 292.6(d). Because the Secretary's IGRA decision cannot be squared with the text, structure, or purpose of the statute and regulations, and because it is an inexplicable (and unexplained) departure from agency precedent, the IGRA portion of the ROD should be vacated.

A.    The "Initial Reservation" Exception Requires "Significant Historical Connections" To The Parcel *Itself*

1.    To meet IGRA's "initial reservation" exception, a tribe must show that the proposed gaming land is "within an area where the tribe has significant historical connections." 25 C.F.R. § 292.6. The text narrows the scope of the Secretary's discretion: The phrase "within an area" requires that the parcel be *surrounded* by land to which the tribe had historical connections. Only then can the parcel be "within" the requisite "area." And not just *any* historical connections will do. The word "significant" means "important, weighty, [or] notable." Webster's Third New Int'l Dictionary 2116 (1986). Tribes may meet that test by "demonstrat[ing] by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use" (25 C.F.R. § 292.2)—each criterion connoting a *long-term and regular* interaction with the land.

To be sure, as the district court noted (JA0139-40), a tribe can satisfy the "initial reservation" exception by showing that its "villages, burial grounds, occupancy or subsistence use" were "*in the vicinity* of the land." 25 C.F.R. § 292.2

36

(emphasis added).  But the word "vicinity" is not an invitation to choose any parcel someplace near a tribe's historical lands.  Rather, "vicinity" means "a *surrounding area* or district," Webster's Third, at 2550 (emphasis added).  That meaning confirms the separate textual requirement that the parcel be "within an area" to which the tribe can document historical connections.  25 C.F.R. § 292.6.

2.    The Secretary's precedents confirm this interpretation.  Indeed, those precedents make clear that the "significant historical connections" test is satisfied only when the tribe's relationship to land in the vicinity permits a "natural inference" that the tribe had "significant historical connections" to *the parcel itself*.

The Secretary's decision in *Scotts Valley Band of Pomo Indians* (May 25, 2012)—which arose in the context of the "restored lands" exception[15]—states that rule most emphatically.  In rejecting a tribe's gaming request, the Secretary recognized that tribes may not be able "to produce *direct* evidence of actual use or occupancy on every parcel within [its] historic use and occupancy area."  Scotts Valley Op. at 15 (JA4350) (emphasis added).  Accordingly, the Secretary explained, the Department adopted the word "vicinity" to allow a finding of the requisite connections where the tribe used or occupied nearby lands—but only if

---

[15] The "restored lands" exception, like the "initial reservation" exception, requires a showing of a "significant historical connection" to the land.  25 C.F.R. § 292.12. See Mashpee ROD at 54 (JA4514).

such usage creates "a natural inference that the tribe historically *used or occupied the subject parcel as well.*" *Ibid.* (emphasis added). As the Secretary held:

> The Department used the word "vicinity" in the Part 292 regulations to permit a finding of restored land on parcels where a tribe lacks any direct evidence of actual use or ownership of the parcel itself, but where the particular location and circumstances of available direct evidence on other lands cause a natural inference that the tribe historically used or occupied the subject parcel as well. … A definition of "vicinity" based solely on proximity would expand "restored land" beyond land that was historically used or occupied by a tribe. Instead, a determination of whether a particular site with direct evidence of historic use or occupancy is within the vicinity of newly acquired land depends on the nature of the tribe's historic use and occupancy, and whether those circumstances lead to the natural inference that the tribe also used or occupied the newly acquired land.

*Ibid.*

More recently, the Secretary reaffirmed—in the context of the initial-reservation exception—that the term "vicinity" requires circumstances that "'lead to the natural inference that the tribe also used or occupied the newly acquired land.'" Mashpee ROD at 58 (JA4518) (quoting Scotts Valley Op. at 15) (JA4350); *id.* at 74 (JA4534) ("evidence of major travel routes, when viewed in conjunction with direct evidence related to historical occupation at multiple sites, only furthers the natural inference that the Mashpee Tribe used and occupied the Taunton parcel.").

