**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No. 14-5326
### Consolidated with No. 15-5033

CONFEDERATED TRIBES OF THE GRANDE RONDE
COMMUNITY OF OREGON,

*Plaintiff-Appellant*,

CLARK COUNTY, WASHINGTON, *et al.*,

*Plaintiffs-Appellants*,

v.

SALLY JEWELL, in her official capacity as Secretary of the Interior, *et al.*,

*Defendants-Appellees*,

COWLITZ INDIAN TRIBE,

*Intervenor-Appellee*.

---

*On Appeal from the United States District Court for the District of Columbia*
*Civil Action No. 1:13-cv-849-BJR*
*Hon. Barbara J. Rothstein, Judge Presiding*

**BRIEF OF CLARK COUNTY, WASHINGTON, CITY OF VANCOUVER,
WASHINGTON, CITIZENS AGAINST RESERVATION SHOPPING,
AL ALEXANDERSON, GREG AND SUSAN GILBERT,
DRAGONSLAYER, INC., AND MICHELS DEVELOPMENT LLC**

Christine M. Cook
Sr. Deputy Prosecuting Attorney
Clark County Prosecuting
Attorney's Office
Civil Division
P.O. Box 5000
Vancouver, WA 98666
(360) 397-2478
Christine.Cook@clark.wa.gov

Brent D. Boger
Assistant City Attorney
210 E. 13th Street
Vancouver, WA 98660
(360) 487-8500
brent.boger@cityofvancouver.us

Benjamin S. Sharp
Jennifer A. MacLean
Donald C. Baur
PERKINS COIE LLP
700 13th Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 654-6262
BSharp@perkinscoie.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a), the following is a statement of the parties, amici, rulings under review, and related cases:

## I.    Parties and Amici

Clark County and the City of Vancouver, Washington, Al Alexanderson, Greg and Susan Gilbert, Citizens Against Reservation Shopping, Dragonslayer, Inc., and Michels Development, LLC (collectively, the "County") were plaintiffs in the district court and are appellants in 15-5033. The Confederated Tribes of the Grande Ronde Community of Oregon were plaintiffs in the district court and are appellants in this case.

Appellees are Sally Jewell, in her official capacity as Secretary of the Department of the Interior; Kevin Washburn, in his official capacity as Assistant Secretary–Indian Affairs of the Department of the Interior; Stanley M. Speaks, in his official capacity as Regional Director, Northwest Region, Bureau of Indian Affairs; the Department of the Interior.

The Intervenor for Appellees is the Cowlitz Indian Tribe.

The Chinook Nation, the City of La Center, Washington, the Confederated Tribes of the Warm Springs Reservation of Oregon, the Samish Indian Nation, the United South and Eastern Tribes, Inc., and the Jamestown S'Klallam Tribe appeared as amici in the district court.

## II.  Rulings Under Review

The rulings under review are the Order, JA0103, and Memorandum Opinion, JA0104, issued by Judge Barbara J. Rothstein on December 12, 2014, in *Confederated Tribes of the Grand Ronde Community of Oregon v. Jewell*, 75 F. Supp. 3d 387 (D.D.C. 2014).

## III.  Related Cases

The Court consolidated the County's appeal, No. 15-5033, with this case.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Citizens Against Reservation Shopping, Dragonslayer, Inc., and Michels Development, LLC each represent that they have no parent corporation, and that no publicly held corporation owns 10% or more of their stock.  None of these entities have issued stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............i

    I.     Parties and Amici ................................................................. i

    II.    Rulings Under Review .......................................................... ii

    III.   Related Cases ........................................................................ ii

CORPORATE DISCLOSURE STATEMENT ...................................... iii

TABLE OF AUTHORITIES ................................................................ viii

GLOSSARY ...........................................................................................xiv

STATEMENT OF JURISDICTION ......................................................1

STATEMENT OF ISSUES ....................................................................1

STATUTES AND REGULATIONS ......................................................1

PRELIMINARY STATEMENT ............................................................2

STATEMENT OF THE CASE ...............................................................3

      A.     Statutory Framework ..........................................................3

      B.     Statement of Facts ..............................................................4

            1.     Background ................................................................4

            2.     Record of Decision ...................................................5

            3.     The District Court's Opinion ...................................6

SUMMARY OF ARGUMENT ...............................................................7

ARGUMENT ..........................................................................................8

    I.    Standard of Review ...............................................................8

# TABLE OF CONTENTS
### (continued)

**Page**

II.   Because the Tribe was not "recognized" or "under Federal
jurisdiction" in 1934, the Secretary lacked authority to acquire
land in trust for it. ...........................................................................9

   A.   Because the word "now" modifies both "recognized" and
"under federal jurisdiction," a tribe must have been both
in 1934 to satisfy Section 479. ...........................................10

   B.   The IRA uses "recognized" in a formal, political sense. ...................15

   C.   Because the Cowlitz Tribe was landless and did not have
a treaty, executive order, or legislation, it cannot have
been "under federal jurisdiction" in 1934. ........................................18

       1.   The phrase "under Federal jurisdiction" is
unambiguous. ...........................................................19

       2.   The Secretary's two-step test violates the plain
language of Section 479, and the Tribe cannot
satisfy it. ...................................................................23

           a.   Failed treaty negotiations cannot establish that the
Tribe was "under Federal jurisdiction." .........................23

           b.   Evidence of interaction between low-level
Department officials with the Tribe (or individual
Indians) cannot establish legal obligations or duties
on the part of the United States. ....................................24

III.  The Secretary violated the APA, the IRA, and NEPA by
refusing to address the County's questions about the Tribe's
expanded enrollment..........................................................................27

   A.   The Secretary violated the APA by failing to address the
County's questions about the Tribe's expanded
enrollment...........................................................................28

# TABLE OF CONTENTS
## (continued)

**Page**

B.    The Secretary was obligated under the IRA and her trust regulations to examine the Tribe's expanded enrollment to determine whether she had authority to act. ................................30

C.    The Secretary did not comply with NEPA because she failed to independently evaluate the effect of enrollment on the Business Plan. ...........................................................................35

IV.   The Secretary's determination that the Parcel qualifies for gaming as an "initial reservation" is arbitrary and capricious. ...................39

A.    The exceptions to IGRA's gaming prohibition should be narrowly construed. ..............................................................................41

B.    The Secretary erred by applying the wrong standard for identifying an "initial reservation." ....................................................42

C.    The Secretary also impermissibly departed from precedent regarding what constitutes a "significant historical connection." ......................................................................46

CONCLUSION ...................................................................................................52

STATUTORY AND REGULATORY ADDENDUM

Indian Reorganization Act, §§ 5 and 19, Pub. L. No. 73-383, 48 Stat 984, codified as amended at 25 U.S.C. §§ 465 and 479

§ 465. Acquisition of lands, water rights or surface rights; appropriation; title to lands; tax exemption .............................................Add. 1

§ 479.  Definitions .................................................................................Add. 1

Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2485, codified in pertinent part at 25 U.S.C. § 2719

§ 2719. Gaming on lands acquired after October 17, 1988...................Add. 2

## TABLE OF CONTENTS
(continued)

**Page**

25 C.F.R. §§ 292.2, 292.6, and 292.12

§ 292.2  How are key terms defined in this part?..................................Add. 3

§ 292.6  What must be demonstrated to meet the "initial reservation" exception...................................................................................Add. 3

§ 292.12  How does a tribe establish connections to newly acquired lands for the purposes of the "restored lands" exception? ......Add. 4

25 C.F.R. §§ 83.7 and 83.12 (2002)

§ 83.7  Mandatory criteria for Federal acknowledgement. ...................Add. 5

§ 83.12  Implementation of decisions.....................................................Add. 5

National Environmental Policy Act, Pub. L. No. 91-190, 83 Stat. 853, codified as amended and in pertinent part at 42 U.S.C. § 4332

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts ...Add. 6

40 C.F.R. §§ 1500.1, 1503.4, 1506.5, 1508.8, and 1508.14

§ 1500.1 Purpose. ...................................................................................Add. 7

§ 1503.4 Response to comments. ...........................................................Add. 7

§ 1506.5 Agency responsibility. .............................................................Add. 8

§ 1508.8 Effects. .....................................................................................Add. 8

§ 1508.14 Human environment. ..............................................................Add. 8

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

<span style="font-variant:small-caps">Cases</span>

*Airport Impact Relief, Inc. v. Wykle*,
  192 F.3d 197 (1st Cir. 1999) ................................................................. 37

*Atkinson Trading Co. v. Shirley*,
  532 U.S. 645 (2001) ............................................................................ 12

*Bangor Hydro-Elec. Co. v. FERC*,
  78 F.3d 659 (D.C. Cir. 1996) ............................................................... 15

*Blackfeet et al. Nations v. U.S.*,
  81 Ct. Cl. 101 (1935) .......................................................................... 24

*\*Brown v. Comm. Indian Affairs*,
  8 IBIA 183 (1980) .......................................................................... 13, 27

*Brown* v. *Gardner*,
  513 U.S. 115 (1994) ............................................................................ 17

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ............................................................................ 51

*Butte Cnty., Cal. v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) ............................................................. 30

*\*Carcieri v. Salazar*,
  555 U.S. 379 (2009) ............................................. 2, 3, 5, 9, 10, 12, 13, 14, 18, 34

*Catholic Healthcare West v. Sebelius*,
  748 F.3d 351 (D.C. Cir. 2014) ............................................................... 8

*Christensen v. Harris Cnty.*,
  529 U.S. 576 (2000) ...................................................................... 45, 46

_____

*Authorities upon which we chielfly rely are marked with asterisks.

