**ORAL ARGUMENT SCHEDULED MARCH 18, 2016**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No. 14-5326

### Consolidated with No. 15-5033

CONFEDERATED TRIBES OF THE GRANDE RONDE
COMMUNITY OF OREGON,

*Plaintiff-Appellant,*

CLARK COUNTY, WASHINGTON, *et al.*,

*Plaintiffs-Appellants,*

v.

SALLY JEWELL, in her official capacity as Secretary of the Interior, *et al.*,

*Defendants-Appellees,*

COWLITZ INDIAN TRIBE,

*Intervenor-Appellee.*

_____

*On Appeal from the United States District Court for the District of Columbia
Civil Action No. 1:13-cv-849-BJR
Hon. Barbara J. Rothstein, Judge Presiding*

**REPLY BRIEF OF CLARK COUNTY, WASHINGTON, CITY OF
VANCOUVER, WASHINGTON, CITIZENS AGAINST RESERVATION
SHOPPING, AL ALEXANDERSON, GREG AND SUSAN GILBERT,
DRAGONSLAYER, INC., AND MICHELS DEVELOPMENT LLC**

Christine M. Cook
Sr. Deputy Prosecuting Attorney
Clark County Prosecuting
Attorney's Office
Civil Division
P.O. Box 5000
Vancouver, WA 98666
(360) 397-2478
Christine.Cook@clark.wa.gov

Brent D. Boger
Assistant City Attorney
210 E. 13th Street
Vancouver, WA 98660
(360) 487-8500
brent.boger@cityofvancouver.us

Benjamin S. Sharp
Jennifer A. MacLean
Donald C. Baur
Eric Miller
PERKINS COIE LLP
700 13th Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 654-6262
BSharp@perkinscoie.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

GLOSSARY ............................................................................... vi

SUMMARY ................................................................................. 1

ARGUMENT ............................................................................... 2

    I.    The Secretary lacked authority to acquire land in trust for the Tribe ............................................................................... 2

        A.    The Secretary can acquire trust land only for tribes that were both "recognized" and "under federal jurisdiction" in 1934 ..................................................................... 2

        B.    The Tribe was not "under Federal jurisdiction" in 1934, because it did not have lands set aside and supervised by the government .............................................................. 9

        C.    The Tribe cannot meet the Secretary's overly permissive "under Federal jurisdiction" test ............................. 13

    II.    The Secretary acted arbitrarily in refusing to address the Tribe's expanded enrollment ........................................................ 15

        A.    The Secretary acted arbitrarily in failing to investigate the Tribe's claimed increase in membership ....................... 15

        B.    The County properly raised the question of expanded enrollment and demonstrated how the issue bears on the Secretary's decisions .......................................... 16

        C.    The County plainly raised the relevance of the Tribe's expanded enrollment to the NEPA review .............................. 19

    III.    The Parcel does not qualify for gaming under the "initial reservation" exception ..................................................... 21

CONCLUSION ........................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Alaska* v. *Native Village of Venetie Tribal Gov't*,
  522 U.S. 520 (1998)..............................................................9, 10, 12, 14

*Albuquerque Indian Rights* v. *Lujan*,
  930 F.2d 49 (D.C. Cir. 1991) ................................................................7

*Bates* v. *Clark*,
  95 U.S. 204 (1877)................................................................................11

*Brown* v. *Commissioner of Indian Affairs*,
  8 I.B.I.A. 183 (1980)............................................................................7

*Butte Cnty., Cal.* v. *Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) ..............................................................16

*Carcieri* v. *Kempthorne*,
  497 F.3d 15 (1st Cir. 2007), *rev'd*, 555 U.S. 379 (2009) ....................6

*Carcieri* v. *Salazar*,
  555 U.S. 379 (2009)..............................................1, 2, 3, 4, 6, 8, 13

*Chevron U.S.A. Inc.* v. *NRDC, Inc.*,
  467 U.S. 837 (1984)..............................................................................3, 4

*City of Arlington, Texas* v. *FCC*,
  133 S. Ct. 1863 (2013)..........................................................................3, 4

*Connecticut Nat. Bank* v. *Germain*,
  503 U.S. 249 (1992)..............................................................................5, 6, 13

*Customs & Border Prot.* v. *FLRA*,
  751 F.3d 665 (D.C. Cir. 2014) ..............................................................18

*General Elec. Co.* v. *Commissioner*,
  245 F.3d 149 (2d Cir. 2001) ................................................................5

_____

*Authorities upon which we chielfly rely are marked with asterisks.

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Haselwander* v. *McHugh*,
    774 F.3d 990 (D.C. Cir. 2014)........................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................16

*NetworkIP, LLC* v. *FCC*,
    548 F.3d 116 (D.C. Cir. 2008)........................................................................18

*Nuclear Energy Inst., Inc.* v. *EPA*,
    373 F.3d 1251 (D.C. Cir. 2004)........................................................................19

*Organized Village of Kake* v. *Egan*,
    369 U.S. 60 (1962)........................................................................11

*Pharm. Research & Mfrs. of Am.* v. *FTC*,
    790 F.3d 198 (D.C. Cir. 2015)........................................................................16

*Portland Cement Ass'n* v. *Ruckelshaus*,
    486 F.2d 375 (D.C. Cir. 1973)........................................................................21

*Roelofs* v. *Secretary of the Air Force*,
    628 F.2d 594 (D.C. Cir.1980)........................................................................15

*Rubin* v. *U.S.*,
    449 U.S. 424 (1981)........................................................................6

