**[ORAL ARGUMENT SCHEDULED FOR MARCH 18, 2016]**
**Nos. 14-5326 and 15-5033**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CONFEDERATED TRIBES OF THE GRANDE RONDE COMMUNITY OF OREGON, <br>   Plaintiff-Appellant, <br> CLARK COUNTY, WASHINGTON, et al., <br>   Plaintiffs-Appellants, <br>   v. <br> SALLY JEWELL, in her official capacity as Secretary of the Interior, et al., <br>   Defendants-Appellees, <br> COWLITZ INDIAN TRIBE, <br>   Intervenor-Appellee. | On Appeal from the United States District Court for the District of Columbia <br><br> No. 1:13-cv-849-BJR <br><br> Hon. Barbara J. Rothstein <br> Judge Presiding |

# APPELLANTS' REPLY IN SUPPORT OF ITS MOTION FOR EMERGENCY RELIEF OR IN THE ALTERNATIVE TO EXPEDITE APPEAL

## TABLE OF CONTENTS

                                                                                                       Page

APPELLANTS' REPLY MOTION FOR EMERGENCY RELIEF OR IN
THE ALTERNATIVE TO EXPEDITE APPEAL ....................................................1

        A.      Appellants moved as soon as they could establish
                 irreparable harm .......................................................................................1

        B.      An injunction will prevent further irreparable harm..................4

        C.      The balance of the equities favor Appellants............................8

        D.      The public interest favors an injunction ...................................9

        E.      The Court should not require Appellants to post a bond.........10

CONCLUSION........................................................................................................10

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

                                                                                              **Page**

**CASES**

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ..................................................................... 1

*Coalition for Common Sense in Gov't Procurement v. United States*,
    576 F. Supp. 2d 162 (D.D.C. 2008) .............................................................. 1

*Compare New York v. Shinnecock Indian Nation*,
    280 F. Supp. 2d 1 (E.D.N.Y 2003) ............................................................... 8

*Cronin v. U.S. Dep't of Agric.*,
    919 F.2d 439 (7th Cir. 1990) ...................................................................... 10

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
    766 F.2d 1319 (9th Cir. 1985) .................................................................... 10

*Save Jobs USA v. Dep't of Homeland Sec.*,
    105 F. Supp. 3d 108, 112 (D.D.C. 2015) ..................................................... 1

*Sierra Club v. United States Army Corps of Engineers*,
    990 F. Supp. 2d 9 (D.D.C. 2013) .................................................................. 1

**OTHER AUTHORITIES**

40 C.F.R. § 1506.5(c) ........................................................................................ 2

Fed. R. App. P. 8(a)(2)(E) ............................................................................... 10

Because Appellants have established a likelihood of success on the merits, injunctive relief is necessary to prevent the casino from becoming a fait accompli before this Court rules. Nothing Appellees argue supports a contrary conclusion.

**A.    Appellants moved as soon as they could establish irreparable harm.**

The standard for irreparable harm "is particularly high in the D.C. Circuit." *Save Jobs USA v. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). "To warrant emergency injunctive relief the alleged injury must be certain, great, actual, and imminent." *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) (citation omitted). Further, the injury "must be beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Grading and site preparation do not meet this Circuit's standard. *See e.g., Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (concluding that plaintiffs did not establish that pipeline construction would be "permanent or irreversible"). Given that the Tribe (at 7) does not consider *any* of its construction activities to constitute irreparable harm, had Appellants filed earlier, the Tribe would have objected that its grading and site preparation did not meet this Circuit's irreparable harm standard and that full-scale construction was not imminent, just as the Tribe now argues (at 12-13) that Interchange construction is not imminent because it needs one final approval.

-1-

2. Appellants could not have known that irreparable harm was "certain, great, actual, and imminent" until the Tribe had (1) secured construction financing; and (2) received approvals for the UIC and the Interchange construction. The Tribe argues (at 5-6) that Appellants knew by September that construction would not be delayed by financing, but Appellants are not privy to the Tribe's financing arrangements. Moreover, when the Tribe announced that it had secured financing on December 8, 2015, it called it "a monumental step both for the Cowlitz Tribe and for the Authority as developer and manager, *as we can now proceed with the development*." Mar. 2, 2016 MacLean Decl. ¶ 10 (emphasis added).