This "Natural Inference" test confirms the meaning of the regulatory text: "Vicinity" means more than "somewhere nearby." Indeed, to read the term that

38

broadly would constitute a sharp break, not only from the Scott's Valley and
Mashpee decisions, but also from a long line of agency decisions that required
petitioners to show that their desired gaming site was within their historical
territory, and often in the very *heart* of the tribe's territory, as opposed to its
fringes.[16]  Indeed, in *all* of the prior opinions cited by the ROD, the tribe's gaming
sites were shown or required to be well *within* territory that the tribe had ceded to
the United States, settled on, or aboriginally controlled—that is, on land to which
the tribe had a "consistent," sustained relationship.   Scotts Valley Op. at 13
(JA4348).  See also NIGC Op., *Poarch Band of Creek Indians* (May 19, 2008) at
24-25 (JA2692-93) (parcel was in the center of land that exclusively belonged to
tribe's ancestors); NIGC Op., *Mechoopda Indian Tribe of the Chico Rancheria*
(March 14, 2003) at 10 (JA1170) (parcel was "squarely within th[e] boundaries" of
23 aboriginal villages).[17]   And in *every* case, the agency required evidence of

---

[16] *E.g.*, Solicitor's Op., *Pomo of Upper Lake Indian Lands Determination* (Nov.
21, 2007) at 6-7 (JA2526-27) (land was not "nearby or peripheral—it is central …
[to the] aboriginal territory); NIGC Op., *Turtle Creek Casino Site, Grand Traverse
Band* (Aug. 31, 2001) at 19 (JA1102) (land was "at the heart of the Band's culture
throughout history"); NIGC Op., *Ft. Sill Apache Tribe Luna Co., NM Property*
(May 19, 2008) at 24-25 (JA2662-63) (land was part of the tribe's aboriginal
territory "from time immemorial"); Solicitor's Op., *Confederated Tribe of Coos* at
9 (JA1115) (land was within tribal reservation).

[17] See also NIGC Op., *Sault Ste. Marie Tribe* (July 31, 2006) at 11 (JA2120) (site
was within territory ceded to the United States); NIGC Op., *Bear River Band of
Rohnerville Rancheria* (Aug. 5, 2002) at 13 (JA1159) (parcel was "in the middle
of" 25 different sites known to be inhabited by the tribe); NIGC Op., *Karuk Tribe*

39

additional important connections to the land.[18]  A showing that the gaming site is in the heart of the tribe's territory allows the agency to infer that the site *itself* was important to the petitioner, even when there is no direct evidence of significant activity on the land.  Rohnerville Op. at 13 (JA1159) ("Because the parcel is located in the middle of these many sites that were used by the Wiyot, we can assume that the parcel, too, was used by the Wiyot.").

3.    Any broader construction of the regulatory language would defeat the purpose of IGRA's "initial reservation" exception.[19]  IGRA generally prohibits off-reservation gaming on any land acquired after IGRA's enactment.  25 U.S.C. § 2719(a).  By limiting gaming to land that tribes owned pre-IGRA—land to which they necessarily had close historical connections—that prohibition prevents tribes

_of Cal._ (Apr. 9, 2012) at 10 (JA4333) (parcel was at the site of an aboriginal tribal community).  The ROD relies on *one* prior agency interpretation in which the land was not in an area of exclusive use by the tribe, but fails to acknowledge that in that case there was evidence that the tribe historically occupied *the parcel itself*. JA0292 (citing Karuk Op. at 10) (JA4333).

[18] See, *e.g.*, Pomo Op. at 7 (JA2527) (land was less than a mile from tribe's burial grounds); Mechoopda Op. at 10-11 (JA1170-71) (parcel was crossed by trails linking several nearby tribal villages); Ft. Sill Apache Op. at 24-25 (JA2662-63) (subsistence use in the area surrounding the land); Poarch Op. at 22 (JA2690) (two burial mounds at parcel site); Rohnerville Op. at 12-13 (JA1158-59) (near major trails and natural landmarks with cultural significance); Coos Op. at 9 (JA1115) (adjacent to burial ground).

[19] Because the "initial reservation" provision is *an exception* to IGRA's general prohibition of gaming on land acquired after 1988, it must be strictly construed. See *Comm'r* v. *Clark*, 489 U.S. 726, 739 (1989).

from opportunistically acquiring casino land in lucrative gaming markets outside of areas they traditionally inhabited.  The initial-reservation and restored-lands exceptions were intended to place landless tribes on an equal footing with tribes who could game on their existing land.  *Citizens Exposing Truth About Casinos* v. *Norton*, No. 02-1754, 2004 WL 5238116, at *3 n.5 (D.D.C. Apr. 23, 2004), *aff'd*, 492 F.3d 460 (D.C. Cir. 2007).  But those exceptions were *not* designed to give landless tribes an unfair *advantage* by allowing them to acquire land based on market research, rather than tribal history.   See Coos Op. at 12 (JA1118) (exceptions were not intended "to substantially undercut the general prohibition on gaming on lands acquired after IGRA's passage").