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991)(Buckley, J., dissenting) ............................... 37, 38

*Citizens Exposing Truth About Casinos v. Kempthorne*,
  492 F.3d 460 (D.C. Cir. 2007) ........................................................................ 42

*City of Sault Ste. Marie* v. *Andrus*,
  532 F. Supp. 157 (D.D.C. 1980) .................................................................... 15

*Clairmont v. U.S.*,
  225 U.S. 551 (1912) ........................................................................................ 21

*Comm'r of Internal Revenue v. Clark*,
  489 U.S. 726 (1989) ........................................................................................ 42

*Crandon v. United States*,
  494 U.S. 152 (1990) ........................................................................................ 11

*DeRosa v. National Envelope Corp.*,
  595 F.3d 99 (2d Cir. 2010) ............................................................................. 22

*Elk v. Wilkins*,
  112 U.S. 94 (1884) .......................................................................................... 17

*Estate of Peter Alvin Ward*,
  19 IBIA 196 (1991) ......................................................................................... 26

*Evans v. Victor*,
  204 F. 361 (1913) ............................................................................................ 21

*Ex parte Webb*,
  225 U.S. 663 (1912) ........................................................................................ 21

*FCC* v. *Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................................ 34

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir. 1986) .......................................................................... 37

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Greater Yellowstone Coal. v. Flowers*,
  359 F.3d 1257 (10th Cir. 2004) ..........................................................39

*Halbert v. United States*,
  283 U.S. 753 (1931)............................................................................26

*Koch v. White*,
  744 F.3d 162 (D.C. Cir. 2014) ..........................................................31

*Miami Nation of Indians of Indiana, Inc. v. U.S.*,
  255 F.3d 342 (7th Cir. 2001) .............................................................22

*Montoya v. United States*,
  180 U.S. 261 (1901)............................................................................28

*Motor Veh. Mfrs. Ass'n. v. State Farm*,
  463 U.S. 29 (1983)........................................................................24, 30

*Natural Res. Def. Council, Inc. v. EPA*,
  824 F.2d 1146 (D.C. Cir. 1987)....................................................33, 34

*NetworkIP, LLC v. FCC*,
  548 F.3d 116 (D.C. Cir. 2008) ..........................................................31

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)............................................................................22

*Nuclear Energy Inst., Inc. v. EPA*,
  373 F.3d 1251 (D.C. Cir. 2004) ........................................................31

*Perez v. Mortg. Bankers Ass'n.*,
  135 S. Ct. 1199 (2015)..................................................................10, 45

*Redding Rancheria v. Jewell*,
  776 F.3d 706 (9th Cir. 2015) .............................................................42

*Robinson v. Jewell*,
  790 F.3d 910 (9th Cir. 2015) .............................................................23

## TABLE OF AUTHORITIES
### (continued)

**Page**

*S. Utah Wilderness Alliance v. Bankert*,
    2007 WL 2873788 (D. Utah, Oct. 3, 2007) ........................................37

*Sac and Fox Tribe of Indians of Oklahoma v. United States*,
    161 Ct. Cl. 189 (1979) ................................................................26, 47

*Sierra Club v. Van Antwerp*,
    526 F.3d 1353 (11th Cir. 2008) ...........................................38

*Sierra Club v. Van Antwerp*,
    709 F. Supp. 2d 1254 (S.D. Fla. 2009) .............................37

*Tourus Records, Inc. v. DEA*,
    259 F.3d 731 (D.C. Cir. 2001) .............................................30

*Transactive Corp. v. United States*,
    91 F.3d 232 (D.C. Cir. 1996) ..............................................51

*TRW, Inc. v. Andrews*,
    534 U.S. 19 (2001) ................................................................17

*U.S. v. Pelican*,
    232 U.S. 442 (1914) ............................................................21

*United States v. Chavez*,
    290 U.S. 357 (1933) ............................................................16

*\*United States v. John*,
    437 U.S. 634 (1978) ....................................................14, 15

*United States v. John*,
    560 F.2d 1202 (5th Cir. 1977) ..........................................14

*United States* v. *McGowan*,
    302 U.S. 535 (1938) ............................................................20

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ..............................................................9

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States* v. *State Tax Commission*,
   505 F.2d 633 (5th Cir. 1974) ...........................................................15

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ..........................................................................49

*Van Abbema v. Fornell*,
   807 F.2d 633 (7th Cir. 1986) ...........................................................37

**STATUTES**

5 U.S.C. § 500 ...................................................................................2

5 U.S.C. § 706 ...................................................................8, 10, 30

25 U.S.C. § 71 ..................................................................................16

*25 U.S.C. § 465 ............................................................................3, 10

*25 U.S.C. § 479 ...................2-5, 7, 9, 10, 13, 14, 15, 17, 19, 23, 26, 27, 31, 34, 35

25 U.S.C. § 2701 ...............................................................................4

*25 U.S.C. § 2719 ...........................................................2, 4, 5, 40, 41

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

42 U.S.C. § 4321 ...............................................................................2

42 U.S.C. § 4332(2)(C) ...................................................................37

**REGULATIONS**

25 C.F.R. Part 62 ............................................................................36

25 C.F.R. Part 83 .......................................................................4, 25

25 C.F.R. Part 151 ..........................................................................32

# TABLE OF AUTHORITIES
## (continued)

**Page**

25 C.F.R. § 83.2 ..........................................................................22, 33

*25 C.F.R. § 83.7 (2002) ..............................................22, 28, 29, 33

*25 C.F.R. § 83.12(b) ..................................................... 31-35

25 C.F.R. § 151.10(a)..............................................................31

25 C.F.R. § 151.11(a)..............................................................31

*25 C.F.R. § 292.2 ...............................................43, 44, 46, 48

*25 C.F.R. § 292.6 ...............................................4, 41, ,42, 44,

25 C.F.R. § 292.12(b) ...........................................................41, 44

40 C.F.R. § 1500.1(b) .............................................................36

40 C.F.R. § 1501.2(c) .............................................................38

*40 C.F.R. § 1506.5 .......................................................35, 36, 37

40 C.F.R. § 1508.8(b) .............................................................37

59 Fed. Reg. 9280 (Feb. 25, 1994) ......................................32

73 Fed. Reg. 29354 (May 20, 2008) ..............................42, 48

80 Fed. Reg. 37862 (July 1, 2015).......................................33

**OTHER AUTHORITIES**

78 Cong. Rec. 11,727 (1934) ...............................................12

Act of February 22, 1889, ch. 180, § 4, 25 Stat. 676.............21

Act of June 20, 1910, ch. 310, § 20, 36 Stat. 557 ..................21

Act of May 21, 1872, ch. 177, 17 Stat. 136............................27

Appropriations Act of March 3, 1871, ch. 120, § 1, 6 Stat. 544 ............16

General Allotment Act, Act of Feb. 8, 1887............................12

## GLOSSARY

| | |
|---|---|
| BIA: | Bureau of Indian Affairs |
| The County: | Clark County and the City of Vancouver, Washington, Al Alexanderson, Greg and Susan Gilbert, Citizens Against Reservation Shopping, Dragonslayer, Inc., and Michels Development, LLC |
| The Department: | The Department of the Interior |
| IBIA: | Interior Board of Indian Appeals |
| ICC: | Indian Claims Commission |
| IGRA: | Indian Gaming Regulatory Act |
| IRA: | Indian Reorganization Act |
| NIGC: | National Indian Gaming Commission |
| ROD: | Record of Decision |
| The Secretary: | The Secretary of the Interior |
| The Solicitor: | The Solicitor of the Department of the Interior |

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331, and issued a final order disposing of all claims on December 12, 2014. JA0103. The County filed a timely notice of appeal on February 3, 2015. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

The Secretary of the Interior approved the acquisition of trust land for the Cowlitz Tribe and declared the land eligible for gaming. The County raises three issues in this appeal:

1.      Whether the Secretary has authority under the Indian Reorganization Act to acquire trust land for the Tribe.

2.      Whether the Secretary had an obligation to consider the Tribe's post-acknowledgment growth from 1,482 to 3,544 members under the Administrative Procedure Act, the Indian Reorganization Act, or the National Environmental Policy Act.

3.      Whether the Indian Gaming Regulatory Act and implementing regulations support the Secretary's determination that the proposed trust land qualifies as an "initial reservation."

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are included in the Addendum.

## PRELIMINARY STATEMENT

In 2009, the Supreme Court held that the Secretary of the Interior's authority to acquire land in trust under the first definition of "Indian" in the Indian Reorganization Act (IRA), 25 U.S.C. § 479, is limited to members of "recognized Indian tribes" that were "under federal jurisdiction" in 1934. *See Carcieri v. Salazar*, 555 U.S. 379, 395 (2009). This case raises the question of whether a tribe that was landless since 1863, believed by the United States to have been absorbed into the body politic by 1924, and went unrecognized until 2002 meets that definition. The plain language of Section 479 does not permit such a paradoxical conclusion.

Second, between 2002—the year the Tribe was acknowledged—and 2006, the Tribe more than doubled its base roll of 1,482 by enrolling 2,062 new members. When questioned how the Tribe's expanded enrollment affected tribal identity, the trust acquisition process, the gaming eligibility determination under Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2719, and the environmental analysis under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the Secretary said *nothing*. At a bare minimum, the Secretary must explain her decisions and consider information bearing on the issues before her to satisfy the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.*, and the statutes she implements. She did not.

- 2 -

Third, the trust parcel is not eligible for gaming. IGRA prohibits gaming on land acquired after 1988, unless the Secretary determines a statutory exception applies. Here, the Secretary determined that the parcel qualified for gaming under the "initial reservation" exception, but in doing so, she (1) applied the wrong regulation and (2) departed without explanation from the standards she has imposed to establish "significant historic connections."

The Secretary is not permitted to rewrite or ignore the law because she finds it expedient in a particular case. Because she has done so here, the decision must be vacated.

## STATEMENT OF THE CASE

### A.    Statutory Framework

The IRA authorizes the Secretary to acquire land and hold it in trust "for the purpose of providing land for Indians." 25 U.S.C. § 465. This case addresses the meaning of the first definition of "Indian" in Section 479, which includes "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." *Id*. § 479.

In considering this definition in 2009, the Supreme Court determined that "the term 'now under Federal jurisdiction' in Section 479 unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934." *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009). The

Court concluded that the Secretary did not have authority to acquire land in trust for the Narragansett Tribe, because—although recognized in 1983—the Tribe was "neither federally recognized nor under the jurisdiction of the federal government" in 1934. *Id.* at 395-96.

This case also raises the question of whether the APA, Section 479 of the IRA, and NEPA require the Secretary to respond to questions raised regarding the effect of a tribe's substantially expanded enrollment on the Secretary's trust authority and the scope of review in her environmental impact statement.

Congress passed IGRA in 1988 to regulate tribal gaming on Indian lands. 25 U.S.C. § 2701. Section 20 of IGRA prohibits gaming on land acquired after October 17, 1988, unless a statutory exception applies *or* the Secretary authorizes gaming pursuant to a process that requires the approval of the governor of the affected state. *Id*. § 2719. As relevant here, a tribe must demonstrate the existence of "significant historical connections" before a statutory exception can apply. 25 C.F.R. § 292.6(d).

### B.    Statement of Facts

#### 1.    Background

In January 2002, the Secretary recognized the 1,482-member Cowlitz Tribe, pursuant to the acknowledgment regulations, 25 C.F.R. Part 83. JA1121. In 2004,

the Tribe filed another application for the Parcel, identifying a casino as the purpose of its request. JA0167 n.1.

In April 2005, the Tribe asked NIGC to determine that the Parcel was eligible for gaming as "restored lands" for a tribe that was terminated, but later "restored." JA1245 (citing 25 U.S.C. § 2719(b)(1)). NIGC granted the request in November 2005, concluding that the Tribe was unrecognized throughout the twentieth century. JA1338.

The Secretary issued a draft environmental impact statement (DEIS) for the casino in April 2006. JA1882. The Secretary issued a final environmental impact statement (FEIS) for the casino in May 2008. JA2696. The Supreme Court issued its *Carcieri* opinion on February 24, 2009.  In June 2009, the Tribe submitted an analysis to the Secretary arguing that it was "under Federal jurisdiction" in 1934. JA4231.

### 2.     Record of Decision

The Secretary issued a record of decision (ROD) on April 22, 2013 establishing a test for determining whether a tribe qualifies for trust land under the first definition in Section 479 and approving the Tribe's trust request. JA0161. The Secretary first determined that Section 479 of the IRA does not require a tribe to have been "recognized" in 1934. JA0255. The Secretary then stated that a tribe was "under Federal jurisdiction" in 1934 if (1) the United States had taken actions

before 1934 that reflect federal obligations to the tribe and (2) the tribe's jurisdictional status remained intact in 1934, JA0260-61. The Secretary then concluded that failed treaty negotiations brought the Cowlitz Tribe "under Federal jurisdiction," JA0263, and that the Tribe must have been "under Federal jurisdiction" in 1934 because there was no evidence it was terminated before then, JA0264.