*SEC* v. *Chenery Corp.*,
    318 U.S. 80 (1943)........................................................................16, 24

*Shoshone Bannock Tribes* v. *Reno*,
    56 F.3d 1476 (D.C. Cir. 1995)........................................................................7, 14

*Time Warner Entm't Co.* v. *FCC*,
    144 F.3d 75 (D.C. Cir. 1998)........................................................................19

*Tourus Records, Inc.* v. *DEA*,
    259 F.3d 731 (D.C. Cir. 2001)........................................................................15

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States* v. *Home Concrete & Supply, LLC*,
132 S. Ct. 1836 (2012) (plurality opinion) .........................................................4

*United States* v. *John*,
437 U.S. 634 (1978)...........................................................................................8

*United States* v. *McGowan*,
302 U.S. 535 (1938)...........................................................................................9

*United States* v. *Thomas*,
151 U.S. 577 (1894).........................................................................................10

*United States* v. *Unzeuta*,
281 U.S. 138 (1930).........................................................................................10

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*,
435 U.S. 519 (1978).........................................................................................21

*Wash. Ass'n for Television & Children* v. *FCC*,
712 F.2d 677 (D.C. Cir. 1983).........................................................................19

*Worcester* v. *Georgia*,
31 U.S. 515 (1832).......................................................................................9, 10

**STATUTES**

5 U.S.C. § 555(e) ..............................................................................................16

25 U.S.C. § 2701 *et seq.*.....................................................................................2

25 U.S.C. § 465 .................................................................................................13

*25 U.S.C. § 479 ......................................................... 1, 2, 3, 4, 5, 7, 8, 11, 13, 15

*42 U.S.C. § 4321 *et seq.*..........................................2, 16, 17, 19, 20, 21

Act of June 25, 1948, c. 645, 62 Stat. 757 .............................................11

Act of June 28, 1932, 47 Stat. 336....................................................12

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Act of June 30, 1834, c.161, 4 Stat. 732 ....................................................11

Act of March 3, 1885, 23 Stat. 362 ...........................................................12

18 Stat. 1091, tit. 74 (1874) .....................................................................11

**REGULATIONS**

25 C.F.R. § 83.12(b) ................................................................................18

*25 C.F.R. § 292.6 ................................................................22, 23, 24, 25

25 C.F.R. § 292.12(b) ..............................................................................22

73 Fed. Reg. 29,360 (May 20, 2008) ........................................................25

**OTHER AUTHORITIES**

78 Cong. Rec. 11,732 (1934) ....................................................................7

Felix S. Cohen Handbook of Federal Indian Law 358 ............................12

*Webster's Third New International Dictionary of the English
    Language* 1546 (1976)........................................................................5

# GLOSSARY

| | |
|---|---|
| APA: | Administrative Procedure Act |
| BIA: | Bureau of Indian Affairs |
| The County: | Clark County and the City of Vancouver, Washington, Al Alexanderson, Greg and Susan Gilbert, Citizens Against Reservation Shopping, Dragonslayer, Inc., and Michels Development, LLC |
| The Department: | The Department of the Interior |
| IBIA: | Interior Board of Indian Appeals |
| IGRA: | Indian Gaming Regulatory Act |
| IRA: | Indian Reorganization Act |
| NEPA: | National Environmental Policy Act |
| ROD: | Record of Decision |
| The Secretary: | The Secretary of the Interior |
| The Solicitor: | The Solicitor of the Department of the Interior |

## SUMMARY

In taking land into trust for the Cowlitz Tribe and determining it to be eligible for gaming, the Secretary committed three errors, each of which requires that her decision be set aside.

First, the Secretary exceeded her authority under the Indian Reorganization Act (IRA), 25 U.S.C. § 479, which extends to members of "recognized Indian tribes" that were "under federal jurisdiction" in 1934. *See Carcieri* v. *Salazar*, 555 U.S. 379, 395 (2009). The Tribe was neither. In attempting to defend her decision, the Secretary disregards the statutory text, relying instead on policy considerations. But the statutory text is unambiguous, foreclosing her arguments.

Second, in the four years following its acknowledgment, the Tribe more than doubled its membership. The Secretary erred in refusing to consider the questions the Tribe's suspiciously rapid growth precipitated, including whether the new members satisfy the IRA's definition of "Indian." The Secretary now attempts to defend her failure to address those questions, but the time for her to explain herself was in the ROD, not in the brief filed by agency counsel. The Secretary also suggests that the issues were not raised during the administrative process, but that is incorrect; commenters specifically asked the Secretary to investigate the Tribe's membership growth. As these issues are relevant not only to the IRA analysis but

also to the analysis under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, explanation was required.

Third, the Parcel is not eligible for gaming under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.* Because the Secretary now admits that standards for the "initial reservation" and "restored lands" exceptions are different, it is evident that she applied the wrong regulation. That error requires vacatur of her decision.

## ARGUMENT

### I.    The Secretary lacked authority to acquire land in trust for the Tribe.

To be eligible for a trust land acquisition under the IRA, the Tribe must have been "recognized" and "under Federal jurisdiction" in 1934. 25 U.S.C. § 479; *see Carcieri*, 555 U.S. at 395. Because the Tribe was neither, the Secretary cannot acquire land for it.

#### A.    The Secretary can acquire trust land only for tribes that were both "recognized" and "under federal jurisdiction" in 1934.