The Tribe (at 5) also complains that Appellants waited until after wastewater and Interchange approvals were obtained to request relief. But Appellants had to wait until they could establish that their injury was "certain, great, actual, and imminent." If the Tribe does not like that "delay," blame rests with the Tribe and the NEPA contractor, AES, who recommended to the Secretary that she segment her review process to "reduce[] the responsibility of federal agencies for compliance with local environmental procedural requirements (such as SEPA or County ordinance)." AR123001-04; AR122785.[1] The Secretary adopted their recommendation to "simplify[] the approval of the trust acquisition by reducing the

---

[1] Documents are attached to Suppl. MacLean Decl. ¶¶ 6,7. *See generally* AR122978-123260; AR033841-922 for AES's collaboration with the Tribe without BIA oversight. *See* 40 C.F.R. § 1506.5(c) (requiring "responsible Federal official" to "furnish guidance and participate in the preparation").

number of ancillary approvals required." AR122785. Thus, their strategy may have made the Secretary's path to "approval" easier by segmenting her trust decision from Clean Water Act and Interchange permitting, but it also segmented Appellants' injury, preventing Appellants from seeking injunctive relief earlier.

3. If the Tribe had been genuinely concerned about injunctive relief, it could have been forthcoming about construction plans. It was not. The Tribe cites (at 3) to its June 22 "notice," but that email vaguely states that the Tribe "*may* move forward with some construction." Mar. 2, 2016 MacLean Decl. ¶ 7 (emphasis added). It was clearer on another point, however: "we are no longer obligated to provide notice regarding our timing or plans for the property." *Id.*

And when Appellants asked for information in September, the Tribe only said that "the work currently underway includes grading and site prep, to be followed by excavation and later construction of the gaming facility and tribal buildings."[2] *Id.* ¶ 9. The Tribe did not inform Appellants of any of the specific construction activities it now references (at 4-5). And because the casino site is located in the middle of the 151-acre parcel of sloped agricultural land, construction activities were *not* readily visible, which is why Appellants stated in

---

[2] While the Tribe's construction contractor invited Mark McCauley to review plans before site preparation commenced, Iyall Decl. ¶ 6.b., Ex. A, the Tribe refused to give Appellants detailed information when they requested it.

-3-

September: "We do not know if the planned casino is under construction or whether it is some lesser or temporary structures." *Id.* ¶ 8.

The Secretary curiously cites (at 10) to the Tribe's Environment, Public Health, and Safety ordinance (EPHS), but the EPHS only underscores Appellants' dilemma. Section 4(A) of the EPHS requires the Tribe to appoint a Tribal Enforcement and Compliance Officer (TECO) "before any gaming facility construction commences…." JA2479. The Tribe did not appoint a TECO until December 18, 2015, and did not provide Appellants notice of the TECO until March 2. Iyall Decl. ¶¶ 6.c, 6.d. Ultimately, the Tribe's unwillingness to provide specific information regarding its activities prevented Appellants from being able to establish injury that was "certain, great, actual, and imminent" earlier.

**B.   An injunction will prevent further irreparable harm.**

The Tribe claims (at 7) that Appellants are not being irreparably harmed, while simultaneously arguing (at 8), "there is no way that the parties can be returned to the *status quo ante*." The Tribe's position appears to be that since Appellants have already suffered some harm, why not allow construction to continue until injury is complete? But far *more* construction will occur. The casino is not built; the Parcel has not been paved over with parking lots; wetlands have

-4-

not been converted into detention basins; roads have not been relocated; and the UIC has not been built.[3] *See e.g.*, Mar. 2, 2016 MacLean Dec. ¶ 10.

The Tribe argues (at 8) that the construction has no impact on the character of area because it is "not destroying a pristine agricultural environment." The Secretary similarly contends (at 8) that the construction yet to come will not cause "substantial additional harm to aesthetic interests" and that "the parcel does not qualify for protection under the federal Farmland Protection Policy Act." These comments ignore the transformative nature of the Tribe's development and cannot be seriously credited.[4]

Moreover, the Tribe's claim (at 9) that water impacts are settled is false, precisely because the Secretary made her trust decision before the Tribe sought Clean Water Act approvals. *See supra*, Section A.2. That is why the EIS *does not* evaluate the Tribe's plan to inject treated wastewater and sewage into the ground above the sole source drinking water aquifer for Clark County. Thus, it is curious that the Secretary argues (at 11) that concerns that the UIC will not meet or exceed applicable standards are contrary to the record, *because there is no record* on this

---

[3] This Court and the district court plainly have jurisdiction to order the Tribe to take remedial action.