The present case illustrates the inequity of abandoning these limiting principles.  Unlike the Cowlitz parcel, Grand Ronde's Spirit Mountain Casino is in the heart of its historic territory; it is located on its historic reservation, on land that was restored to the tribe by Congress.  Pub. L. No. 103-263, 108 Stat. 707 (1994).  At one and a half hours outside of Portland, however, Grand Ronde's casino is located far from its principal customer base.  JA3326.  Meanwhile, the heart of the Cowlitz's historic territory is almost exactly the same distance from Portland in the opposite direction.  JA0452; JA0638.  Land for a casino was available near the center of the Cowlitz's historic territory, JA2801-05, yet the Cowlitz are seeking to game fifty miles away—and only half an hour from Portland.  The advantage this

41

would give them over the Grand Ronde is obvious, and it is exactly the type of uneven playing field the "significant historical connections" requirement was intended to prevent.

### B.   Under These Standards, The Cowlitz Are Not Entitled To Have Gaming On The Parcel

The Secretary's IGRA ruling constitutes the worst sort of ad hoc decision-making. The ROD did not apply the "Natural Inference" test. It failed to reckon with the phrase "within an area," and therefore never identified any *surrounding* land to which the Cowlitz had a "significant historical connection." And its reliance on a string of off-site, sporadic incidents, often involving individual Indians and not the Cowlitz as a tribe, drains "significant" of any coherent meaning.

1.   The heart of the Cowlitz's historical land is approximately 50 miles north of the Parcel, and its southernmost historical village was 25 miles north. See Map (Exhibit D); JA4605. The undisputed fourteen-mile distance from the southernmost edge of historic Cowlitz territory puts the Parcel well *outside* any "area where the [Cowlitz] have significant historical connections." 25 C.F.R. § 292.6. Indeed, that fact alone is virtually dispositive under agency precedent, because a parcel's location within the heart of the tribe's historic territory is the best evidence by which the agency can infer that the land *itself* was significant to

42

the tribe.  See pp. 39-40, *supra*.[20]  In no prior case has the agency ever even intimated that "14 miles [from the *edge* of a tribe's territory] is consistent with a finding of significant historical connection."  JA0293.

What is more, the Indian Claims Commission (ICC) and the BIA unequivocally concluded that *other* Indians controlled and occupied the area surrounding the Parcel.  JA0453-54; JA0624; JA0673; JA0952.[21]  Not surprisingly, BIA historians and census data also documented that virtually no Cowlitz Indians lived in Clark County between 1850 and 1920.  JA0997-98; JA0938-40; JA1336-37.  Census data from the late 1800s consistently showed the "overwhelming majority" of Cowlitz families lived in Lewis County, whose closest border is approximately 50 miles north of the Parcel.  JA0989.

Nor is there evidence that the Cowlitz regularly traveled to the Parcel.  The ROD concludes otherwise only by gathering a pocketful of isolated or transient activities, somewhere around the Parcel (but not *surrounding* the parcel), and then proclaiming those activities to constitute "use" and "occupancy" in the "vicinity"

---

[20] The trip to the Parcel from Cowlitz territory was no small feat to travel before the days of the modern interstate.  See JA0306-07; JA0534 ("it was difficult to get from the Clarke [sic] County communities of Kalama and the Lewis River to their distant county seat, Vancouver"—15 miles away).

[21] See also JA0801-05 (BIA report identifying five anthropological groups representing all members of the modern-day Cowlitz and concluding that *none* had roots near the Lewis River, where the Parcel is located).

of the Parcel—without showing how that leads to the "natural inference" that the Cowlitz used the Parcel itself.