The Secretary did not address any of the County's questions regarding the Tribe's expanded enrollment.

Finally, the Secretary concluded that the Parcel was eligible for gaming as an "initial reservation." JA0303. The Secretary concluded that the Tribe has a "significant historical connection" to the site based on the Tribe's occasional travel on the Columbia River, which flows past the Parcel and three isolated sightings of the Tribe or an individual Cowlitz within a few miles of the Parcel. JA0293-301.

### 3.     The District Court's Opinion

The district court granted Defendants' cross-motions for summary judgment on December 12, 2014. JA0104. The court held that "the term 'recognized' does not unambiguously refer to recognition as of 1934," and deferred to the Secretary's interpretation that a tribe need only be recognized at the time the Secretary acquires land in trust. JA0120. The court also deferred to the Secretary's claim that the phrase "now under Federal jurisdiction" is ambiguous and concluded that the

Secretary reasonably relied on "the totality of evidence [which] tipped in favor of finding that the Cowlitz Tribe was under federal jurisdiction." JA0132-33.

With respect to the County's arguments regarding tribal enrollment, the court held that the County waived the argument with respect to the Secretary's acknowledgment regulations, JA0133, and did not directly address the County's arguments under NEPA, JA0154. The court did not address the County's APA argument.

Finally, the court concluded that the Secretary complied with her regulations for the "initial reservation exception," despite not following the plain language of the regulation, JA0137 n.15, and concluded that the Secretary reasonably determined that the Tribe has "significant historic connections" in the vicinity of the Parcel based on a handful of isolated sightings, JA0137.

The County appealed. On March 9, 2015, the Department took trust title to the Parcel.

## SUMMARY OF ARGUMENT

The ROD should be vacated for three independent reasons:

1.     The Secretary does not have authority to acquire land in trust under the IRA because a landless Tribe that went unrecognized until 2002 cannot have been either "recognized" or "under federal jurisdiction" in 1934, as Section 479 of the IRA requires.

2.     The Secretary violated the APA, the IRA, and NEPA by failing to respond to Clark County's questions regarding the Tribe's expanded enrollment or to consider the effect of the Tribe's 139% membership increase in her decisionmaking.

3.     The Secretary erred in determining that the Parcel was eligible for gaming under the "initial reservation" exception for two reasons. First, the Secretary did not find that the Parcel is "within an area where the tribe has significant historical connections," as her regulations require. Second, the Secretary departed without explanation from the standards she has imposed to establish "significant historic connections."

## ARGUMENT

### I.     Standard of Review

This Court's review is *de novo*. *Catholic Healthcare West v. Sebelius*, 748 F.3d 351, 353 (D.C. Cir. 2014). The Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2).

## II.   Because the Tribe was not "recognized" or "under Federal jurisdiction" in 1934, the Secretary lacked authority to acquire land in trust for it.

The Secretary based her authority to acquire land in trust for the Tribe on the first definition of "Indian" in Section 479 of the IRA, 25 U.S.C. § 479. JA0260. That definition, however, limits the Secretary's authority to "persons of Indian descent who are members" of a tribe that was both "recognized" and "under Federal jurisdiction" in 1934. *Id.* § 479. Because the Tribe was landless since at least 1863 and was not recognized until 2002, it cannot meet the IRA's first definition of "Indian."[1]

The Secretary maintains in the ROD that Section 479 is ambiguous and that her interpretative test is entitled to deference. JA0260-61. The Supreme Court concluded, however, that "Congress left no gap in 25 U.S.C. § 479 for the agency to fill." *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009). By explaining that Congress "explicitly and comprehensively defined the term 'Indian' by including only three discrete definitions," *id.*, the Court made clear that it is not inclined to read ambiguity into Section 479, nor conclude that Congress delegated interpretative authority to the Secretary. *See United States v. Mead Corp.*, 533 U.S. 218, 227-30

---

[1] The Indian Claims Commission determined that "following the Presidential Proclamation of March 20, 1863, the United States …deprive[d] the plaintiff of its aboriginal Indian title." JA0498-99.

(2001). [2] More importantly, Section 479 is not ambiguous and the Secretary's interpretation is inconsistent with statutory text, the structure and purpose of the IRA, and precedent.

### A.  Because the word "now" modifies both "recognized" and "under federal jurisdiction," a tribe must have been both in 1934 to satisfy Section 479.

The IRA authorizes the Secretary to acquire land in trust "for the purpose of providing land for Indians." 25 U.S.C. § 465. As relevant here, Congress defined the term "Indian" to "include all persons of Indian descent who are members of any recognized Indian tribe *now* under Federal jurisdiction." *Id.* § 479 (emphasis added). In 2009, the Supreme Court held that the word "now" in Section 479 "refers solely to events contemporaneous with the Act's enactment"—in 1934. *Carcieri*, 555 U.S. at 389. It follows that the Secretary's authority extends only to tribes that were "recognized" *and* "under federal jurisdiction" in 1934.

The Secretary announced in the ROD that "the word 'now' modifies only the phrase 'under federal jurisdiction'; it does not modify the phrase 'recognized tribe.'" JA0255. Consequently, she reasoned, if a tribe was "under federal

---

[2] *See also Carcieri*, 555 U.S. at 397 (Breyer, J. concurring) (finding deference inappropriate because "Congress did not intend to delegate interpretive authority"). Given that the APA requires "the *reviewing court* [to] decide all relevant questions of law, interpret constitutional and statutory provisions," 5 U.S.C. § 706 (emphasis added), Congress's considered debate regarding the definitions, and the Secretary's vacillating interpretation, deference to her latest interpretation is inappropriate. *See generally Perez v. Mortg. Bankers Ass'n.*, 135 S. Ct. 1199 (2015).

jurisdiction" in 1934, "the tribe need only be recognized at the time the Department acquires the land into trust." *Id.* That interpretation is contrary to the statutory text, congressional purpose, and precedent.

1.     In ordinary usage, the phrase "recognized Indian tribe now under Federal jurisdiction" refers to an Indian tribe that is both "recognized" and "under Federal jurisdiction" "now"—in 1934. If a tribe was not a "recognized Indian tribe" in 1934, it cannot have been a "recognized Indian tribe now under Federal jurisdiction" in 1934. The Secretary's contrary reading rests on the idea that the prepositional phrase "now under Federal jurisdiction" modifies "tribe," but not "recognized Indian tribe." JA0247. Thus, she reads the statute as though it said, "any Indian tribe that is recognized and is now under Federal jurisdiction." Although the district court uncritically accepted this interpretation. JA0118-119, 125, the statutory context forecloses this reading. Neither "Indian" nor "recognized" is an ordinary adjective that can be separated from the noun it modifies ("tribe"). The phrase "recognized Indian tribe" is a well-established term of art in Indian law, is properly regarded as a unit, and "now under Federal jurisdiction" applies to all of it.

2.     The Secretary's interpretation is contrary to the purposes behind the limited definition of "Indian"—an important consideration in interpreting statutory text. *See Crandon v. United States*, 494 U.S. 152, 158 (1990) (stating that courts

"look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy"). Congress enacted the IRA "to repudiate[] the practice of allotment," which resulted in the loss of millions of acres of reservation land.[3] *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 650 n.1 (2001). Tribes without a reservation—such as the Cowlitz—were not adversely affected by allotment and do not fall a within the Act's remedial purpose.

Because Congress intended to limit the Act's beneficiaries, it enacted only "three discrete definitions" of "Indian" after extensive debate. *See Carcieri*, 555 U.S. at 391-92. Representative Howard, the chief House sponsor of the bill, explained, "the line . . . [must] be drawn somewhere" or else "the Government would take on impossible financial burdens in extending wardship over persons with a minor fraction of Indian blood." 78 Cong. Rec. 11,727, 11,732 (1934). The Secretary's interpretation is inherently expansive, and it disregards Congress's deliberate limits. By interpreting the IRA's definitional framework to include tribes Congress could not have known existed or were unaffected by the policies the IRA was enacted to repudiate, the Secretary has moved well beyond her delegated authority into effectuating the policies she prefers. That is impermissible.

---

[3] The General Allotment Act, Act of Feb. 8, 1887 provided for the allotment of "any reservation created for [the use of any tribe or band of Indians], either by treaty stipulation or by virtue of an act of Congress or executive order …  in severalty to any Indian located thereon." 24 Stat. 388.

3.      It is equally clear that the Secretary has departed from her earlier interpretations and those of the Supreme Court. In 1976, the Secretary explained to the Stillaguamish Tribe that—based on the Solicitor's analysis of the statutory language and legislative history—the Department did not appear to have authority to take land in trust for "*tribes* that were not administratively recognized on the date of the act (June 18, 1934)." JA4632. Similarly, the Interior Board of Indian Appeals, at the urging of the Indian Commissioner, read Section 479 to require a tribe to be recognized as of 1934. *See Brown v. Comm. Indian Affairs*, 8 IBIA 183 (1980). There, the Board rejected a claim by a Cowlitz member that he qualified under the first definition of "Indians," and did "not consider it necessary to dwell on the import of the phrase [now under Federal jurisdiction]," because as a Cowlitz member, he could not show that he "was a member of a federally recognized tribe on June 18, 1934 (the date of enactment of sec. 19)." *Id.* at 188. Again in 1994, the Assistant Secretary—in the course of explaining the difference between historic and non-historic tribes to the House Committee on Natural Resources—explained that Section 479 "defined 'Indians' … as all persons of Indian descent who are members of any recognized [in 1934] tribe under Federal jurisdiction." JA4636 (brackets in original).

The Secretary abandoned her prior interpretations to embrace Justice Breyer's suggestion in *Carcieri* that a tribe need not have been recognized in 1934

to qualify for trust land. JA0255 nn.65-66. But the Court's majority did not endorse Justice Breyer's view, which simply states, without explanation, that "[t]he statute . . . imposes no time limit upon recognition." *Carcieri*, 555 U.S. at 398.

In fact, the only time the Supreme Court addressed this question, it concluded that a tribe had to be recognized in 1934. In *United States v. John*, 437 U.S. 634 (1978), the Court found that the Choctaw Indians' Mississippi reservation satisfied the federal statutory definition of "Indian country" because, although the Choctaws failed to satisfy the first definition of "Indian," they qualified under the third (i.e., one-half or more Indian blood). *Id.* at 650. With respect to the first definition, the Court explained that "[t]he 1934 Act defined 'Indians' … as 'all persons of Indian descent who are members of any recognized [*in 1934*] tribe now under Federal jurisdiction.'" *Id.* (quoting 25 U.S.C. § 479) (brackets in original; emphasis added). The bracketed phrase "in 1934" reflects the Court's understanding that the word "now" restricts the operation of the IRA to tribes that were "recognized" in 1934.