As explained in the opening brief (at 10-17), the Secretary has authority to take land into trust only for "Indians," which the IRA defines as "persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. § 479. The statute uses "recognized" in its formal, political sense, which means that the Tribe—which was not recognized until 2002—does not qualify.

The Secretary does not argue that the Tribe was recognized in 1934.[1] The ROD contains no such finding, which in any event would be contrary to the record. JA0255. Instead, she argues that the IRA did not require a tribe to be recognized at the time of enactment. That argument lacks merit.

1.     The Secretary claims (Br. 34-35) that her interpretation of Section 479 is entitled to deference under *Chevron U.S.A. Inc.* v. *NRDC, Inc.*, 467 U.S. 837 (1984). But in *Carcieri*, as the County argued (at 9-10), the Court declined to give *Chevron* deference to the Secretary's interpretation: "Congress left no gap in 25 U.S.C. § 479 for the agency to fill" when "it explicitly and comprehensively defined the term [Indian] by including only three discrete definitions." 555 U.S. at 391.

The Secretary responds by citing (Br. 34 n.9) *City of Arlington, Texas* v. *FCC*, 133 S. Ct. 1863 (2013), for the proposition that "courts may not reject the *Chevron* framework on the theory that an issue is 'jurisdictional' or otherwise of a type that Congress did not intend to delegate." In *City of Arlington*, the Court held *Chevron* applies when an agency fills a statutory gap "that concerns the scope of the agency's statutory authority (that is, its jurisdiction)." 133 S. Ct. at 1868. That holding is irrelevant here. The County has not suggested that the Secretary's

---

[1] The ROD states that it was unnecessary to construe "recognized," but that the Cowlitz were recognized in a "cognitive" sense in 1934. The Secretary appears (Br. 27 n.8) to have abandoned that argument.

interpretation is undeserving of deference because it concerns the scope of her jurisdiction. Rather, it is undeserving of deference because the Supreme Court has determined that Section 479 does not delegate gap-filling authority to the Secretary. *City of Arlington* did not disturb the rule, applied in *Carcieri*, that "unambiguous language" represents "a clear sign that Congress did *not* delegate gap-filling authority to an agency." *United States* v. *Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1843 (2012) (plurality opinion). Because the Supreme Court held that Section 479 contains no delegation of authority to the Secretary, *Chevron* is inapplicable.

2.     Even under *Chevron*, the Secretary's interpretation is invalid because it is contrary to the statutory text. The County explained (at 11) that the ordinary meaning of the phrase "recognized Indian tribe now under Federal jurisdiction" is an Indian tribe that is both "recognized" and "under Federal jurisdiction" in 1934. *See Carcieri*, 555 U.S. at 388-89 (holding that "now" refers to the time of enactment). Because the phrase "recognized Indian tribe" is a commonly used term of art, it must be read as a unit, such that the prepositional phrase "now under Federal jurisdiction" modifies all of it, not just the word "tribe." It follows that a tribe cannot have been "a recognized Indian tribe now under Federal jurisdiction" in 1934 if it was not a "recognized Indian tribe" at that time.

The Secretary makes only a passing effort to reconcile her position with the statutory text. She asserts that "the normal position of an adjective is *directly before* the word it modifies," so that "now" must be understood to modify "under Federal jurisdiction" only. Gov. Br. 38 (quoting *General Elec. Co.* v. *Commissioner*, 245 F.3d 149, 155 (2d Cir. 2001)). That argument fails because "now" is an adverb, not an adjective. *Webster's Third New International Dictionary of the English Language* 1546 (1976).[2] Unlike adjectives, adverbs can go either before or after the words they modify, or sometimes in the middle of a compound phrase that they modify. Moreover, even the Secretary concedes that "now under Federal jurisdiction" modifies the words "Indian tribe" even though it comes after them. The Secretary's grammatical theory fails.

3.     The Secretary generally avoids (Br. 41-42) analyzing the actual words of the statute, relying instead on "statutory purpose." The Secretary's invocation of the statute's supposed purpose to overcome its text is inappropriate. The Supreme Court has repeatedly stated "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank* v. *Germain*, 503 U.S. 249, 253-54 (1992). Accordingly, "[w]hen the words of

---

[2] The word "now" also has an adjective sense—one could say that in 2004, John Kerry, the now Secretary of State, was a candidate for President. That usage is relatively uncommon and is not how "now" is used in Section 479.

a statute are unambiguous, . . . this first canon is also the last: 'judicial inquiry is complete.'" *Id.* (quoting *Rubin* v. *United States*, 449 U.S. 424, 430 (1981)).

The Secretary emphasizes (Br. 42) that "when Congress enacted the IRA, there was no official list of 'recognized Indian tribes,' nor any formal process for granting official recognition." In her view (Br. 43), that means Congress could not have intended "to bind Interior to such a list, without regard to its accuracy and without the possibility of amendment or correction." But the Secretary said much the same thing in *Carcieri*, arguing that "it would make no sense to distinguish among tribes based on the happenstance of their federal recognition status in 1934." Gov't Br. at 22, *Carcieri*, 555 U.S. 379 (No. 07-526) (quoting *Carcieri* v. *Kempthorne*, 497 F.3d 15, 27 (1st Cir. 2007), *rev'd*, 555 U.S. 379 (2009)). The Court rejected that argument. By using the word "now," Congress made clear its intent to limit the Secretary's authority based on the status of tribes in 1934.