[4] The Parcel did not "revert" to agricultural zoning, as the Secretary suggests (at 7). The County redesignated the land as agricultural in 2012.

issue.[5] And for the Tribe to fault (at 11) the County for not following the EPHS process when it did not notify the County of its existence until March 2 (*after* the County informed the Tribe that it was in violation of the EPHS) is disingenuous. *See supra*, Section A.3.

The Secretary (at 13) is also incorrect that Appellants do not allege harm from the Interchange construction. The Gilberts, for example, allege harm from the increase in impervious surfaces, stormwater detention and discharges to surface water from the Interchange, which will eliminate groundwater discharge in the entire area. Gilbert Decl. ¶ 13. Weber alleges that the Interchange will decrease natural discharge and increase contaminated UIC recharge. Weber Decl. ¶ 13.

The Secretary's and the Tribe's dismissive treatment of Appellants' environmental and jurisdictional concerns in their oppositions is simply the continuation of a long-standing problem. AES contempt for Appellants' environmental (and other) concerns during the NEPA process, as well as its cozy relationship with the Tribe, are evident in its internal comments it shared with the Tribe. When a commenter raised jurisdictional concerns about the project, for example, AES commented, "Yeah, that is the nice thing about it becoming Indian land, it removes it from the civil jurisdiction of locals." AR101726. And when

---

[5] The Tribe also argues (at 11) that there is no evidence that the UIC will harm the aquifer, even though Eric Weber submitted an expert report documenting such harm to EPA.

-6-

questions about the adequacy of the Troutdale aquifer to meet the Tribe's water needs were raised, AES dismissed those concerns: "This is [Clark County Public Utility]'s problem since we do not specify how CPU is going to find the water." AR101753; *see also* AR101685. When questions were raised about the project's consistency with the State's Growth Management Act, AES wrote, "Consistency is the hobgoblin of small minds." AR101725.

AES moved from dismissive to derisive in response to concerns raised about the effect of discharged wastewater and stormwater on the unnamed stream that runs through the Gilberts' property and its habitat: "important habitat for what, teenagers seeking hormonal readjustment?" AR101727. When a commentor raised a question about cultural resources on the Parcel, AES responded, "OK, what a moron, but tell him." AR101736. And when asked whether the Secretary failed to consult with Grand Ronde regarding cultural resources, AES commented, "Ask them if they are maintaining that the site is a culturally important potato field." AR101743. Neither AES nor the Tribe took seriously Appellants' environmental and jurisdictional concerns—concerns that are now playing out as a consequence of the construction.

The Secretary takes a different tack, arguing (at 4) that Appellants' environmental injuries "are not part of the merits claims … raised on appeal." But of course they are. Construction would not occur *but for* the Secretary's trust

decision; as the Tribe acknowledges (at 7-8), the trust acquisition "pav[ed] the way for the Tribe to develop its property." Appellants also argue on appeal that the Secretary violated various statutes, including the APA and NEPA, by relying on unconfirmed enrollment numbers to inflate the Tribe's economic need. County Brief (Oct. 9, 2015) at 27-38. Appellants contend that the Secretary's unquestioning reliance on the Tribe's representations of economic need and expanded membership to exclude reasonable alternatives from consideration violated NEPA.[6] If, as AES states, "the majority of the Tribal members are scattered and not in Clark County to be able to take advantage of either governmental programs or the strengthened Tribal Government," then the Secretary's blind reliance on the Unmet Needs Report, which the Tribe calculated on a per capita basis, violated NEPA's alternatives requirement. AR123071.

## C.  The balance of the equities favor Appellants.

The Tribe's purported economic need does not outweigh Appellants' injury. *Compare New York v. Shinnecock Indian Nation*, 280 F. Supp. 2d 1 (E.D.N.Y 2003) (enjoining casino construction because environmental harm to communities vastly outweighed harm to tribe from a delay in casino development). The Tribe

---

[6] Appellants argue that the Secretary's failure to address their questions regarding the Tribe's enrollment expansion—i.e., how that expansion affects her authority, the potential for fraud, manipulation of the NEPA alternatives review, and abuse of the trust process—violated the APA. *See* Supp. MacLean Decl. ¶ 4. By failing to provide *any* explanation regarding this issue, Appellants have been denied the opportunity to address legal deficiencies in her reasoning (if any) before this Court.

argues (at 16) that it needs revenues to fund services and programs for its now "nearly 4,000 members." But there is no immediacy to that need; to the extent that individual members are in crisis, they may avail themselves of generally available Federal and state programs. Ultimately, "[t]he primary beneficiary of the project is the Cowlitz Tribe as a corporate body, not the individual tribal members." AR101701. And the Tribe can take advantage of other economic opportunities, including gaming. The Tribe's gaming compact authorizes it to lease 1,125 slot machines to other tribal casinos, allowing it to generate gaming revenues before (or in lieu of) opening any casino. Supp. MacLean Decl. ¶ 3; *see also id.* ¶ 5.