For instance, the agency relied heavily on the Cowlitz's use of the Columbia River, which flows within several miles of the Parcel. JA0293-96. But the Columbia River is over 1200 miles long. Cowlitz presence in such a large area—especially one that *does not include the Parcel*—is wholly without significance. In the Scotts Valley opinion, for instance, the agency held that evidence that the tribe lived in the "San Francisco Bay area"—an area that included the gaming parcel—was insufficient because that area "is quite large, and the Band has not established that the individuals' new homes were located on or within the vicinity" of the parcel itself. Scotts Valley Op. at 18 (JA4353); see also Guidiville Op. at 13 (JA4315).

To make matters worse, much of the agency's evidence is conjectural. The agency cites, for example, the "possibility" of Cowlitz presence along a 100-mile stretch of the Columbia River, JA0294, and an anthropologist's report speculating that the Cowlitz "*may have* indeed have had *some sort of presence* along the Columbia," *ibid* (emphasis added). But that is exactly the sort of inconclusive evidence that the agency has invariably rejected—except when it comes to the Cowlitz. See, *e.g.*, Scotts Valley Op. at 11-12 (JA4346-47) (rejecting the tribe's claim of significant historical connections because there was "countervailing

44

evidence"). Similarly, the government cites evidence that Cowlitz Indians "*may well* have manned the boats between the Cowlitz and Fort Vancouver as well, passing the mouth of the Lewis River on their way"; but there is no basis to infer that the Cowlitz actually *exited* the river to use the Parcel. JA0300-01 (emphasis added); *compare* Scotts Valley Op. at 16-17 (JA4351-52) ("[t]he Band has provided no evidence that its ancestors working … on the north side of the Bay ever crossed the Bay" to visit the gaming parcel). These "possibilit[ies]" and "may[bes]" never would have sufficed for any other tribe; even evidence that a tribe was "probably" descended from the Indians that lived on the gaming parcel, Scotts Valley Op. at 11 & n.43 (JA4346), or "likely" lived on the same stretch of river as the parcel, NIGC Op., *Karuk Tribe of Cal.* (Oct. 12, 2004) at 8 (JA1238), has been found insufficient under agency precedent. The Secretary has always required *conclusive* evidence of historical activity, repeatedly rejecting evidence that was open to debate. See, *e.g.*, Scotts Valley Op. at 10, 11 & n.43 (JA4345-46); Guidiville Op. at 16-18 (JA4318-20).

Most of the government's remaining evidence consists of three isolated sightings of Cowlitz Indians within several miles of the Parcel. This is how meager the Secretary's case is: She actually invokes a single sighting of a single Indian named "Zack" who was apparently hunting on the Chelatchie Prairie. JA0300. Even the government could not bring itself to contend that Zack's one-

45

time trip meant that the Cowlitz *as a tribe* used the Prairie for subsistence hunting, much less that they used the Parcel, six miles downstream.  Compare Scotts Valley Op. at 18 (JA4353) (evidence about individual Indians' occupancy does not establish *tribal* occupancy).  But even if such sightings of individual Indians were evidence of tribal occupancy—and they are not—the agency's prior opinions flatly hold that a tribe's connection to its gaming site must be long-standing; "occasional[] visit[s]" to the gaming site do not support a significant historical connection.  Scotts Valley Op. at 17 (JA4352).

Similarly, an ornithologist's reported sighting of Cowlitz "lodges" "near" Warrior's Point in the 1800s, even if accurate,[22] does not suggest that the Parcel itself was used by the Cowlitz in any sustained manner.  See JA0294.  The isolated sighting contains no indication of a *long-term* presence such as a village or burial ground in the area.[23]  In fact, the evidence is exactly to the contrary:  The source cited by the agency concludes that *if* the lodges were correctly identified as belonging to Cowlitz Indians, the Cowlitz were probably there only en route to another location.  JA0296 (citing JA2585).  Such temporary occupancy—even if it

---

[22]  Contrary to the agency's assertion, JA0295, neither the ICC nor the BIA accepted the accuracy of the account.  See JA0648-49.  Three reports in the administrative record also challenge the accuracy of the sighting.  JA0295.