While the holding in *John* did not turn on whether the Choctaw were "recognized" and "under federal jurisdiction" in 1934, the Court clearly considered the Choctaws' failure to satisfy those conditions in its analysis. The Fifth Circuit relied precisely on that fact to hold that its reservation was not "Indian country." *United States v. John*, 560 F.2d 1202, 1212 (5th Cir. 1977). Thus, the issue

whether Section 479 is limited to tribes that were "recognized" and "under federal jurisdiction" in 1934 was before the Court in *John*, even though it relied on the alternative "half-blood" definition to conclude that the Tribe was covered by the IRA.[4] The Court's reading of the first definition of "Indians" is entitled to respect. *See Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659, 662 (D.C. Cir. 1996).

## B.     The IRA uses "recognized" in a formal, political sense.

Nor is there any ambiguity regarding the meaning of the phrase "recognized Indian tribe." Supreme Court cases predating the IRA establish that the word "recognized" was commonly used in a political sense. The Secretary claims, however, that there is "confusion over the meaning of the term 'recognized Indian tribe' as used in the IRA." JA0253. She nonetheless did not determine "the precise meaning of the term 'recognized tribe,'" because—she claimed—"the date of federal recognition does not affect the Secretary's authority under the IRA." JA0254-255. The Secretary still hedged her bets, suggesting that Congress "appeared to use the term 'recognized Indian tribe' in the cognitive or quasi-anthropological sense," which meant that "federal officials simply 'knew' or 'realized' that an Indian tribe existed." JA0253 (citation omitted). She is right in

---

[4] *See also United States* v. *State Tax Commission*, 505 F.2d 633, 642 (5th Cir. 1974)(stating that "[t]he language of Section [479] positively dictates that tribal status is to be determined as of June, 1934"); *City of Sault Ste. Marie* v. *Andrus*, 532 F. Supp. 157, 161 n.6  (D.D.C. 1980)(stating that "the IRA was intended to benefit only those Indians federally recognized at the time of passage").

- 15 -

concluding the meaning must be consistent with usage in 1934, but wrong in claiming that it meant "cognitive" recognition at the time. As is evident from contemporaneous interpretations and precedent that use "recognized" in a political sense, the Secretary's cognitive interpretative is nothing more than an effort to suggest ambiguity where none exists.

1.      The phrase "recognized Indian tribe" was a term of art by 1934, and it unambiguously referred to a tribe's political status. A 1934 Solicitor's Opinion states that "[a] tribe is not a geographical but a political entity." JA0400. A year earlier, the Supreme Court discussed "recognition" in political terms, when it held that only *Congress* could determine "'to what extent, and for what time [Indian tribes] *shall be recognized and dealt with as dependent tribes* requiring the guardianship and protection of the United States." *United States v. Chavez*, 290 U.S. 357, 363 (1933) (quoting *United States v. Sandoval*, 231 U.S. 28, 45 (1913) (emphasis added)).

Decades earlier, Congress abrogated the Executive's power to treat with Indian tribes in unequivocally political terms: "No Indian nation or tribe within the territory of the United States shall be *acknowledged or recognized* as an independent nation, tribe, or power with whom the United States may contract by treaty." Appropriations Act of March 3, 1871, ch. 120, § 1, 6 Stat. 544 (codified as amended at 25 U.S.C. § 71) (emphasis added). And in 1884, the Supreme Court

discussed the political significance of recognition when it described the condition of Massachusetts Indians as "remnants of tribes never recognized by the treaties or legislative or executive acts of the United States as distinct political communities." *Elk v. Wilkins*, 112 U.S. 94, 108-09 (1884). Congress obviously understood "recognized" to denote a political status by 1934.

2.     An interpretation of "recognized" as connoting mere knowledge or realization that an Indian tribe existed would render "recognized" superfluous. Section 479 also requires a tribe to be "under federal jurisdiction" in 1934. A tribe could not be "under federal jurisdiction" if the government did not have knowledge or awareness of the tribe's existence. If "recognized" only means "cognitive" recognition, inclusion of "recognized" adds nothing to the phrase "any Indian tribe." Such a reading violates the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). The Secretary cannot propose implausible interpretations to create ambiguity where none exists. *See Brown* v. *Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context.").

**C.    Because the Cowlitz Tribe was landless and did not have a treaty, executive order, or legislation, it cannot have been "under federal jurisdiction" in 1934.**

The Secretary's post-*Carcieri* position that the phrase "under Federal jurisdiction" is ambiguous stands in stark contrast to her pre-*Carcieri* understanding, which plainly linked Federal jurisdiction to Indian country or property. The meaning of "under federal jurisdiction" must be what the words meant in 1934. That meaning was obvious in 1933 when Commissioner Collier determined that the Cowlitz "*have no reservation under Governmental control.*" JA1364 (emphasis added). And that meaning was obvious in 2000, when the Secretary issued the Technical Report to the Final Determination for Federal Acknowledgment of the Cowlitz Tribe, which states: "from 1880-1940, the Cowlitz Indians were not a reservation tribe *under Federal jurisdiction* or *under direct federal supervision*." JA1076 (emphasis added). Discovering in 2009 that your authority is more limited than previously understood does not render clear statutory text ambiguous.

In the ROD, however, the Secretary announced a "test" to determine whether a tribe was "under Federal jurisdiction" within the meaning of the IRA. JA0260-261. Under that test, a tribe can demonstrate that it was "under Federal jurisdiction" if it can show that (1) an agent of the United States "in 1934 or at some point in the tribe's history prior to 1934," (2) "[took] an action or series of

- 18 -

actions," (3) "for or on behalf of the tribe or . . . tribal members" (4) "sufficient to establish, or that generally reflect federal obligations, duties, responsibility for or authority over the tribe by the Federal Government." *Id*. And as long as there is no "probative evidence that a tribe's jurisdictional status was terminated or lost prior to 1934," the Secretary will presume that jurisdiction to have continued. JA0261.

The Secretary's test does not comport with the plain language of Section 479, agency precedent, and the record evidence. The Secretary's 2000 statement that the Tribe was *not* under federal jurisdiction should be dispositive here.

### 1.    The phrase "under Federal jurisdiction" is unambiguous.

In 1933, the Commissioner of Indian Affairs John Collier denied a request from a Cowlitz Indian asking to be enrolled in the Cowlitz Tribe, because the Cowlitz are "no longer in existence as a communal entity," "have no reservation *under Governmental control,*" and "no tribal funds on deposit to their credit in the Treasury of the United States." JA1364 (emphasis added). Secretary of the Interior, Hubert Work, reached a similar conclusion in 1924, when he informed Congress that the Cowlitz Indians "were reported as being scattered through the southern part of the State of Washington, most of them living on small farms on their own; that they hardly formed a distinct class, having been so completely absorbed into the settlements." *Id.* Accordingly—he finished—they "are without any tribal

organization, are generally self-supporting, and have been absorbed into the body politic." *Id.* Collier's and Work's contemporaneous statements are conclusive for IRA purposes, because in 1934—as both comments clearly reflect—tribes that did not have land did not have a government-to-government relationship with the United States and were not "under federal jurisdiction."

     1.    The Secretary's interpretive test is inconsistent with the Department's unambiguous understanding of its jurisdiction in 1934. In 1932, the Commissioner of Indians Affairs provided guidance to California regarding its obligations to destitute Indians, by explaining that "Indians living off the reservation on privately owned land … *are not wards*, as they have no property held in trust, do not live on an Indian reservation, [and] belong to no tribe with which there is a treaty." JA0324 (emphasis added). Indeed, both the Tribe and the Secretary concede that the prevailing view was that "Indians living off reservations were not seen as wards, but as citizens." JA0626.

     By contrast, the government viewed tribes living in "Indian country" as subject to Federal jurisdiction. When land "has been validly set apart for the use of the Indians," "[i]t is *under the superintendence* of the government." *United States* v. *McGowan,* 302 U.S. 535, 539 (1938) (emphasis added). Within this context, "[t]he government has authority to enact regulations and protective laws respecting this territory." *Id.* Under allotment, Indians residing on allotted lands "continued to

- 20 -

be *under the jurisdiction and control* of Congress for all governmental purposes relating to the guardianship and protection of the Indians." *U.S. v. Pelican*, 232 U.S. 442, 447 (1914) (emphasis added). *Compare Clairmont v. U.S.*, 225 U.S. 551, 560 (1912) (holding no jurisdiction in federal court when right-of-way ceased to be Indian country and state law applied). Put simply, when lands were "Indian country," the federal government had jurisdiction; when the lands were not (or ceased to be) "Indian country," the federal government did not. *Evans v. Victor*, 204 F. 361 (1913) (discussing cases); *see also Ex parte Webb*, 225 U.S. 663 (1912).[5] Consistent with Collier's and Work's decisions, the Cowlitz could not have been "under Federal jurisdiction," as understood in 1934, without having land.

2.    Despite finding Collier's and Work's statements credible during the acknowledgment proceedings, JA1076, the Secretary dismissed them in the ROD as inconsistent with the Tribe's 2002 acknowledgment, JA0265. No such conflict exists. The acknowledgment regulations do not establish whether a tribe was "under Federal jurisdiction." They serve a different purpose—that of establishing whether an Indian entity exists as a *tribe*, regardless of its prior dealings with the

---

[5] In fact, state enabling acts generally provide that "Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States" and include separate provisions for Indians residing outside of reservations or off Indian lands. Act of February 22, 1889, ch. 180, § 4, 25 Stat. 676, 677; *see* Act of June 20, 1910, ch. 310, § 20, 36 Stat. 557, 569.

United States or the government's exercise of jurisdiction. *See e.g. Miami Nation of Indians of Indiana, Inc. v. U.S.*, 255 F.3d 342, 345 (7th Cir. 2001); 25 C.F.R. § 83.7(a) (listing evidence to show the group exists as an entity, but not requiring federal identification). That is why the Secretary did not perceive any conflict in 2000 when she concluded *both* that (1) from "1880-1940, the Cowlitz Indians were not a reservation tribe under Federal jurisdiction or under direct federal supervision," JA1076; and (2) the Tribe existed as an Indian tribe on a substantially continuous basis *entitled* to the protection, services, and benefits of the Federal government, 25 C.F.R. § 83.2.

NIGC also found Collier's and Work's statements reliable in 2005, when it concluded that "the United States did not recognize the Cowlitz Tribe as a governmental entity from at least the early 1900s until 2002," and had no "government-to-government relationship with" the Tribe in 1934. JA1363-364. The government did not consider itself obligated in any way to the Cowlitz in 1924 and 1933 because it was not a reservation tribe. The Tribe relied on these same statements to argue that it was "administratively terminated in the early twentieth century." JA1260. Having successfully employed that argument to obtain a restored-lands opinion, it should be estopped from arguing otherwise in this proceeding. *New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001); *DeRosa v.*

*National Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (applying judicial estoppel to administrative proceedings).

> ### 2.     The Secretary's two-step test violates the plain language of Section 479, and the Tribe cannot satisfy it.

Not only does the Secretary's test conflict with the Department's clear understanding its jurisdiction in 1934, the Tribe fails the test because (1) a failed treaty is a legal nullity; (2) evidence that the Tribe rejected Federal overtures is not evidence of "being under Federal jurisdiction"; and (3) consistent with Departmental guidance, the provision of benefits to individual Indians is not evidence of jurisdiction over a tribe.

> #### a.     Failed treaty negotiations cannot establish that the Tribe was "under Federal jurisdiction."