The Secretary asserts (Br. 39) that "the term 'recognized' goes to whether the subject group is an actual 'Indian tribe,'" and that "the relevant concern is not the state of Federal knowledge at the time of the IRA's enactment . . . but whether tribal status is confirmed (and the tribe 'recognized') before land is taken into trust." But that interpretation makes "recognized" superfluous—the Secretary could not acquire trust land for a tribe that she did not believe to exist as a tribe. By contrast, looking to recognition as of 1934 would further the congressional purpose

of limiting the application of the IRA and ensuring that "the Government would [not] take on impossible financial burdens in extending wardship over persons with a minor fraction of Indian blood." 78 Cong. Rec. 11,732 (1934) (statement of Rep. Howard).

4.     Because the Secretary's interpretation is inconsistent with prior administrative and judicial interpretations, it is due little deference. *See Albuquerque Indian Rights* v. *Lujan*, 930 F.2d 49, 58 (D.C. Cir. 1991). The Secretary argues inaccurately that "Interior[] has interpreted § 479 consistently." Br. 47 (capitalization omitted). She points out (Br. 49) that Interior took land into trust for the Stillaguamish Tribe in 1980, even though it was not recognized in 1934, but she ignores a 1976 secretarial decision declining to take land into trust for the Stillaguamish because of "doubts that the Department can take land in trust . . . for *tribes* that were not administratively recognized" in 1934. JA4632. Similarly, she attempts (Br. 47-48) to explain away the decision in *Brown* v. *Commissioner of Indian Affairs*, 8 I.B.I.A. 183 (1980), which, she says, "expressly declined to 'dwell on' the phrase 'now under Federal jurisdiction.'" In fact, the Board explained that it was unnecessary "to dwell on the import of [that] phrase" because the party seeking a conveyance of trust land—a Cowlitz Indian—was unable to show that he "was a member of a federally recognized tribe on June 18, 1934." *Id.* at 188. The premise of the Board's decision was that recognition must

have existed as of 1934. Nor does the Secretary address her predecessor's 1994 statement to Congress, defining Indians as "all persons of Indian descent who are members of any recognized [in 1934] tribe under Federal jurisdiction." JA4636 (brackets in original).

At a minimum, those statements show that the Secretary has not consistently interpreted Section 479. Tellingly, the ROD does not cite any prior administrative determinations supporting her interpretation, but instead relies on Justice Breyer's concurring opinion in *Carcieri*. JA0255. But Justice Breyer simply asserted, without explanation, that "[t]he statute . . . imposes no time limit upon recognition." 555 U.S. at 398. That issue was not before the Court, and the other five Justices in the majority did not address it.

To the extent the Supreme Court has addressed this issue, it rejected the Secretary's position. *See United States* v. *John*, 437 U.S. 634 (1978). The Secretary may be correct (Br. 40-41) that *John*'s holding does not directly control this case, but the Court did consider whether the IRA "was . . . intended to apply to" a particular tribe. And in answering that question, the Court explained that "[t]he 1934 Act defined 'Indians' not only as 'all persons of Indian descent who are members of any recognized [in 1934] tribe now under Federal jurisdiction,' and their descendants who then were residing on any Indian reservation, but also as 'all other persons of one-half or more Indian blood.'" *John*, 437 U.S. at 649-50

(quoting 25 U.S.C. § 479) (brackets in original). The Court's paraphrase of the statutory language is carefully considered dicta that further undermines the Secretary's newly adopted position.

### B. The Tribe was not "under Federal jurisdiction" in 1934, because it did not have lands set aside and supervised by the government.

In its opening brief (at 20-21), the County explained that the meaning of "under federal jurisdiction" is plain and that the Tribe could not have been "under federal jurisdiction" in 1934 because the government had not set aside land for it. *See also United States* v. *McGowan,* 302 U.S. 535, 539 (1938) (When land has been "validly set apart for the use of the Indians," "[i]t is *under the superintendence* of the government." (emphasis added and deleted)). In her opposition, the Secretary focuses (Br. 51-54) on the County's shorthand use of "Indian country" to refer to various types of federal set-asides, glossing over the County's argument regarding the *necessity* of such set-asides to establish federal jurisdiction, which myriad cases discuss. *See, e.g., Alaska* v. *Native Village of Venetie Tribal Gov't*, 522 U.S. 520 (1998). Her efforts fail.

1.    Contrary to the Secretary's arguments (Br. 50-51), the meaning of "federal jurisdiction" has never been ambiguous. *See, e.g.*, *Worcester* v. *Georgia*, 31 U.S. 515, 516 (1832) ("The extra-territorial power of every legislature being limited in its action, to its own citizens or subjects, the very passage of this act is an assertion of jurisdiction over the Cherokee nation, and of the rights and powers

consequent on jurisdiction."); *United States* v. *Unzeuta*, 281 U.S. 138 (1930) (discussing federal jurisdiction in context of cession). Indeed, the Secretary acknowledges (Br. 61) that "under federal jurisdiction" cannot mean "all tribes within Congress's plenary authority, but only those over which the United States exercised authority." It is also clear that the United States historically "exercised authority" over tribes—by setting aside and managing property for their benefit. *Worcester*, 31 U.S. at 557 (federal acts "manifestly consider the several Indian nations as distinct political communities, having territorial boundaries … guaranteed by the United States").