In any case, the Tribe concedes (at 15) that it "understood and accepted the risk that this Court might reverse the District Court's decision." In other words, the Tribe knows that this Court can stop construction. The Tribe claims (at 15) that the risk of reversal is a very different risk than an injunction, but fails to explain why that is so—in either case, the result would be the same. The equities favor stopping construction now, rather than when the Court issues its final opinion.

### D. The public interest favors an injunction.

The Tribe asserts (at 18) that the public interest would be disserved by an injunction because, it says, IGRA has established a policy in favor of tribal gaming and because a court should "not delay implementation of agency action." Both of those theories are derivative of the Tribe's flawed arguments on the merits. As

-9-

explained in the parties' briefs, gaming in these circumstances is inconsistent with IGRA. And the public interest would hardly be promoted by accelerating the implementation of agency action that is contrary to law.

**E.    The Court should not require Appellants to post a bond.**

This Court has the discretion to decide whether to require a bond: "The court *may* condition relief upon a party's filing a bond or other appropriate security in the district court," Fed. R. App. P. 8(a)(2)(E) (emphasis added). It should not require one here for two reasons. First, a court may "dispense with the security requirement, or . . . request mere nominal security, where requiring security would effectively deny access to judicial review." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985); *see also Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 445 (7th Cir. 1990) (noting that "a number of environmental decisions . . . waive the requirement or allow the posting of a nominal bond"). Because Appellants cannot post the requested bond, requiring one would effectively deny them a meaningful remedy if they prevail. Second, "the likelihood of success on the merits" is a factor that "tips in favor of a minimal bond or no bond at all." *Van De Kamp*, 766 F.2d at 1326.

## CONCLUSION

For the forgoing reasons, Appellants respectfully request that the Court enjoin further construction until such time as it rules on the pending appeal.

-10-

Dated: March 17, 2016

Respectfully submitted,

**PERKINS COIE LLP**

By: */s/ Benjamin S. Sharp*
　　Jennifer A. MacLean
　　Benjamin S. Sharp
　　Donald C. Baur
　　JMacLean@perkinscoie.com
　　700 Thirteenth Street, N.W.
　　Suite 600
　　Washington, D.C. 20005-3960
　　Telephone: 202.654.6200
　　Facsimile: 202.654.6211

　　Christine M. Cook
　　Sr. Deputy Prosecuting Attorney
　　Clark County Prosecuting Attorney's Office
　　Civil Division
　　P.O. Box 5000
　　Vancouver, WA 98666
　　Telephone: 360.397.2478
　　Christine.Cook@clark.wa.gov

Attorneys for Appellants Clark County Washington, Citizens Against Reservation Shopping, Al Alexanderson, Greg and Susan Gilbert, Dragonslayer, Inc., and Michels Development LLC

# CERTIFICATE OF SERVICE

I, Benjamin S. Sharp, certify that on March 17, 2016, I electronically filed the foregoing Appellants' Reply In Support of Its Motion for Emergency Relief or in the Alternative to Expedite Appeal, and accompanying declaration, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to attorneys of record. I further certify that on March 17, 2016 paper copies will be hand delivered to the following:

| | |
|---|---|
| V. Heather Sibbison<br>Suzanne R. Schaeffer<br>Kenneth J. Pfaehler<br>DENTONS US LLP<br>1301 K Street, N.W.<br>Suite 600 East Tower<br>Washington, D.C. 20005<br>Telephone: (202) 408-6400<br>Facsimile: (202) 408-6399<br>heather.sibbison@dentons.com | John L. Smeltzer<br>Gina Allery<br>Kristofor Swanson<br>U.S. DEPARTMENT OF JUSTICE<br>Environmental & Natural Resources Division<br>601 D Street, N.W.<br>3rd Floor – Room 3507<br>Washington, D.C. 20044<br>Telephone: (202) 305-0343<br>john.smeltzer@usdoj.gov |
| | Robert Luskin<br>PAUL HASTINGS LLP<br>875 15th Street, N.W.<br>Washington, D.C. 20005<br>Telephone: (202) 551-1966<br>Facsimile: (202) 551-0466<br>robertluskin@paulhastings.com |

*/s/ Benjamin S. Sharp*
Benjamin S. Sharp