[23] Furthermore, it is unknown how far the encampment was from Warrior's Point (which is itself several miles from the Parcel).  JA0295.

had been on the Parcel itself—is insufficient given the regulation's use of the word "*significant*." Guidiville Op. at 10 (JA4312) (tribe may not game on just "*any* aboriginal land that [it] ever occupied."); see also NIGC Op., *Wyandotte Nation Amended Gaming Ordinance* (Sept. 10, 2004) at 12 (JA1227) (tribe lacked a sufficient historical connection to a site it had historically occupied for 11 years); Scotts Valley Op. at 17 (JA4352).[24]

And while the Secretary asserted that all of these activities are in the "vicinity" of the parcel, she never explained how they meet the agency's definition of "vicinity." As shown above, the regulations and the agency's prior opinions make clear that historical activity is in the "vicinity" of the parcel *only* if the location and type of activity give rise to the "natural inference" that the tribe used the Parcel itself. The ROD never claims any inference that the Cowlitz, as a tribe, used or occupied the Parcel itself—and in fact *denies* that "significant historical connections" might require "actual inhabitance" of the Parcel. JA0298. Instead, the Secretary baldly states that any Cowlitz presence within 15 miles of the Parcel (or, in some cases, much farther away) is in the "vicinity." But the agency has

---

[24] Furthermore, a battle between Cowlitz and Chinook Indians three miles from the Parcel demonstrates that the *Chinook*, not the Cowlitz, occupied and controlled the area south of the Cowlitz's territory. The historical account shows that the Cowlitz *failed* to encroach on the Chinook's land, and instead "returned home" after the fight. JA0300. In other words, the Cowlitz's "home" was nowhere near the Parcel. Although it acknowledged that inconsistency, the ROD inexplicably continued to cite the battle in support of its decision. *Ibid.*

*rejected* that very definition of "vicinity" because "[a] definition of 'vicinity' based solely on proximity would expand 'restored land' beyond land that was historically used or occupied by a tribe." Scotts Valley Op. at 15 (JA4350). The ROD does not acknowledge its departure from its recent interpretation of the word "vicinity" or its failure to apply the agency's "natural inference" test—another hallmark of arbitrary and capricious decision-making. See, *e.g.*, *Comau*, *Inc.* v. *Nat'l Labor Relations Bd.*, 671 F.3d 1232, 1236 (D.C. Cir. 2012) (an agency cannot "ignore its own relevant precedent"); *Ramaprakash* v. *F.A.A.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003).

2.    The district court's decision sustaining the IGRA ruling is as flawed as the ruling itself. First, the court misread the ROD. The Secretary did *not* (as the district court stated) "ultimately conclude[]" that "there was sufficient evidence of use and occupancy ... to support the natural inference that the Cowlitz used or occupied the Parcel" (JA0141). The Secretary did not apply that legal standard at all.

The district court also misunderstood what that legal standard requires. In the court's view, the "Natural Inference" standard does not "require the Cowlitz Tribe to have occupied or used the Parcel or the land adjacent to it." JA0137. But the court misread the Scotts Valley opinion. While that decision did not require "direct evidence" of use of the parcel itself, it plainly *did* require the sort of activity

48

surrounding the parcel as to give rise to the "natural inference" that the tribe used the *parcel itself*.  Scotts Valley Op. at 15 & n.59 (JA4350).  The Secretary made no such finding in this case, and the district court let her off the hook.

But it gets worse.  The district court also effectively read the word "significant" out of the regulation, holding that Section 292.2 does not require "long-term" connections to the land.  JA0137.  But as explained, agency precedent requires a tribe to show "more than a transient or occasional presence in an area"; rather, "[o]ccupancy can be demonstrated by a *consistent presence*" on the land. Scotts Valley Op. at 13 (JA4348) (emphasis added).  The Cowlitz made no such showing in this case; the Secretary did not require the tribe to do so; and the district court said there was no need to do so.

## CONCLUSION

This Court should reverse the district court's decision and vacate the ROD.

49

Dated: October 9, 2015                     Respectfully submitted.


                                           /s/ Lawrence S. Robbins

                                           Lawrence S. Robbins
                                           Gary A. Orseck
                                           Daniel N. Lerman
                                           ROBBINS, RUSSELL, ENGLERT, ORSECK,
                                           UNTEREINER & SAUBER LLP
                                           1801 K Street, N.W., Suite 411
                                           Washington, D.C. 20006
                                           Telephone: (202) 775-4500
                                           Facsimile: (202) 775-4510
                                           lrobbins@robbinsrussell.com

                                           *Counsel for Appellant The
                                           Confederated Tribes of the Grand
                                           Ronde Community of Oregon*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,922 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 Point Times New Roman.