The Secretary concluded that a failed treaty negotiation between the Tribe and the United States was "sufficient evidence" that the Tribe was under "federal jurisdiction as of at least 1855." JA0263. The district court rejected that conclusion, holding that "failed treaty negotiations do not, in and of themselves, 'establish, or . . . generally reflect federal obligations, duties, responsibility for or authority over the tribe by the Federal Government.'" JA0129 (quoting JA0261). Treaty *negotiations* obviously cannot establish duties or obligations on the part of the United States because an unratified treaty is "a legal nullity." *Robinson v. Jewell*, 790 F.3d 910, 917 (9th Cir. 2015). One needs an *executed* treaty to

- 23 -

establish any obligation on the part of the United States. Indeed, "[t]he doctrine of governmental *ratification* has been firmly entrenched during the entire course of the Indian relationship." *Blackfeet et al. Nations v. U.S.*, 81 Ct. Cl. 101, 127 (1935) (emphasis added).

Having rejected the Secretary's interpretation that the Tribe came "under federal jurisdiction" because of failed treaty negotiations, JA0129, the district court should have vacated the ROD. Courts are not permitted to rewrite agency decisions. *Motor Veh. Mfrs. Ass'n. v. State Farm*, 463 U.S. 29, 57 (1983). The district court, however, did just that by relying on evidence the Secretary cited as evidence that jurisdiction over the Tribe was not terminated to establish that the Tribe was "under federal jurisdiction" in the first instance. JA0129. The decision should be reversed on that basis alone.

> **b.    Evidence of interaction between low-level Department officials with the Tribe (or individual Indians) cannot establish legal obligations or duties on the part of the United States.**

The second part of the Secretary's test merely requires that there be no "probative evidence that a tribe's jurisdictional status was terminated or lost prior to 1934." JA0261. Having erred in concluding that a failed treaty brought the Tribe "under Federal jurisdiction," the Secretary's presumption that the Tribe's jurisdictional status continued is without basis. JA0129. Regardless of its intended application, the record evidence is unpersuasive.

1.     The Secretary illogically relies on the Tribe's *refusal* to engage with the government as evidence that it was "under Federal jurisdiction." For example, the tribe refused to accept services or goods for fear that doing so would be interpreted as agreement to cede lands. JA0264. In a similar vein, the Secretary stated, "during the 1860's, Office of Indian Affairs officials in Washington Territory made several [unsuccessful] efforts to consolidate the Cowlitz Indians with the Chehalis Indians on a single reservation." JA0263-264. The Secretary also notes that the Cowlitz "began a prolonged effort to obtain legislation to bring a claim against the United States for the taking of their land" in 1904 with assistance from the local Superintendent, JA0266, but the Department repeatedly "opposed the proposed legislation." JA0749. None of these facts support the conclusion that the Tribe was "under Federal jurisdiction" or establish any legal obligation or duties on the part of the United States.

2.     The Secretary's reliance on the provision of services or benefits to individual Cowlitz is equally unavailing. The Secretary concedes that evidence of benefits to individual Indians is not sufficient to demonstrate that a tribe was "under federal jurisdiction." JA0258; *see also* The Official Guidelines to the Federal Acknowledgment Regulations, 25 C.F.R. § 83, at 57 (stating that "the BIA distinguishes between government actions involving Indian **tribes** and government actions involving Indian **individuals**") available at

http://www.bia.gov/cs/groups/public/documents/text/idc-001214.pdf (emphasis in original). Indeed, the IRA distinguishes between individual Indians and Indian tribes in the definitions for "Indian." 25 U.S.C. § 479.

Yet the district court accepted evidence that the Federal government provided for the Cowlitz's education and medical needs, including educating Cowlitz children at schools operated by the Bureau of Indian Affairs, and authorizing money for "health services, funeral expenses, or goods at a local store on behalf of Cowlitz Indians" as evidence that the *Tribe* was under federal jurisdiction. JA0126, 129 (citing JA0264-265). But the provision of these services does not mean the *Tribe* was "under federal jurisdiction." The Indian Commissioner informed Congress in 1975 (while addressing the distribution of funds from the *Plamandon* case) that "*Individual* education employment assistance had been extended to *individual* Cowlitz Indians based on a blood degree determination." *See* JA4643 (emphasis in original).

The Secretary then argues that allotments to Cowlitz Indians constitute evidence that the Tribe was "under federal jurisdiction." JA0267–69. But with respect to allotments on the Quinault Reservation under the Act of March 4, 1911, the Secretary concluded that under *Halbert v. United States*, 283 U.S. 753 (1931), "individuals of Chehalis, Chinook, and Cowlitz *ancestry* were entitled to allotments on the reservation." *Estate of Peter Alvin Ward*, 19 IBIA 196, 199

(1991) (emphasis added); *see also Brown*, 8 IBIA at 187-88. More generally, these allotments were given to Indians "who have abandoned … tribal relations" and are not evidence of tribal status. AR015511–12.

Finally, the Secretary cites the approval of an attorney services contract as evidence that the Tribe was "under federal jurisdiction," JA0269, which the district court considered significant, JA0128–29. The contract in the record, however, was approved pursuant to the Act of May 21, 1872, ch. 177, 17 Stat. 136, which allows "any member of a tribe *having no recognized tribal organization* [to] enter into a contract in behalf of the tribe."[6] 17 Stat. 136, 136.

This evidence cannot establish that the Tribe was "under Federal jurisdiction."

## III. The Secretary violated the APA, the IRA, and NEPA by refusing to address the County's questions about the Tribe's expanded enrollment.

The trust acquisition was unlawful for the independent reason that the Secretary failed to consider whether the Tribe's members were "persons of Indian descent." 25 U.S.C. § 479. In 2002, the Secretary concluded in acknowledgment proceedings that each of the Tribe's 1,482 "members are of Indian descent." JA0947. But over the next four years, the Tribe more than doubled its membership, adding 2,062 people to its rolls. The Secretary never confirmed who these new

---

[6] Bureau of Indian Affairs, Attorney Contracts with Indian Tribes, at 7.1(D) (Mar. 17, 1958) (emphasis added), available at
http://www.bia.gov/cs/groups/xraca/documents/text/idc010107.pdf.

- 27 -

members are or whether they meet the IRA's definition of "Indian." And when the County questioned the Tribe's rapid 139% increase in membership, the Secretary ignored its inquiries. The Secretary thus failed to ensure that she satisfied the statutory requirement that land be acquired in trust only for "persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. § 479.

In the proceedings below, the County argued that the Secretary violated the APA, IRA, and NEPA by failing to address the County's enrollment questions. The court did not address the APA argument. With respect to the IRA, it held that Plaintiffs never raised this argument at the administrative level and therefore waived it." JA0133–34. And with respect to NEPA, the court answered a different question regarding the Secretary's obligation to confirm the accuracy of the Tribe's economic objectives, but it failed to grapple with the significance of the tribal-membership question. JA0154. The court erred on all counts.

## A.    The Secretary violated the APA by failing to address the County's questions about the Tribe's expanded enrollment.

Acknowledgment requires a determination that a putative tribe's "membership consists of individuals who descend from a historical Indian tribe" and that those members have maintained community, political, and social ties. 25 C.F.R. § 83.7(e) (2002); *see also Montoya v. United States*, 180 U.S. 261, 266 (1901) (defining "tribe" as "a body of Indians of the same or a similar race, united

in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory"). A petitioner must "provide an official membership list, separately certified by the group's governing body, of all known current members of the group" so that the Secretary can determine whether the members satisfy the applicable standards. 25 C.F.R. § 83.7(e)(2) (2002).

In 2002, the Secretary concluded that the 1,482 members included on the Tribe's certified base roll satisfied the acknowledgment criteria.[7] JA1144. But by 2006, the Tribe had more than doubled its membership, growing to 3,544 members. JA2175. Relying on the newly increased membership numbers, the Tribe calculated its annual economic needs as $114 million/year or over $32,000/member/year in its "Unmet Needs" report. JA2284; JA3426.

When that report became public, the County questioned the Tribe's increased membership. JA2336. It argued that the 2,062 new members appeared to have been improperly added to bolster the Tribe's claim of a modern connection to Clark County in support of its IGRA arguments. JA2145–46. It objected that the Tribe's sudden enrollment expansion, the excessive assessment of its economic need, and the lack of sunshine in the process were "serious abuse[s] of the trust land acquisition process [that demand] a full public airing." JA2375. In addition,

---

[7] Bureau of Indian Affairs, Press Release (Jan. 3, 2002), available at http://www.bia.gov./cs/groups/public/documents/text/idc013730.pdf.

- 29 -

several parties questioned whether the Tribe's economic projections based on the new enrollment figures were being used to eliminate reasonable alternatives from NEPA review. JA2336; JA3389–98; JA2357–58. The County asked for an "investigation" and "a full public airing" of the issue. JA2336; JA2375. The Secretary did not respond.

In failing to address the County's questions, the Secretary violated the APA. Because the enrollment figures are directly relevant to the Secretary's trust authority, gaming eligibility determination, and NEPA review, she was required to examine the Tribe's new membership claims and answer the questions the County raised. Specifically, she should have provided "a brief statement of the grounds for denial of the party's request" and "explain[ed] why [she] decided to act as [she] did." *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (internal quotation marks omitted). Because she instead refused "to consider evidence bearing on the issue," her action was arbitrary and capricious. *Id.* (citing 5 U.S.C. § 706 and *State Farm*, 463 U.S. at 43); *see Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001).

### B. The Secretary was obligated under the IRA and her trust regulations to examine the Tribe's expanded enrollment to determine whether she had authority to act.

Because the record does not demonstrate that the Tribe—in its expanded form—meets the IRA definition of "Indian," the Secretary violated the IRA and

- 30 -

her own regulations in acquiring land in trust for the Tribe. As explained above, Section 479 requires that members be of Indian descent. And the Secretary's trust regulations expressly require her to consider Congress' limitations on her authority. *See* 25 C.F.R. §§ 151.10(a), 151.11(a); JA0244–45. The Secretary's failure to do so requires that her decision be set aside.

The district court declined to consider this argument, reasoning that the County had waived it by failing to cite 25 C.F.R. § 83.12(b) in its submissions to the Secretary. JA0134. That is incorrect.

Whether a party has exhausted administrative requirements is a purely legal question that this court reviews *de novo*. *Koch v. White*, 744 F.3d 162, 164 (D.C. Cir. 2014). The litmus test for determining if a party adequately preserved an argument is whether an agency had a "fair opportunity" to entertain it. *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004). Although an agency must have an "opportunity to pass" on an issue, the "issue need not be raised explicitly; it is sufficient if the issue was 'necessarily implicated' in agency proceedings." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 122 (D.C. Cir. 2008) (quoting *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 79–80 (D.C. Cir. 1998)).

The record demonstrates that the Secretary had more than a "fair opportunity" to address the Tribe's expanded enrollment in the trust decision. The district court believed that the County raised the issue only in the context of its

NEPA argument, but that is not so. The County questioned whether the new members "constitute a tribal community," JA2145–46, and asserted that the Tribe's growing enrollment appeared to be an abuse of the "trust land acquisition process," JA2375. Both comments necessarily implicate the Secretary's authority under 25 C.F.R. Part 151 and the IRA.