The government supervises tribes within territory it controls for that purpose. "The Indians of the country are considered as the wards of the nation, and *whenever the United States set apart any land of their own as an Indian reservation* … they have full authority to pass such laws and authorize such measures as may be necessary." *United States* v. *Thomas*, 151 U.S. 577, 585 (1894) (emphasis added). The Supreme Court requires explicit Congressional action establishing "both a federal set-aside and federal superintendence [to conclude] that the Indian lands in question constituted Indian country and *that it was permissible for the Federal Government to exercise jurisdiction over them*." *Venetie*, 522 U.S. at 530 (emphasis added), *see id.* at 531 n.6.

By contrast, Indians going beyond the boundaries of lands set aside for their protection are subject to state law. *Organized Village of Kake* v. *Egan*, 369 U.S. 60, 75 (1962). A tribe cannot be said to be "under federal jurisdiction" when its members all live on land within state jurisdiction. The phrase "now under federal jurisdiction" can only refer to tribes which the government supervised in 1934 on lands set aside and managed for that purpose. That is why the Secretary unhesitatingly concluded in 2002 that the Cowlitz "were not a reservation tribe under Federal jurisdiction or under direct Federal supervision." JA1076.

2.      The Secretary counters (Br. 53) that the County must be incorrect because "Indian country" was an "important and well-recognized construct in Indian law" in 1934. Accordingly, she concludes Congress would have used the term in Section 479 had it meant to refer to tribes for which land had been set aside.

But the 1854 definition of "Indian country" the Secretary cites (Br. 53), which generally included land west of the Mississippi where Indian title had not been extinguished, Act of June 30, 1834, c.161, 4 Stat. 732, was obsolete by 1934. *See Bates* v. *Clark*, 95 U.S. 204, 207 (1877). Congress *repealed* the 1834 statutory definition in 1874, 18 Stat. 1091, tit. 74 (1874), and did not codify another until 1948. *See* Act of June 25, 1948, c. 645, 62 Stat. 757. Between 1874 and 1948,

there was no statutory definition of "Indian country," forcing courts to address the question on a case-by-case basis. *See Venetie*, 522 U.S. at 528-30.

Congress did not incorporate the "Indian country" construct in 1885, when it extended federal jurisdiction over certain intra-Indian crimes in what is commonly called the "Ten Major Crimes Act." Act of March 3, 1885, 23 Stat. 362. That Act applied to "any territory of the United States" and "'within the limits of any Indian reservation' lying wholly within the boundaries of a state." *Id.* at 385. Nor did Congress incorporate the "Indian country" construct in 1932 when it amended the Ten Major Crimes Act to apply "on and within any Indian reservation *under the jurisdiction of the United States Government*, including rights of way running through the reservation." Act of June 28, 1932, 47 Stat. 336 (emphasis added).

Tellingly, the Solicitor found the phrase "under the jurisdiction of the United States" plain in 1940. *See* Felix S. Cohen, Handbook of Federal Indian Law 358 n.9 (1942). In concluding that "the amendment should be given its apparent and normal meaning," he explained that "[p]rior to the passage of the amendment the courts had concluded that rights-of-way to which the Indian title had not been extinguished remained part of the reservation *and within Federal jurisdiction*, whereas other rights-of-way to which such title had been extinguished *were subject to State jurisdiction*." *Id.*

3.     The Secretary finally objects (Br. 54) on policy grounds, claiming that the County's argument "entail[s] a finding that Congress intended to limit Interior's land-into-trust authority (25 U.S.C. § 465) to Indians already possessing trust lands." That argument ignores the other definitions of "Indian" in Section 479, as well as the fact that Congress did intend to limit application of the IRA, as the Secretary has acknowledged (Br. 27). In any event, the statutory text establishes Congressional intent, and when the text is plain—as it is here—that is the end of the matter. *Connecticut Nat. Bank*, 503 U.S. at 253-54.

The Secretary's 2002 conclusion that, "from 1880–1940, the Cowlitz Indians were not a reservation tribe under Federal jurisdiction or under direct Federal supervision," JA1076, reflects the Secretary's clear understanding of the statutory text. The Secretary reached that conclusion because Indians living outside Indian country were not considered wards under federal jurisdiction because they were under state jurisdiction. The Secretary may not like the import of her conclusion after *Carcieri*, but that decision does not cast doubt on the clarity of the language Congress used.

**C.     The Tribe cannot meet the Secretary's overly permissive "under Federal jurisdiction" test.**

Even if the Secretary's interpretation of "under Federal jurisdiction" were correct, the Cowlitz do not satisfy it. The Secretary's test (Br. 52) specifically requires the existence of "federal obligations, duties, responsibility for or authority

over the tribe." Such duties and authority do not come out of nowhere. There must be "a treaty, statute or agreement [that] imposes, expressly or by implication, that duty." *Shoshone Bannock Tribes* v. *Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995). Here, there is nothing.

The Secretary maintains (Br. 56-58) that the government's failed treaty negotiations and subsequent efforts to assist Cowlitz Indians establish "a specific jurisdictional relationship with the Cowlitz Tribe." Failed treaty negotiations have no legal effect, so whatever "relationship" they might establish, it cannot be jurisdictional. The Secretary's reliance on federal censuses is similarly misplaced because the taking of a census does not create a "duty" or "obligation" to a *tribe*.

Likewise, the Secretary errs in relying (Br. 56) on various interactions with individual Cowlitz Indians. Indian benefits may have been based on blood quantum and cannot establish that a tribe was "under Federal jurisdiction." Moreover, the Supreme Court has explained that "health, education, and welfare benefits are merely forms of general federal aid," and therefore "they are not indicia of active federal control over the Tribe's land sufficient to support a finding of federal superintendence." *Venetie*, 522 U.S. at 534.