Dated: October 9, 2015                    /s/ Lawrence S. Robbins
                                          Lawrence S. Robbins

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2015, I electronically filed the foregoing brief, together with the Appendix filed concurrently with the brief, by using the appellate CM/ECF system, which will send notice of such filing to counsel for Appellee.  In addition, I caused paper copies of the brief and Appendix to be sent via Federal Express overnight delivery to the Clerk of Court's office and counsel for all parties.


/s/ Lawrence S. Robbins
Lawrence S. Robbins

**ADDENDUM**

TABLE OF CONTENTS

25 U.S.C. § 465

25 U.S.C. § 479

25 U.S.C. § 2719

25 C.F.R. § 292.2

25 C.F.R. § 292.6

25 C.F.R. § 292.12

United States Code Annotated
  Title 25. Indians
    Chapter 14. Miscellaneous
      Subchapter V. Protection of Indians and Conservation of Resources (Refs & Annos)

25 U.S.C.A. § 465

§ 465. Acquisition of lands, water rights or surface rights; appropriation; title to lands; tax exemption

Currency

The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year: *Provided*, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico, and for other purposes, or similar legislation, becomes law.

The unexpended balances of any appropriations made pursuant to this section shall remain available until expended.

Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

**CREDIT(S)**
   (June 18, 1934, c. 576, § 5, 48 Stat. 985; Nov. 1, 1988, Pub.L. 100-581, Title II, § 214, 102 Stat. 2941.)

Notes of Decisions (159)

25 U.S.C.A. § 465, 25 USCA § 465
Current through P.L. 114-49 approved 8-7-2015

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 25. Indians
      Chapter 14. Miscellaneous
         Subchapter V. Protection of Indians and Conservation of Resources (Refs & Annos)

25 U.S.C.A. § 479

§ 479. Definitions

Currentness

The term "Indian" as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words "adult Indians" wherever used in this Act shall be construed to refer to Indians who have attained the age of twenty-one years.

**CREDIT(S)**

   (June 18, 1934, c. 576, § 19, 48 Stat. 988.)

Notes of Decisions (25)

25 U.S.C.A. § 479, 25 USCA § 479
Current through P.L. 114-49 approved 8-7-2015

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    1

United States Code Annotated
    Title 25. Indians
        Chapter 29. Indian Gaming Regulation (Refs & Annos)

25 U.S.C.A. § 2719

§ 2719. Gaming on lands acquired after October 17, 1988

Currentness

(a) Prohibition on lands acquired in trust by Secretary

Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless--

**(1)** such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988; or

**(2)** the Indian tribe has no reservation on October 17, 1988, and--

**(A)** such lands are located in Oklahoma and--

**(i)** are within the boundaries of the Indian tribe's former reservation, as defined by the Secretary, or

**(ii)** are contiguous to other land held in trust or restricted status by the United States for the Indian tribe in Oklahoma; or

**(B)** such lands are located in a State other than Oklahoma and are within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located.

(b) Exceptions

**(1)** Subsection (a) of this section will not apply when--

**(A)** the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

**(B)** lands are taken into trust as part of--

**(i)** a settlement of a land claim,

**(ii)** the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

**(iii)** the restoration of lands for an Indian tribe that is restored to Federal recognition.

**(2)** Subsection (a) of this section shall not apply to--

**(A)** any lands involved in the trust petition of the St. Croix Chippewa Indians of Wisconsin that is the subject of the action filed in the United States District Court for the District of Columbia entitled St. Croix Chippewa Indians of Wisconsin v. United States, Civ. No. 86-2278, or

**(B)** the interests of the Miccosukee Tribe of Indians of Florida in approximately 25 contiguous acres of land, more or less, in Dade County, Florida, located within one mile of the intersection of State Road Numbered 27 (also known as Krome Avenue) and the Tamiami Trail.

**(3)** Upon request of the governing body of the Miccosukee Tribe of Indians of Florida, the Secretary shall, notwithstanding any other provision of law, accept the transfer by such Tribe to the Secretary of the interests of such Tribe in the lands described in paragraph (2)(B) and the Secretary shall declare that such interests are held in trust by the Secretary for the benefit of such Tribe and that such interests are part of the reservation of such Tribe under sections 465 and 467 of this title, subject to any encumbrances and rights that are held at the time of such transfer by any person or entity other than such Tribe. The Secretary shall publish in the Federal Register the legal description of any lands that are declared held in trust by the Secretary under this paragraph.