Nor can the Secretary credibly claim that she failed to appreciate the import of the County's questions. During the acknowledgment proceedings, the Secretary expressly informed the Tribe that it would be limited to its certified base roll "for some time to come." JA0597. The Secretary warned the Tribe again that the list of members on the base roll would be "binding on the group for some time to come, except for minor corrections." JA0605. And the genealogical report notes that certain changes to the Tribe's membership rules "would change the entire nature of the petitioning entity."[8] JA1054.

The district court concluded that because the County did not specifically cite 25 C.F.R. § 83.12(b) that it had somehow waived its ability to challenge the trust decision based on the Tribe's enrollment. Section 83.12(b), which has since been repealed, was a regulatory limit on the Secretary's authority to act that paralleled

---

[8] There are many administrative documents that confirm the Department's generalized concerns regarding this issue. *See* 59 Fed. Reg. 9280, 9292 (Feb. 25, 1994) (noting that 83.12(b) was added "so that membership for purposes of Federal funding cannot later be so greatly expanded that the petitioner becomes, in effect, a different group than the one acknowledged"); JA0608–611; JA0528, 612, 617.

the limit imposed by the IRA.[9] The purpose of the acknowledgment regulations is to "implement Federal statutes for the benefit of Indian tribes by establishing procedures and criteria for the Department to use to determine whether a petitioner is an Indian tribe" for purposes of Federal law." 25 C.F.R. § 83.2. When an acknowledged tribe substantially expands its membership, the Secretary has no way of knowing whether she has authority to acquire trust land or whether the tribe is entitled to benefits under other authorities that impose limits similar to the IRA if she does not consider the new membership. And she cannot properly evaluate her regulatory criteria governing trust decisions. *Id.* § 151.11(c).

Contrary to the district court's assumption, the County was not required to cite chapter and verse (or even raise the issue at all) when "the agency has in fact considered the issue." *Natural Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1150–51 (D.C. Cir. 1987). Thus, the County did not need to specifically cite 25 C.F.R. § 83.7 when it questioned whether the Tribe's new members "constitute a tribal community, neighborhood, or cultural, social, or political subgroup in an area

---

[9] As the Department explained in 1980, the Secretary originally promulgated Section 83.12(b) to prevent acknowledged tribes from "increasing tribal membership" which "increases the dollars available to the tribal leaders to manage without diluting any of the tribe's assets." JA0529. The Secretary's 2015 decision to eliminate Section 83.12(b), *see* 80 Fed. Reg. 37862, 37884 (July 1, 2015), does not mean that tribes can now add whomever they wish to their rolls *and* continue to receive federal benefits. Such benefits are limited by statute and the federal trust responsibility.

where these essential components of tribalism have not been proven to exist historically." JA2146. The Secretary clearly understood the import of the County's argument because the Secretary had already decided the issue when she informed the Tribe that it could not expand its rolls in the manner the County later questioned. *See, e.g.*, JA0597. The Secretary cannot plead ignorance of the regulations she administers under these circumstances. *Natural Res. Def. Council*, 824 F.2d at 1150–51. And she "may not … depart from a prior policy *sub silentio*." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

In any event, the district court misconstrued the County's argument, which is not merely that the Secretary violated Section 83.12(b). Rather, the County argued that the Secretary had to address the Tribe's expanded enrollment before she could acquire land in trust because Section 479 requires her to do so. ECF 29 at 27. Section 83.12 is regulatory confirmation of the importance of enrollment data, but it is ultimately the effect of enrollment on the Secretary's authority to act under other statutes that is relevant. Yet while the Secretary devised an elaborate test to circumvent *Carcieri*, *see* JA0246–69, she did not devote a single sentence to address whether and/or why she could acquire land for the 2,062 new members whose identity she did not know and whose addition she expressly prohibited. The district court's myopic focus on Section 83.12(b) ignored the Secretary's greater error: unless the Secretary investigated who the 2,062 new tribal members are—

- 34 -

whether through compliance with Section 83.12(b) or merely because Section 479 requires this analysis—she could not reasonably conclude that she had authority to acquire land in trust on their behalf.

### C. The Secretary did not comply with NEPA because she failed to independently evaluate the effect of enrollment on the Business Plan.

Although the district court correctly recognized that the County preserved its NEPA arguments, JA0134, it never directly addressed them. Instead, the court generally concluded that (1) the Secretary reasonably deferred to the Tribe's Business Plan because "second-guessing a tribe's economic needs and socioeconomic development goals would result in the agency undermining the tribe's sovereignty" and (2) 40 C.F.R. § 1506.5(a) did not require the Secretary to independently evaluate socioeconomic information. *See* JA0154. Neither conclusion, however, addresses the County's *enrollment* objections, requiring the ROD to be set aside.

First, the district court erred in failing to appreciate that questioning a tribe's economic needs is not the same as questioning the number of members on which it has estimated those needs. Thus, even if a tribe in its sovereign capacity can establish extravagant economic objectives, that response does not address the underlying enrollment question the County raised. The difference between the two concepts is obvious: if the Tribe had only 1,482 members, the cost of achieving the

Tribe's economic objectives would be far lower. Nor can the Secretary suggest that enrollment is similarly unassailable. The Secretary made that point abundantly clear to the Tribe during the acknowledgment proceedings, JA0597, JA0605, and Department regulations which address appeals from the Department's adverse enrollment decisions likewise establish that the Department has a role in such matters. *See* 25 C.F.R. Part 62.

Second, the district court was wrong to conclude that the Secretary has no NEPA obligation to verify information under 40 C.F.R. § 1506.5, *see* JA0154.[10] That provision states that "[i]f an agency requires an applicant to submit environmental information for possible use by the agency in preparing an [EIS], … [the] agency shall independently evaluate the information submitted and shall be responsible for its accuracy," and that the agency shall verify the information. 40 C.F.R. § 1506.5(a). Not only is there no tribal exception to section 1506.5(a), there is no authority to support the district court's narrow construction of "environmental information" as excluding economic information. JA0154. NEPA defines "environment" very broadly. Agencies must consider the "environmental impact"

---

[10] The district court did not address the County's claims that the Secretary violated other provisions of NEPA, as well. *See* ECF 29 at 42 (arguing that the Secretary has a duty under 40 C.F.R. § 1500.1(b), which provides that "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA"); ECF 59 at 21–22 (citing the Secretary's duty under 40 C.F.R. § 1503.4(a) to respond to substantive issues raised in the comments). These are independent grounds for reversal.

and "environmental effects" of major Federal actions significantly affecting the quality of the "human environment," 42 U.S.C. § 4332(2)(C). The regulations define "environmental" effects/impacts to include "ecological…, aesthetic, *historic, cultural, economic, social*, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8(b) (emphasis added).

Courts have not hesitated to apply Section 1506.5(a) to socioeconomic and other non-"environmental" information. *See, e.g., Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1267 (S.D. Fla. 2009) (agency failure to independently verify economic report evaluating feasibility of alternatives violates section 1506.5(a)); *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 207–08 (1st Cir. 1999) (requiring verification of transit capacity information); *S. Utah Wilderness Alliance v. Bankert*, 2007 WL 2873788, at *5–6 (D. Utah, Oct. 3, 2007) (requiring verification of information regarding preferred seismic exploration methods). And courts have found more generally that when information submitted by an interested party is "specifically and credibly challenged as inaccurate, [agencies have] an independent duty to investigate." *Van Abbema v. Fornell*, 807 F.2d 633, 642 (7th Cir. 1986); *Friends of the Earth v. Hintz*, 800 F.2d 822, 835–36 (9th Cir. 1986) (an agency may rely on information provided by the applicant, but must not do so "uncritically"); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 209 (D.C. Cir. 1991) (Buckley, J., dissenting) (agency has "the duty under NEPA to exercise

a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project").

Finally, the regulations and case law governing an agency's alternatives analysis do not permit the Secretary to disregard the substance of the Unmet Needs Report. The agency, not the applicant, is responsible for "study[ing], develop[ing], and describ[ing] appropriate alternatives," 40 C.F.R. § 1501.2(c). *See Citizens Against Burlington*, 938 F.2d at 195–96 (stating that the agency "bears the responsibility for defining at the outset the objectives of an action"). If the Secretary relies uncritically on a tribe's claim of economic need (no matter how extravagant) to narrow alternatives—as she did here, *see* JA2760–74; JA2801–05; JA3029; JA3002—the tribe controls the alternatives analysis, not the Secretary. The consequence here is that reasonable alternatives were excluded from consideration.[11] NEPA does not permit this. "It is arbitrary and capricious for an agency to rely on such challenged submissions without undertaking some form of independent verification or evaluation." *Sierra Club v. Van Antwerp*, 526 F.3d

---

[11] The County argued that the Business Plan sought to justify an unreasonably narrow alternatives review. JA3389–98; JA2357–58; JA2330; JA2082–84; JA2094–96. The record demonstrates that the Tribe worked directly with the environmental contractor after comments were received on the DEIS to develop the Unmet Needs Report to justify the exclusion of reasonable alternatives within the Tribe's historic territory. *See* JA2126 (discussing whether to interject strawman alternatives); JA3029 (rewrite of purpose and need based on tribe's economic analysis).

1353, 1368 (11th Cir. 2008); *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004).

## IV.   The Secretary's determination that the Parcel qualifies for gaming as an "initial reservation" is arbitrary and capricious.

The Tribe's historic territory is in the Cowlitz River valley in southern Washington State.[12] *See* JA0477 (identifying the southernmost tip of Cowlitz land as the mouth of the Kalama River, approximately 15 miles north of the Parcel); *see also* JA0948 (stating that "[h]istorically, the Cowlitz Indians were essentially those Indians living in the Cowlitz River Valley in the areas which are now Lewis County and Cowlitz County"). The Tribe maintains its present-day administrative and business offices and a health clinic in Longview, Washington, which is located 24 miles north of the Parcel along I-5 at the confluence of the Cowlitz and Columbia Rivers. It also maintains elder housing in Toledo, almost 50 miles north of the Parcel.

In locating its casino, however, the Tribe did not select Longview, Toledo, or any other location in the Cowlitz River valley. Instead, it selected a parcel of land located 24 miles south of Longview. It selected a location outside its historic

---

[12] The Cowlitz River flows into the Columbia River near Longview Junction, approximately 20 miles north of the Parcel. The Cowlitz River runs roughly north-south along the 25-mile stretch (parallel to I-5) between Longview and Toledo, where its path turns northeast towards Mossyrock. The Lewis River flows into the Columbia River approximately three miles west of the Parcel.

territory, not because of historic connections, but because it provided the economic advantage of being closer to Portland, Oregon.

When a tribe seeks to conduct gaming on land to which it lacks a historic connection, IGRA requires the Secretary to follow a specific process to authorize gaming. This process—commonly referred to as the "two-part determination"—requires that the Secretary find that the casino will not be detrimental to the community and the governor of the affected State must concur in her finding. 25 U.S.C. § 2719(b)(1)(A).