The Secretary dismisses (Br. 60) Commissioner Collier's and Secretary Work's conclusions that the Cowlitz Indians had no lands or property subject to federal control, and had generally been assimilated, claiming that both findings

were in error. But whether or not Work and Collier were correct as a factual matter, their policy statements reflect the Department's contemporaneous determination that it lacked jurisdiction over the Tribe, and that is the last word.

## II. The Secretary acted arbitrarily in refusing to address the Tribe's expanded enrollment.

The trust acquisition is also unlawful because the Secretary failed to consider whether the Tribe's members—including new members added shortly before the trust acquisition—were "persons of Indian descent" for whom she could lawfully acquire land. 25 U.S.C. § 479. The Secretary attempts to defend her failure, but her efforts are unavailing.

### A. The Secretary acted arbitrarily in failing to investigate the Tribe's claimed increase in membership.

The County argued (at 28-30) that the Secretary had an APA obligation to respond to the County's request that she investigate the Tribe's membership increase. Instead, she denied that request (by not conducting an investigation), without explanation. "A 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Tourus Records, Inc.* v. *DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quoting *Roelofs* v. *Secretary of the Air Force*, 628 F.2d 594, 599 (D.C. Cir.1980)). When an agency denies a "request of an interested person made in connection with any agency proceeding," it is required to provide

"a brief statement of the grounds for denial." 5 U.S.C. § 555(e); *see Butte Cnty., Cal.* v. *Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). The Secretary's failure to explain why she believed an investigation was unnecessary means that her decision was arbitrary and capricious because she "'entirely failed to consider an important aspect of the problem'" before her. *Pharm. Research & Mfrs. of Am.* v. *FTC*, 790 F.3d 198, 209 (D.C. Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Secretary does not address her APA obligation to respond to the County's request, but instead asserts (Br. 72) that the County "has not shown that its concerns bear on Interior's decision or NEPA review." That is incorrect, but even if it were correct, the Secretary had an obligation to say so in her decision. This Court must evaluate the Secretary's decision on the basis of the rationale set forth in the decision, not on agency counsel's *post hoc* rationalizations. *SEC* v. *Chenery Corp.*, 318 U.S. 80 (1943). At a minimum, a remand is necessary to allow the Secretary to explain her denial of the County's request for an investigation.

### B.    The County properly raised the question of expanded enrollment and demonstrated how the issue bears on the Secretary's decisions.

The Secretary argues (Br. 72) that she had no obligation to examine the Tribe's expanded membership because the "County failed to raise its present claims with Interior." That is incorrect.

- 16 -

1.      Several parties to the agency proceedings (and to this appeal) noted that "it is troubling, and in need of investigation, as to how the Tribe's membership could grow by nearly 1,200 members" in a four-year period. JA2336. The County specifically alleged that claimed increase in membership was illegitimate, arguing that the Tribe is attempting "to inflate its tribal needs to constrain BIA review and short circuit the NEPA process," and advising the Secretary that "[s]uch a serious abuse of the trust land acquisition process demands a full public airing." JA2375. Commenters connected the claimed membership increase and the validity of the Tribe's status as Indians for whom the Secretary could acquire land, noting that "the Tribe has failed to show how, or even if, these tribal members constitute a tribal community, neighborhood, or cultural, social, or political subgroup in an area where these essential components of tribalism have not been proven to exist historically." JA2146.

2.      The Secretary says little about her statutory obligation to ensure that those for whom she is acquiring trust land are "Indians," but instead complains (Br. 76) that her "statutory duty is even less obvious than her supposed regulatory duty." But her duty is far from mysterious: the Secretary may acquire land only for "Indians," and the Tribe's sudden doubling of membership raises questions as to whether the 2,062 new members qualify.

The Secretary notes (Br. 76) that the Tribe has "'inherent power' to determine [its] own tribal membership." But the question is not whether the Tribe may admit new members but whether, having done so, it is eligible to have the Secretary acquire land for it. That issue was raised in the administrative proceedings by commenters who accused the Tribe of "a serious abuse of the trust land acquisition process," JA2375, and the Secretary erred in failing to address it.

      3.     The Secretary maintains (Br. 73-76) that the comments did not require response because they did not cite 25 C.F.R. § 83.12(b), which imposed restrictions on additions to a tribe's membership, and she has now repealed that regulation. Her repeal of Section 83.12 cannot alter her statutory obligation under the IRA. And this Court has never held that a party challenging agency action must cite particular statutory or regulatory provisions before the agency. *See Customs & Border Prot.* v. *FLRA*, 751 F.3d 665, 669 (D.C. Cir. 2014) (finding argument preserved even though challenger "did not itself cite every relevant provision in the [statute] in the proceedings below"). To the contrary, "even if specific arguments are not expressly made to an agency, they may still be raised on appeal if the agency 'reasonably should have understood the full extent of [the petitioner's] argument.'" *Haselwander* v. *McHugh*, 774 F.3d 990, 997 (D.C. Cir. 2014) (quoting *Customs and Border Prot.*, 751 F.3d at 669-70) (brackets in original); *accord NetworkIP, LLC* v. *FCC*, 548 F.3d 116, 122 (D.C. Cir. 2008) ("[A]n issue need not

be raised explicitly; it is sufficient if the issue was 'necessarily implicated' in agency proceedings.") (quoting *Time Warner Entm't Co.* v. *FCC*, 144 F.3d 75, 79-80 (D.C. Cir. 1998)). To preserve an argument, a challenger need only "have given the agency a 'fair opportunity' to entertain it in the administrative forum before raising it in the judicial one." *Nuclear Energy Inst., Inc.* v. *EPA*, 373 F.3d 1251, 1290-91 (D.C. Cir. 2004) (quoting *Wash. Ass'n for Television & Children* v. *FCC*, 712 F.2d 677, 681 (D.C. Cir. 1983)).