(c) Authority of Secretary not affected

Nothing in this section shall affect or diminish the authority and responsibility of the Secretary to take land into trust.

(d) Application of Title 26

**(1)** The provisions of Title 26 (including sections 1441, 3402(q), 6041, and 6050I, and chapter 35 of such title) concerning the reporting and withholding of taxes with respect to the winnings from gaming or wagering operations shall apply to Indian gaming operations conducted pursuant to this chapter, or under a Tribal-State compact entered into under section 2710(d)(3) of this title that is in effect, in the same manner as such provisions apply to State gaming and wagering operations.

**(2)** The provisions of this subsection shall apply notwithstanding any other provision of law enacted before, on, or after October 17, 1988, unless such other provision of law specifically cites this subsection.

**CREDIT(S)**
   (Pub.L. 100-497, § 20, Oct. 17, 1988, 102 Stat. 2485.)

Notes of Decisions (54)

25 U.S.C.A. § 2719, 25 USCA § 2719

Current through P.L. 114-49 approved 8-7-2015

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 25. Indians
        Chapter I. Bureau of Indian Affairs, Department of the Interior
            Subchapter N. Economic Enterprises
                Part 292. Gaming on Trust Lands Acquired After October 17, 1988 (Refs & Annos)
                    Subpart A. General Provisions

25 C.F.R. § 292.2

§ 292.2 How are key terms defined in this part?

Effective: June 19, 2008

Currentness

For purposes of this part, all terms have the same meaning as set forth in the definitional section of IGRA, 25 U.S.C. 2703. In addition, the following terms have the meanings given in this section.

Appropriate State and local officials means the Governor of the State and local government officials within a 25–mile radius of the proposed gaming establishment.

BIA means Bureau of Indian Affairs.

Contiguous means two parcels of land having a common boundary notwithstanding the existence of non-navigable waters or a public road or right-of-way and includes parcels that touch at a point.

Former reservation means lands in Oklahoma that are within the exterior boundaries of the last reservation that was established by treaty, Executive Order, or Secretarial Order for an Oklahoma tribe.

IGRA means the Indian Gaming Regulatory Act of 1988, as amended and codified at 25 U.S.C. 2701–2721.

Indian tribe or tribe means any Indian tribe, band, nation, or other organized group or community of Indians that is recognized by the Secretary as having a government-to-government relationship with the United States and is eligible for the special programs and services provided by the United States to Indians because of their status as Indians, as evidenced by inclusion of the tribe on the list of recognized tribes published by the Secretary under 25 U.S.C. 479a–1.

Land claim means any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:

(1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;

(2) Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and

(3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

Legislative termination means Federal legislation that specifically terminates or prohibits the government-to-government relationship with an Indian tribe or that otherwise specifically denies the tribe, or its members, access to or eligibility for government services.

Nearby Indian tribe means an Indian tribe with tribal Indian lands located within a 25–mile radius of the location of the proposed gaming establishment, or, if the tribe has no trust lands, within a 25–mile radius of its government headquarters.

Newly acquired lands means land that has been taken, or will be taken, in trust for the benefit of an Indian tribe by the United States after October 17, 1988.

Office of Indian Gaming means the office within the Office of the Assistant Secretary–Indian Affairs, within the Department of the Interior.

Regional Director means the official in charge of the BIA Regional Office responsible for BIA activities within the geographical area where the proposed gaming establishment is to be located.

Reservation means:

(1) Land set aside by the United States by final ratified treaty, agreement, Executive Order, Proclamation, Secretarial Order or Federal statute for the tribe, notwithstanding the issuance of any patent;

(2) Land of Indian colonies and rancherias (including rancherias restored by judicial action) set aside by the United States for the permanent settlement of the Indians as its homeland;

(3) Land acquired by the United States to reorganize adult Indians pursuant to statute; or

(4) Land acquired by a tribe through a grant from a sovereign, including pueblo lands, which is subject to a Federal restriction against alienation.