Rather than follow that process, the Secretary has twice tried to fit a square peg into a round hole—by invoking two narrow statutory provisions under which gaming can occur without gubernatorial concurrence. In 2005, the Tribe requested and obtained from NIGC a determination that the Tribe qualified as a "restored tribe," and the Parcel as "restored lands," so that gaming would be permitted under an exception set out at Section 2719(b)(1)(B)(iii). JA1357–80. In 2009, the Tribe filed an amended trust application requesting a determination that the Parcel qualifies for gaming as an "initial reservation" under 2719(b)(1)(B)(ii) instead. JA3634–44. It is on this latter determination the Secretary has based her decision.[13] JA0282.

---

[13] The Secretary did not explain why she relied on the "initial reservation" exception, instead than "restored lands" exception. Because "restored lands" was not the basis for the trust decision, the County did not challenge NIGC's

The "initial reservation" exception, however, *requires* that the Parcel be located "within an area where the tribe has significant historical connections." 25 C.F.R. § 292.6(d). This Parcel plainly is not. The "restored lands" exception is similar to the "initial reservation" exception, except that "restored lands" requires that the Tribe, among other things, have a "significant historical connection" to the Parcel itself. *Id.* § 292.12(b). But the Tribe does not meet either standard.

The Secretary made two key errors in her "initial reservation" decision: (1) she applied the wrong regulatory standard; and (2) she unreasonably departed from the standards she has uniformly applied to establish a "significant historical connection."

## A.    The exceptions to IGRA's gaming prohibition should be narrowly construed.

IGRA generally prohibits gaming on lands acquired in trust after 1988. *See* 25 U.S.C. § 2719(a). To authorize gaming on such lands, the Secretary may comply with the two-part process and obtain gubernatorial concurrence. *Id.* § 2719(b)(1)(A). Failing that, gaming is permitted only in the limited circumstances in which the Secretary determines that land meets the regulatory standards for an "initial reservation" for an acknowledged tribe or restored lands for a tribe "restored to Federal recognition." *Id.* § 2719(b)(1)(B)(ii), (iii).

---

determination (including whether an acknowledged tribe can qualify as a "restored tribe" under 25 U.S.C. § 2719). Accordingly, the ROD cannot be sustained on the basis of NIGC's decision.

These exceptions are intended to place newly acknowledged tribes on equal footing with historic tribes. *Citizens Exposing Truth About Casinos v. Kempthorne,* 492 F.3d 460, 467 (D.C. Cir. 2007)*.* Exceptions to a general rule—here, a prohibition—are interpreted narrowly. *See Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 739 (1989). Consistent with that principle, the Secretary developed regulations in 2008 "[t]o define and place reasonable limits on the exceptions." *Redding Rancheria v. Jewell*, 776 F.3d 706, 710 (9th Cir. 2015). As she explained, the exceptions were "not intended to give restored tribes an open-ended license to game on newly acquired lands," but rather "to promote parity between established tribes, which had substantial land holdings at the time of IGRA's passage, and restored tribes, which did not." *Id.* at 711; *see* 73 Fed. Reg. 29354, 29360 (May 20, 2008) (stating that it is not "good policy to create an initial reservation in an area where the tribe has no preexisting connection"). That principle dictates that the "initial reservation" exception not be construed so as to swallow the general rule prohibiting gaming on newly acquired lands.

**B.      The Secretary erred by applying the wrong standard for identifying an "initial reservation."**

The "initial reservation" exception, on which the Secretary based her decision, requires a tribe to demonstrate that the proposed gaming parcel "is located … *within an area* where the tribe has significant historical *connections.*" 25 C.F.R. § 292.6(d) (emphases added). The regulation requires (1) that a tribe

establish multiple "significant historic connections" with a particular area and (2) that the proposed parcel be "within" the area demarcated by those connections. The regulatory definition of a (single) "significant historical connection" is met if a tribe "can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." *Id.* § 292.2.[14] Thus, "historical connections" are those places where a tribe lived, hunted, and died, and an "initial reservation" is to be located within an area defined by those connections.

Here, the Secretary determined that the Tribe "has significant historical connections *to the land in the vicinity* of the Cowlitz Parcel." JA0291–92; *see* JA0287. That is not the regulatory standard. The "initial reservation" regulation requires a tribe to establish that the proposed parcel "is located … *within an area where the tribe has significant historical connections.*" 25 C.F.R. § 292.6(d) (emphases added). That the tribe has historical connections to land "in the vicinity of" a parcel does not mean that the parcel itself is "within" an area with which it has historical connections.

The Secretary's failure to apply the right standard is plain on the face of the ROD. The Secretary states that "both the initial reservation exception and the

---

[14] The definition is also satisfied if the parcel "is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty," but that provision is not met here. *Id.*

restored lands exception require that the [Tribe] have significant historical connections with the [Parcel]," and accordingly applied the standard for the "restored lands" exception. JA0284. But the "restored lands" exception requires a tribe to "demonstrate a significant historical connection to the land." 25 C.F.R. § 292.12(b). Because the definition of "significant historical connection" is intended to establish whether a tribe has a significant historical connection to a particular parcel, *id.* § 292.2, satisfaction of the definition is tantamount to meeting the "restored lands" standard.

The requirements for the "initial reservation" exception, however, are different. That exception requires a tribe to establish not just a single "significant historical connection," but rather multiple connections. *Id.* § 292.6(d). And it requires a showing that the parcel lies "within an area" where those connections are located. *Id.* Thus, while the two regulatory exceptions rely on a common definition—"significant historical connection"—the exceptions use that definition in different ways. The Secretary was required to follow the "initial reservation" standard. She did not.

The district court erred by claiming to defer to the Secretary's interpretation when the Secretary, without explanation, claimed the standards were the same. *See* JA0137 n.15 (stating that "[w]hile the text of 25 C.F.R. § 292.6 requires that the Parcel be 'within an area' where the Cowlitz had significant historical connections,

the Secretary reasonably interpreted this to mean that the Cowlitz Tribe needed to have significant historical connections to the Parcel itself"). Moreover, courts are not to defer to agency interpretations when the regulation is unambiguous, as is the case here. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000); *see also Perez,* 135 S. Ct. 1199, 1211–25 (2015) (Scalia, J. and Thomas, J. concurring opinions) (questioning legitimacy of deference to an agency's interpretation of regulations). "Within" means "that which is within or inside," which the Secretary understood when she concluded that the Parcel and the Tribe are both located "within the State of Washington."[15] JA0290–91. Nor is it a "useless exercise" to define the "'parameters' of an 'area,'" as the district court suggests. JA0137 n.15. The ICC did precisely that when it compensated the Cowlitz Indians for the land they lost. *See* JA0477. The district court is also wrong that "the real disagreement among the parties" is the meaning of "vicinity." JA0137 n.15. Had the Parcel been located in Oregon, but nonetheless "in the vicinity" of Washington State, no one could claim that the regulation was satisfied. That is because "in the vicinity of" does not mean "within," and unless the Secretary identifies where the Tribe's "significant historical connections" are and then establishes that a parcel is located

---

[15]     Within     Definition,     Oxford     English     Dictionary     Online
http://www.oed.com/view/Entry/229670?rskey=GsrILd&result=1&isAdvanced=false#eid.

within that area—that is, surrounded by documented villages, burial grounds, and subsistence use areas—the Secretary has not complied with her regulation.

The Secretary promulgated unambiguous language to govern the "initial reservation" exception and that language plainly is different from the language she used for "restored lands." She is required to give that language effect. Allowing her to read them as imposing the same requirement—as the district court did—would impermissibly "permit [her], under the guise of interpreting a regulation, to create *de facto* a new regulation," which violates the APA. *Christensen*, 529 U.S. at 588.

### C.    The Secretary also impermissibly departed from precedent regarding what constitutes a "significant historical connection."

The Secretary's decision is independently flawed because it rests on a misapplication of the definition of a "significant historical connection."[16] The historical documentation the ROD relies on does not meet the interpretation of "significant historic connection" the Secretary has followed in other cases.

To establish a "significant historical connection," the Tribe must provide "historical documentation [of] the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." 25 C.F.R. § 292.2. "Significant" means "sufficiently great or important to be worthy of attention;

---

[16] Because both regulations incorporate the definition of "significant historic connection," opinions evaluating what constitutes a "significant historic connection" for "restored lands" purposes are relevant to the "initial reservation" exception.

- 46 -

noteworthy; consequential, influential."[17] In the Solicitor's Opinion in *Guidiville*

*Band of Pomo Indians* (Sept. 1, 2011), the Secretary explained that "providing

documentation of the tribe's villages and burial grounds, occupancy or subsistence

use in the vicinity of the land [to establish a 'significant historical connection']

which is akin to the aboriginal use and occupancy of a tribe." JA4312. This, of

course, is the standard the ICC uses to determine compensation—a "showing of

actual, exclusive and continuous use and occupancy 'for a long time' prior to the

loss of the land." *Sac and Fox Tribe of Indians of Oklahoma v. United States*, 161

Ct. Cl. 189 (1979). *See also* JA1148–49 (requiring evidence that the land actually

belonged to the Tribe).

 Consistent with that principle, the Secretary has required connections based

on subsistence use and occupancy to be *enduring*, *substantial*, and *non-speculative*,

requirements that the Secretary has reaffirmed recently in the ROD for the

Mashpee Indian Tribe. JA4515–17. "[A]ctivities that tend to show a tribe used land

for subsistence purposes" include "'sowing, tending, harvesting, gathering[,] and

hunting on lands and waters." JA4516 (quoting JA4316) (alteration in original).

"Occupancy" requires a "'consistent presence in region supported by the existence

of dwellings, village[,] or burial grounds.'" *Id.* (quoting JA4316) (alteration in

---

[17]  http://www.oed.com/view/Entry/179569?redirectedFrom=significant#eid    (last
visited Sept. 10, 2015).

original). Transient use or occupancy is insufficient to establish a significant connection. JA4316–17; *see also* 73 Fed. Reg. at 29366 ("evidence that a tribe merely passed through a particular area" is not sufficient).

What constitutes "in the vicinity" is also limited. Because "[a] definition of 'vicinity' based solely on proximity would expand 'restored land' beyond what was historically used or occupied by a tribe," whether a parcel is "in the vicinity" ultimately "depends on the nature of the tribe's historic use and occupancy, and whether those circumstances lead to the natural inference that the tribe also used or occupied the newly acquired land." JA4350; *accord* JA4518; JA4285 (requiring actual use and occupancy). Finally, speculation that a tribe used a site is not sufficient; the regulation expressly requires "historical *documentation*." 25 C.F.R. § 292.2 (emphasis added).