Here, the comments were more than sufficient to give the Secretary "fair opportunity" to address the Tribe's suspicious increase in membership. Indeed, commentors expressly requested an "investigation," JA2336, and "a full public airing" of the issue, JA2375, requests that the Secretary acted arbitrarily by failing to address.

## C.    The County plainly raised the relevance of the Tribe's expanded enrollment to the NEPA review.

The Secretary claims (Br. 72) that the County "has not shown that its concerns bear on Interior's decision or NEPA review." The Secretary misstates the County's arguments and ignores the actual arguments in its brief.

The Secretary argues (Br. 79) that the County's comments did not implicate any specific NEPA obligations or challenge the "reasonableness of Interior's alternatives analysis." But the County argued (at 38, n.11) that the Secretary's uncritical reliance on the Unmet Needs Report, which was calculated on the

Tribe's expanded enrollment, impermissibly excluded reasonable alternatives from consideration, which NEPA prohibits. The Secretary also represents (Br. 79) that the County did not challenge the Secretary's response that a tribe has the sovereign right to determine economic need. But that is also wrong—the County argued (at 37) that "when information submitted by an interested party is 'specifically and credibly challenged as inaccurate, [agencies have] an independent duty to investigate.'"

The County explained (at 36-37) that NEPA requires the Secretary to evaluate the accuracy of environmental information submitted by an applicant, and because NEPA defines "environment" broadly, that obligation extends to economic information affecting the scope of the NEPA analysis. The Secretary therefore errs when she asserts (Br. 77-79) that NEPA did not require her to ensure that the Tribe's membership count was accurate. And while the Secretary suggests (Br. 77) that the issue raised by the County "does not concern the accuracy of the Tribe's membership count, *per se*," that is not correct. The County's allegation that the Tribe was attempting "to inflate its tribal needs," JA2375, was an allegation that the increase in membership was unlawful and that the Tribe's true (smaller) membership would indicate reduced economic need. That, in turn, would make alternatives in the Tribe's aboriginal territory, which the Secretary excluded from

consideration, reasonable alternatives under NEPA.    County Br. at 38, n.11; JA2091-2109.

Finally, the Secretary suggests (Br. 78) that, while the Tribe calculated some of its economic needs on a per capita basis, most were not so determined. Essentially, the Secretary argues that if she acted arbitrarily by failing to scrutinize the Unmet Needs Report, her failure was not material. That is also incorrect. While comments under NEPA "must be significant enough to step over a threshold requirement of materiality" before an agency is obliged to consider them, the materiality standard is low, requiring only that the issue be of "*possible* significance in the results." *Vermont Yankee Nuclear Power Corp.* v. *NRDC, Inc.*, 435 U.S. 519, 553 (1978) (quoting *Portland Cement Ass'n* v. *Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973)) (emphasis added). A doubling in the number of members the Tribe claims is clearly material to the Tribe's calculation of economic need and therefore what constituted a reasonable alternative.

## III.    The Parcel does not qualify for gaming under the "initial reservation" exception.

In the ROD, the Secretary stated: "both the initial reservation exception and the restored lands exception require that the Cowlitz Tribe have *significant historical connections with the Cowlitz Parcel*." JA0284 (emphasis added). The County explained in its opening brief (at 41) that the Secretary applied the wrong regulatory standard: while both the "restored lands" and "initial reservation"

- 21 -

exceptions incorporate the definition of a "significant historical connection," the regulations use that definition in different ways. The "restored lands" regulation requires a tribe to "demonstrate a significant historical connection to the land," 25 C.F.R. § 292.12(b), which exists when the parcel itself meets the definition of a "significant historical connection." By contrast, the "initial reservation" standard requires land to be "located . . . *within an area* where the tribe has significant historical connections," *id.* § 292.6(d) (emphasis added).

The "initial reservation" regulation therefore imposes a different—and more demanding—burden. A different standard is appropriate because lands previously set aside for a "restored tribe" would be known with relative precision, whereas the lands of a tribe never before acknowledged, may not. A more demanding burden is particularly appropriate when a tribe—as the Cowlitz have here—seeks land outside of the area formally adjudicated by the Indian Claims Commission to be its aboriginal territory. *See* JA4605.

The Secretary now concedes (Br. 66) that the County's regulatory interpretation is correct: "Interior's initial-reservation rule is not identical to the restored-lands rule." But the Secretary construed both regulations to require "significant historical connections" to the Parcel itself in the ROD, JA0284, and because a connection to the Parcel is the requirement for "restored lands," not an "initial reservation," the Secretary applied the wrong standard, contrary to law.

The Secretary now maintains (Br. 67), however, that the County has misconstrued her decision and that what she really determined was that the Parcel is "within a broader area of historical significance to the Tribe." That is not correct.