Secretarial Determination means a two-part determination that a gaming establishment on newly acquired lands:

(1) Would be in the best interest of the Indian tribe and its members; and

(2) Would not be detrimental to the surrounding community.

Secretary means the Secretary of the Interior or authorized representative.

Significant historical connection means the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land.

Surrounding community means local governments and nearby Indian tribes located within a 25–mile radius of the site of the proposed gaming establishment. A local government or nearby Indian tribe located beyond the 25–mile radius may petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment.

SOURCE: 73 FR 29375, May 20, 2008; 73 FR 35579, June 24, 2008, unless otherwise noted.


AUTHORITY: 5 U.S.C. 301, 25 U.S.C. 2, 9, 2719, 43 U.S.C. 1457.

USCA Case #14-5326     Document #1577559          Filed: 10/09/2015       Page 74 of 78

Notes of Decisions (2)

Current through Sept. 24, 2015; 80 FR 57688.

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.     3

Code of Federal Regulations
  Title 25. Indians
    Chapter I. Bureau of Indian Affairs, Department of the Interior
      Subchapter N. Economic Enterprises
        Part 292. Gaming on Trust Lands Acquired After October 17, 1988 (Refs & Annos)
          Subpart B. Exceptions to Prohibitions on Gaming on Newly Acquired Lands
            "Initial Reservation" Exception

25 C.F.R. § 292.6

§ 292.6 What must be demonstrated to meet the "initial reservation" exception?

Effective: June 19, 2008

Currentness

This section contains criteria for meeting the requirements of 25 U.S.C. 2719(b)(1)(B)(ii), known as the "initial reservation" exception. Gaming may occur on newly acquired lands under this exception only when all of the following conditions in this section are met:

(a) The tribe has been acknowledged (federally recognized) through the administrative process under part 83 of this chapter.

(b) The tribe has no gaming facility on newly acquired lands under the restored land exception of these regulations.

(c) The land has been proclaimed to be a reservation under 25 U.S.C. 467 and is the first proclaimed reservation of the tribe following acknowledgment.

(d) If a tribe does not have a proclaimed reservation on the effective date of these regulations, to be proclaimed an initial reservation under this exception, the tribe must demonstrate the land is located within the State or States where the Indian tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and within an area where the tribe has significant historical connections and one or more of the following modern connections to the land:

(1) The land is near where a significant number of tribal members reside; or

(2) The land is within a 25–mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or

(3) The tribe can demonstrate other factors that establish the tribe's current connection to the land.

SOURCE: 73 FR 29375, May 20, 2008; 73 FR 35579, June 24, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301, 25 U.S.C. 2, 9, 2719, 43 U.S.C. 1457.

Current through Sept. 24, 2015; 80 FR 57688.

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
    Title 25. Indians
        Chapter I. Bureau of Indian Affairs, Department of the Interior
            Subchapter N. Economic Enterprises
                Part 292. Gaming on Trust Lands Acquired After October 17, 1988 (Refs & Annos)
                    Subpart B. Exceptions to Prohibitions on Gaming on Newly Acquired Lands
                        "Restored Lands" Exception

25 C.F.R. § 292.12

§ 292.12 How does a tribe establish connections to newly
acquired lands for the purposes of the "restored lands" exception?

Effective: June 19, 2008
Currentness

To establish a connection to the newly acquired lands for purposes of § 292.11, the tribe must meet the criteria in this section.

(a) The newly acquired lands must be located within the State or States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and the tribe must demonstrate one or more of the following modern connections to the land:

(1) The land is within reasonable commuting distance of the tribe's existing reservation;

(2) If the tribe has no reservation, the land is near where a significant number of tribal members reside;

(3) The land is within a 25–mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or

(4) Other factors demonstrate the tribe's current connection to the land.

(b) The tribe must demonstrate a significant historical connection to the land.

(c) The tribe must demonstrate a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration. To demonstrate this connection, the tribe must be able to show that either:

(1) The land is included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition; or

(2) The tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands.

USCA Case #14-5326    Document #1577559        Filed: 10/09/2015      Page 78 of 78

SOURCE: 73 FR 29375, May 20, 2008; 73 FR 35579, June 24, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301, 25 U.S.C. 2, 9, 2719, 43 U.S.C. 1457.

Notes of Decisions (4)

Current through Sept. 24, 2015; 80 FR 57688.

**End of Document**                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.