The gulf is great between what the Secretary required in other cases and the "historical documentation" in this case. Here, there is no historical documentation of any villages or burial grounds near the Parcel, because those are all located within the Tribe's historic territory. The Tribe instead relies on subsistence use and occupancy, which it also cannot demonstrate consistent with the Secretary's requirements. The "historical documentation" of a Cowlitz presence anywhere near the Parcel is limited to the following:

- 48 -

- An April 1814 battle between the Cowlitz and Chinook, approximately three miles west of the Parcel across the Columbia River, after which the Cowlitz "returned home," JA0299, 2559;[18]

- A trade route a Cowlitz chief controlled for three years (1825-1828), which ran from Puget Sound down the Cowlitz River and along the Columbia River, which flows three miles away from the Parcel (and thousands of others), JA029–97; JA2568–69, 2575–76;

- A May 13, 1836 observation of 100 "Kowalitsk" Indians camping on an island in the Columbia River [Sauvie Island] approximately three miles west of the Parcel, JA0294–95, 2585;

- A Cowlitz Indian named Zack hunting near the Chelatchie Prairie, which the ROD describes as six miles from the Parcel, on March 28, 1856, JA0300;

- A statement that settlers hired Cowlitz boatmen at Kelso to transport them up the Cowlitz River and they "may well have manned the boats between the Cowlitz River and Fort Vancouver as well," which passes three miles west of the Parcel, JA0300–01; and

- Clark County censuses that include Cowlitz Indians, JA0301.[19]

Not one of these "uses" can establish a "significant historical connection" to any site because none leads to the natural inference that the Tribe also occupied or used the Parcel. And all are transient by their very nature, which the Secretary has rejected in other cases. *See* JA4316–17. A single sighting of Cowlitz Indians on

---

[18] The Cowlitz were "off the beaten track," likely trying to break up the Cathlapotle Chief Kiesno's "profitable trade network." JA2560.

[19] The report actually states that the "overwhelming majority of [Cowlitz] were in Lewis County, Washington, in the Cowlitz River valley" and that "few families associated with the Cowlitz Indians resided in Chehalis County." JA0989, 999. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

Sauvie Island in 1936 is not evidence of a "consistent presence" at Sauvie Island and neither is a single battle after which the Cowlitz "returned home." *See* JA4316. Nothing in the record shows that Zack or any other Cowlitz Indian regularly hunted on Chelatchie Prairie—there is a single sighting only. Transient use, by its very nature, precludes the Secretary from (1) finding that the Tribe had a "significant historical connection" to any particular site or (2) inferring actual use and occupancy of the Parcel itself. *See* JA2582 (stating that there was "no apparent pattern" to Cowlitz sightings along the Columbia River). And the census data, if anything, demonstrate that the Cowlitz did not have a significant presence in Clark County. *See* JA0996–97.

The Secretary relies heavily on the Tribe's trade activities, but she previously held that "subsistence use or occupancy [cannot be] based on the fact that its ancestors traveled to various locations to trade and interact with other peoples." JA4316. Her explanation for departing from prior treatment of trade activities was only that it "should not limit our finding here that the extensive and intensive trading activities of the Cowlitz Indians constitute significant historical connections to the Cowlitz Parcel." JA0299. That is not sufficient reason to abandon a clearly stated position.[20] "[A]n agency action is arbitrary when the

---

[20] The Secretary states that she had not concluded trade activities can never constitute evidence of significant historical connections, JA0299, but that is the clear import of her decision. *See* JA4316–17 (stating "the preamble to the

- 50 -

agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).

The analysis that the Secretary conducts may be "fact-intensive" and "vary" based on a particular tribe's history, JA0292, but her legal standards are not meaningless. The Secretary determined in *Scotts Valley* that the nature of the historic connection must "lead to the natural inference that the tribe also used or occupied" the parcel. JA4350. The "connections" recited in the ROD are not of the nature to lead to an inference of "use or occupancy" the way that villages, burial grounds or regular hunting, fishing, or farming might. The evidence the Secretary relies on is not sufficient to meet her prior criteria for establishing a "significant historical connection" to a parcel of land when there is no evidence the Tribe ever set foot on it. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962) ("Expert discretion is the lifeblood of the administrative process, but unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.") (internal quotation marks omitted).

---

regulations makes clear that 'something more than evidence that a tribe merely passed through a particular area'" in response to the Band's reliance on trade activities).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the trust decision vacated.


October 9, 2015                                  Respectfully submitted,


                                                 */s/ Benjamin S. Sharp*
                                                 Benjamin S. Sharp
                                                 Donald C. Baur
                                                 Jennifer MacLean
                                                 PERKINS COIE LLP
                                                 700 13th Street, NW, Suite 600
                                                 Washington, DC 20005
                                                 Phone: 202-654-6200
                                                 BSharp@perkinscoie.com

                                                 ***Attorneys for Citizens Against Reservation Shopping, Al Alexanderson, Greg and Susan Gilbert, Dragonslayer, Inc., and Michels Development, LLP***

                                                 */s/ Brent D. Boger*
                                                 Brent D. Boger
                                                 Assistant City Attorney
                                                 210 E. 13th Street
                                                 Vancouver, WA 98660
                                                 Phone: 360-487-8500
                                                 brent.boger@cityofvancouver.us
                                                 ***Attorney for City of Vancouver, Washington***

*/s/ Christine M. Cook*
Christine M. Cook
Sr. Deputy Prosecuting Attorney
Clark County Prosecuting Attorney's Office
Civil Division
P.O. Box 5000
Vancouver, WA 98666
Phone: 360-397-2478
Christine.Cook@clark.wa.gov
***Attorneys for Clark County, Washington***

*Counsel for Plaintiffs-Appellants*

# ADDENDUM

# STATUTORY AND REGULATORY ADDENDUM

Indian Reorganization Act, §§ 5 and 19, Pub. L. No. 73-383,
48 Stat 984, codified as amended at 25 U.S.C. §§ 465 and 479

§ 465. Acquisition of lands, water rights or surface rights;
appropriation; title to lands; tax exemption............................................Add. 1

§ 479.  Definitions ................................................................................Add. 1

Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2485,
codified in pertinent part at 25 U.S.C. § 2719

§ 2719. Gaming on lands acquired after October 17, 1988....................Add. 2

25 C.F.R. §§ 292.2, 292.6, and 292.12

§ 292.2  How are key terms defined in this part?..................................Add. 3

§ 292.6  What must be demonstrated to meet the "initial reservation"
exception ................................................................................................Add. 3

§ 292.12  How does a tribe establish connections to newly
acquired lands for the purposes of the "restored lands" exception? ......Add. 4

25 C.F.R. §§ 83.7 and 83.12 (2002)

§ 83.7  Mandatory criteria for Federal acknowledgement. ...................Add. 5

§ 83.12  Implementation of decisions....................................................Add. 5

National Environmental Policy Act, Pub. L. No. 91-190, 83 Stat. 853,
codified as amended and in pertinent part at 42 U.S.C. § 4332

§ 4332. Cooperation of agencies; reports; availability of information;
recommendations; international and national coordination of efforts ...Add. 6

40 C.F.R. §§ 1500.1, 1503.4, 1506.5, 1508.8, and 1508.14

§ 1500.1 Purpose. .................................................................................Add. 7

§ 1503.4 Response to comments. ..........................................................Add. 7

§ 1506.5 Agency responsibility.............................................................Add. 8

§ 1508.8 Effects. ..................................................................................Add. 8

§ 1508.14 Human environment. ............................................................Add. 8

Sections 5 and 19 of the Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat 984, codified as amended at 25 U.S.C. §§ 465 and 479, provide in pertinent part as follows:

### § 465. Acquisition of lands, water rights or surface rights; appropriation; title to lands; tax exemption

The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

### § 479.  Definitions

The term "Indian" as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood.

The Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2485, codified in pertinent part at 25 U.S.C. § 2719, provides as follows:

### § 2719. Gaming on lands acquired after October 17, 1988

(a) Prohibition on lands acquired in trust by Secretary

Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988 . . . .

(b) Exceptions

(1) Subsection (a) of this section will not apply when—

(A) the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

(B) lands are taken into trust as part of—

(i) a settlement of a land claim,

(ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

(iii) the restoration of lands for an Indian tribe that is restored to Federal recognition.

25 C.F.R. §§ 292.2, 292.6, and 292.12 provide in pertinent part as follows:

### § 292.2  How are key terms defined in this part?

Significant historical connection means the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land.

### § 292.6  What must be demonstrated to meet the "initial reservation" exception

This section contains criteria for meeting the requirements of 25 U.S.C. 2719(b)(1)(B)(ii), known as the "initial reservation" exception. Gaming may occur on newly acquired lands under this exception only when all of the following conditions in this section are met:

(a) The tribe has been acknowledged (federally recognized) through the administrative process under part 83 of this chapter.

(b) The tribe has no gaming facility on newly acquired lands under the restored land exception of these regulations.

(c) The land has been proclaimed to be a reservation under 25 U.S.C. 467 and is the first proclaimed reservation of the tribe following acknowledgment.

(d) If a tribe does not have a proclaimed reservation on the effective date of these regulations, to be proclaimed an initial reservation under this exception, the tribe must demonstrate the land is located within the State or States where the Indian tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and within an area where the tribe has significant historical connections and one or more of the following modern connections to the land:

(1) The land is near where a significant number of tribal members reside; or

- Add. 3 -

(2) The land is within a 25–mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or

(3) The tribe can demonstrate other factors that establish the tribe's current connection to the land.

### § 292.12  How does a tribe establish connections to newly acquired lands for the purposes of the "restored lands" exception?

To establish a connection to the newly acquired lands for purposes of § 292.11, the tribe must meet the criteria in this section.

. . .

(b) The tribe must demonstrate a significant historical connection to the land.

At the time of the challenged decision, 25 C.F.R. §§ 83.7 and 83.12 provided in pertinent parts as follows:

### § 83.7  Mandatory criteria for Federal acknowledgement.

The mandatory criteria are:

. . .

(e) The petitioner's membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity.

. . .

(2) The petitioner must provide an official membership list, separately certified by the group's governing body, of all known current members of the group. This list must include each member's full name (including maiden name), date of birth, and current residential address. The petitioner must also provide a copy of each available former list of members based on the group's own defined criteria, as well as a statement describing the circumstances surrounding the preparation of the current list and, insofar as possible, the circumstances surrounding the preparation of former lists.

### § 83.12  Implementation of decisions.

. . .

(b) Upon acknowledgment as an Indian tribe, the list of members submitted as part of the petitioners['] documented petition shall be the tribe's complete base roll for purposes of Federal funding and other administrative purposes. For Bureau purposes, any additions made to the roll, other than individuals who are descendants of those on the roll and who meet the tribe's membership criteria, shall be limited to those meeting the requirements of § 83.7(e) and maintaining significant social and political ties with the tribe (i.e., maintaining the same relationship with the tribe as those on the list submitted with the group's documented petition).

The National Environmental Policy Act, Pub. L. No. 91-190, 83 Stat. 853, codified as amended and in pertinent part at 42 U.S.C. § 4332, provides as follows:

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

   (i) the environmental impact of the proposed action,

   (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

   (iii) alternatives to the proposed action,

   (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

   (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes . . . .

40 C.F.R. §§ 1500.1, 1503.4, 1506.5, 1508.8, and 1508.14 provide in pertinent parts as follows:

## § 1500.1 Purpose.

. . .

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

## § 1503.4 Response to comments.

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

## § 1506.5 Agency responsibility.

(a) Information. If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

## § 1508.8 Effects.

Effects include:

. . .

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

## § 1508.14 Human environment.

Human environment shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§ 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental

impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  As measured by the word-processing system used to prepare this brief, the brief contains 11,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14 point proportionally spaced roman-style typeface (Times New Roman).

*/s/ Benjamin S. Sharp*
Benjamin S. Sharp

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Unless otherwise noted, 8 paper copies of the brief have been filed with the Court on the same date Express Mail.

*/s/ Benjamin S. Sharp*
Benjamin S. Sharp