1.     The Secretary did not conclude in the ROD—as she now claims (Br. 67)—that the Parcel is "*within* a broader area of historical significance to the Tribe." The ROD states: "The 2010 Opinion concluded that the Tribe had *a significant historical connection to the Cowlitz Parcel*," and in 2012 "the Office of the Solicitor confirmed its original conclusion." JA0289 (emphasis added). It states again: "[T]here is sufficient evidence of historic use and occupancy in the vicinity of the Cowlitz Parcel to conclude that the Tribe *has significant historical connections to the parcel* pursuant to the regulations." JA0292 (emphasis added). And again: "[T]he Tribe has *significant historical connections with the Cowlitz Parcel*." JA0302 (emphasis added).

In the district court, the Secretary argued that "there is sufficient evidence of historic use and occupancy in the vicinity of the Cowlitz Property to conclude that *the Tribe has significant historical connections to the parcel*." Gov. Cross-Mot. at 43 (Dkt. 37) (emphasis added and deleted). That court upheld the ROD, concluding that "[w]hile the text of 25 C.F.R. § 292.6 requires that the Parcel be 'within an area' where the Cowlitz had significant historical connections, the Secretary reasonably interpreted [the initial reservation exception] to mean that the Cowlitz

Tribe needed to have significant historical connections to the Parcel itself." JA0137 n.15.

This Court cannot uphold the Secretary's decision based on counsel's post-hoc rationalizations. If it is to be upheld, it must be upheld on the rationale she set forth in her decision. *Chenery Corp.*, 318 U.S. at 93-95. The Secretary did not conclude in the ROD that the Parcel is "*within* a broader area of historical significance to the Tribe," nor interpret the two exceptions differently.

2.     Moreover, the Secretary's new argument still fails to meet the "initial reservation" standard, which the County argued (at 42-43) requires the Tribe to establish (1) multiple "significant historic connections" with a particular area and (2) that the proposed parcel be "within" the area demarcated by those connections. The Secretary did not establish multiple "significant historic connections" in the ROD, and the conclusion that the Parcel is "within a broader area of historical significance to the Tribe" does not do that either. In fact, the Secretary admits (Br. 68-69) that she did not cite "any other single piece of evidence in isolation." Rather, she concluded (Br. 69-70) that the Tribe had "an enduring presence" in an area that includes the Parcel. Even if one could reasonably conclude from the record evidence that this were true, an "enduring presence" in a generalized area is not what 25 C.F.R. § 292.6(d) requires.

- 24 -

3.     To the contrary, each of the "significant historic connections" an applicant identifies to satisfy 25 C.F.R. § 292.6 must independently establish use or occupancy that is "enduring" and "substantial" nature, *see* 73 Fed. Reg. 29,360 (May 20, 2008), sufficient to permit "a natural inference that the tribe historically used or occupied the subject parcel," JA4350. None of the evidence the Secretary cites meets this requirement. Zack's presence on Chelatchie Prairie one day in 1856 cannot possibly satisfy that standard. Nor can a single battle in 1815. Speculation that Cowlitz Indians "may well have manned the boats between the Cowlitz River and Fort Vancouver" is similarly insufficient. *See* County Br. at 49.

The Secretary knows this, because she does not even try to argue that these constitute "significant historic connections." She instead explains (Br. 67) that the Tribe "historically used sites that geographically surround the Cowlitz Parcel." She even argues (Br. 71) that the "natural inference" test does not apply to "initial reservation" determinations, despite having used it to make the Mashpee's 2015 "initial reservation" determination. *See* JA4534 (stating that the evidence "furthers the natural inference that the Mashpee Tribe used and occupied the Taunton parcel").

As the County argued (at 43), "significant historical connections" are those places where a tribe lived, hunted, and died, and an "initial reservation" is to be located "within an area" defined by those connections. The evidence in the record

- 25 -

cannot meet this requirement, and the Secretary did not consider it under the correct standard in any case. The Secretary cannot now abandon her interpretation of the "restored lands" and "initial reservation" exceptions as requiring the same showing, nor declare that the "natural inference" test does not apply here to save her decision.

## CONCLUSION

This Court should reverse the district court's decision and vacate the ROD.

January 5, 2016                              Respectfully submitted,

                                             */s/ Benjamin S. Sharp*
                                             Benjamin S. Sharp
                                             Donald C. Baur
                                             Jennifer MacLean
                                             PERKINS COIE LLP
                                             700 13th Street, NW, Suite 600
                                             Washington, DC 20005
                                             Phone: 202-654-6200
                                             BSharp@perkinscoie.com

                                             **Attorneys for Citizens Against Reservation Shopping, Al Alexanderson, Greg and Susan Gilbert, Dragonslayer, Inc., and Michels Development, LLP**

                                             */s/ Brent D. Boger*
                                             Brent D. Boger
                                             Assistant City Attorney
                                             210 E. 13th Street
                                             Vancouver, WA 98660
                                             Phone: 360-487-8500

brent.boger@cityofvancouver.us
**Attorney for City of Vancouver,**
**Washington**

*/s/ Christine M. Cook*
Christine M. Cook
Sr. Deputy Prosecuting Attorney
Clark County Prosecuting Attorney's Office
Civil Division
P.O. Box 5000
Vancouver, WA 98666
Phone: 360-397-2478
Christine.Cook@clark.wa.gov
**Attorneys for Clark County, Washington**

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  As measured by the word-processing system used to prepare this brief, the brief contains 5,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14 point proportionally spaced roman-style typeface (Times New Roman).

*/s/ Benjamin S. Sharp*
Benjamin S. Sharp

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Unless otherwise noted, 8 paper copies of the brief have been filed with the Court on the same date Express Mail.

*/s/ Benjamin S. Sharp*
Benjamin S. Sharp